**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-65.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-65

LEAGUE OF WOMEN VOTERS OF OHIO ET AL. *v*. OHIO REDISTRICTING COMMISSION ET AL.

BENNETT ET AL. *v*. OHIO REDISTRICTING COMMISSION ET AL.

OHIO ORGANIZING COLLABORATIVE ET AL. *v*. OHIO REDISTRICTING COMMISSION ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-65.]**

*Redistricting—Original actions under Ohio Constitution, Article XI—The Ohio Redistricting Commission did not attempt to meet the standards set forth in Article XI, Section 6 of the Ohio Constitution in passing the General Assembly–district plan—Plan invalid—The Ohio Redistricting Commission shall be reconstituted, convene, and adopt a plan in conformity with the Ohio Constitution.*

(Nos. 2021-1193, 2021-1198, and 2021-1210—Submitted December 8, 2021—Decided January 12, 2022.)

ORIGINAL ACTIONS filed pursuant to Ohio Constitution, Article XI, Section 9.

_____

**STEWART, J.**

{¶ 1} Respondent Ohio Redistricting Commission adopted a General Assembly–district plan in September 2021 to be effective for the next four years. The complaints in these three cases allege that the plan is invalid because the commission did not comply with Article XI, Sections 6(A) and 6(B) of the Ohio Constitution, which require the commission to attempt to draw a plan that meets standards of partisan fairness and proportionality. In one case, the challengers also allege that the plan violates the Ohio Constitution's guarantees of equal protection, assembly, and free speech.

{¶ 2} We hold that the plan is invalid because the commission did not attempt to draw a plan that meets the proportionality standard in Article XI, Section 6(B). We also conclude that the commission did not attempt to draw a plan that meets the standard in Section 6(A)—that no plan shall be drawn primarily to favor a political party. Because we declare the plan invalid under these sections, we do not decide whether the plan also violates the rights to equal protection, assembly, and free speech guaranteed under the Ohio Constitution. We order the commission to be reconstituted and, within ten days of this judgment, to adopt a new plan in conformity with the Ohio Constitution.

## I. BACKGROUND

### A. Overview of Article XI of the Ohio Constitution

{¶ 3} In *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, we rejected a challenge to the 2011 apportionment of General Assembly districts adopted under a former version of Article XI of the Ohio Constitution. We stated that former Article XI did not require political neutrality, politically competitive districts, or representational fairness in the creation of state legislative districts. *Id.* at ¶ 14. Accordingly, we held that there was nothing

unconstitutional about the apportionment board—the body then responsible for drawing the state legislative-district maps—considering partisan factors in its apportionment. *Id.* at ¶ 13-14. The General Assembly–district map that we upheld in *Wilson* was in effect through the 2020 general election.

{¶ 4} In November 2015, Ohio voters overwhelmingly approved an amendment to the Ohio Constitution that repealed former Article XI and replaced it with a new version, which established a new process for creating General Assembly districts. The amendment provided for the creation of a seven-member Ohio Redistricting Commission, composed of the governor, the auditor of state, the secretary of state, one person appointed by the speaker of the House of Representatives, one person appointed by the House minority leader, one person appointed by the Senate president, and one person appointed by the Senate minority leader. Ohio Constitution, Article XI, Section 1(A). The commission is responsible for redistricting the boundaries of the 99 districts of the House of Representatives and the 33 Senate districts in any year ending in the numeral one—after the release of the federal decennial census.[1] *Id.* at Section 1(C). The commission "shall draft the proposed plan in the manner prescribed in" Article XI. *Id.*

{¶ 5} Article XI of the Ohio Constitution imposes various requirements for a General Assembly–district plan. For example, Section 3(A) provides that the state's population is to be divided by 99 and by 33 and that those "quotients shall be the ratio of representation in the house of representatives and in the senate, respectively." Section 3(B)(1) specifies that no district shall contain a population of less than 95 percent or more than 105 percent of the applicable ratio of representation set forth in Section 3(A). Section 3(B)(2) provides that a General Assembly–district plan "shall comply with all applicable provisions of the

---

1. If the federal decennial census "is unavailable," Article XI, Section 3(A) of the Ohio Constitution provides an alternative way to determine the state's population by "such other basis as the general assembly may direct."

constitutions of Ohio and the United States and of federal law." Sections 3(C), (D), and (E) control the complex process for creating and numbering House districts, with rules relating to the splitting of counties, municipal corporations, and townships. Section 4 controls the process for drawing Senate districts, and Section 5 relates to senators whose district boundaries change due to redistricting under Article XI before their terms expire.

{¶ 6} Of particular relevance to this litigation, Section 6 provides:

> The Ohio redistricting commission shall attempt to draw a general assembly district plan that meets all of the following standards:
>
> (A) No general assembly district plan shall be drawn primarily to favor or disfavor a political party.
>
> (B) The statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio.
>
> (C) General assembly districts shall be compact.
>
> Nothing in this section permits the commission to violate the district standards described in Section 2, 3, 4, 5, or 7 of this article.

Ohio Constitution, Article XI, Section 6.

{¶ 7} The commission must adopt a final plan under Section 1(C) by September 1 of any year ending in the numeral one. To adopt a plan under Section 1(C), at least two members of each of the two largest political parties represented in the General Assembly must be in the majority voting for the plan. Ohio Constitution, Article XI, Section 1(B)(3). A plan adopted under Section 1(C) is effective for ten years. *See* Ohio Constitution, Article XI, Section 1(C) (the

governor must convene the commission only in a year ending in the numeral one, a plan is effective upon filing with the secretary of state, and the commission is automatically dissolved four weeks after adoption of a General Assembly–district plan or congressional-district plan, whichever is later).  But if the commission does not meet the September 1 deadline to adopt a plan by the requisite bipartisan vote, Section 8 provides an alternative route for adopting a final plan—what the parties here refer to as an "impasse procedure."

{¶ 8} Under the impasse procedure, the commission must introduce a district plan proposed by a simple majority vote of the commission, hold a public hearing on the proposed plan, and adopt a final plan no later than September 15. Ohio Constitution, Article XI, Section 8(A)(1) through (3).  If the majority adopting the plan includes at least two members of each political party, the plan will remain in effect for ten years.  *Id.* at Section 8(B).  Without that level of bipartisan support, the plan will remain in effect "until two general elections for the house of representatives have occurred under the plan"—i.e., four years.  *Id*. at Section 8(C)(1)(a).  If the commission adopts a four-year plan, the plan must include a statement explaining

> what the commission determined to be the statewide preferences of the voters of Ohio and the manner in which the statewide proportion of districts in the plan whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party corresponds closely to those preferences, as described in division (B) of Section 6 of this article.

*Id.* at Section 8(C)(2).

{¶ 9} Under Section 9(A), this court has "exclusive, original jurisdiction in all cases arising under" Article XI.

## B. Factual background and procedural history

*1. The commission, the map-drawing process, and the September 1 deadline*

{¶ 10} On August 6, 2021, the governor convened the first meeting of the Ohio Redistricting Commission. *See* Ohio Constitution, Article XI, Section 1(C). The commission consisted of respondents Governor Mike DeWine, Secretary of State Frank LaRose, Auditor of State Keith Faber, Speaker of the House Robert Cupp, and President of the Senate Matthew Huffman—who are members of the Republican party—and House Minority Leader Emilia Sykes and Senator Vernon Sykes—who are members of the Democratic party. House Speaker Cupp and Senator Sykes were appointed as commission cochairs. Other than administering oaths of office and announcing that the commission would schedule public hearings, the commission did not conduct any business on August 6.

{¶ 11} Between August 23 and August 27, the commission held multiple hearings during which members of the public gave input about the redistricting process.

{¶ 12} The commission held its second meeting on August 31—one day before the deadline to adopt a final district plan. *See* Ohio Constitution, Article XI, Section 1(C). Senator Sykes presented a proposed district plan drafted by the Senate Democratic Caucus. After a presentation by a map drawer from the caucus, the commission members had a discussion that suggested that they had not yet agreed on a process for drafting a district plan. House Minority Leader Sykes asked when the commission intended to present a proposed plan for public comment. House Speaker Cupp replied that a district plan was "being developed" but would not be available by the September 1 deadline due to a delay in receiving census data. Leader Sykes asked who was participating in drafting that plan and when she could expect to participate in the process. She also quoted the portion of Section 1(C) stating that the "commission shall draft the proposed plan."

{¶ 13} House Speaker Cupp explained that the commission itself would not be drafting a plan, that anyone may present a plan for consideration, and that he did not know when other maps would be presented but that the commission had a September 15 deadline. Senate President Huffman stated that the Republican members of the Senate were working on a proposal. He also expressed his expectation that each of the legislative caucuses would present a proposed plan and that the commission would then consider those proposals along with plans submitted by the public. The commission adjourned without adopting a plan by the September 1 deadline.

### 2. *The commission adopts a proposed plan on September 9*

{¶ 14} On September 8, the commission announced that it would meet at 10:00 a.m. and 2:00 p.m. the following day.

{¶ 15} At the 10:00 a.m. meeting, Senate President Huffman offered a proposed plan and introduced Ray DiRossi and Blake Springhetti, who worked for the Senate and House Republican Caucuses, respectively, to talk about the proposal. Senator Sykes asked DiRossi how the plan satisfied the requirements of Article XI, Section 6(B), the standard regarding whether the partisan proportion of the plan closely corresponds to the statewide preference of voters. DiRossi stated that their proposal complied with all constitutional requirements but also noted that their analysis of election data was not yet complete and was "ongoing." Leader Sykes asked how the proposal complied with the Voting Rights Act. DiRossi indicated that the legislative leaders had instructed them not to use racial or demographic data and that therefore, they did not do so.

{¶ 16} At the 2:00 p.m. meeting, Senate President Huffman moved the commission to select the plan introduced by the Republican caucuses as the commission's proposed plan. Senator Sykes and House Minority Leader Sykes expressed concerns, including that the map drawers had not considered the proportionality provision in Article XI, Section 6(B). Other members expressed

their beliefs that Senate President Huffman's plan was merely a "first draft" and that the commission members could now start negotiations. The commission voted five to two, along party lines, to introduce Senate President Huffman's plan as the commission's proposed plan.

*3. The commission adopts a four-year plan on September 16*

{¶ 17} On September 12, 13, and 14, the commission held lengthy public hearings regarding its proposed plan. During the September 13 hearing, Senator Sykes and House Minority Leader Sykes offered an amendment that they believed would move the plan closer to the proportionality standard articulated in Article XI, Section 6(B).

{¶ 18} On the morning of September 15, the commission commenced its final meeting. Senate President Huffman immediately moved for a recess until 3:00 p.m. so that the members could continue consulting with each other. The commission, however, did not reconvene until approximately 11:15 p.m.

{¶ 19} Upon reconvening, Senate President Huffman introduced an amendment to the commission's proposed plan. He stated that the changes were based on conversations between commission members and feedback from the public hearings. He also noted that his amendment would move the commission's proposed plan closer to the amended plan offered by the Sykeses on September 13. Senate President Huffman opined that the commission's proposed plan, with his amendment, was the only submitted plan that met Article XI's requirements.

{¶ 20} The commission voted five to two, along party lines, to adopt the amendment. Senate President Huffman then moved the commission to adopt his amendment as the final plan. Senator Sykes and House Minority Leader Sykes gave lengthy statements explaining why they would be voting against the plan.

{¶ 21} Secretary LaRose expressed disappointment in the commission's failure to reach a ten-year plan. He stated:

I'm casting my yes vote with great unease. I fear, I fear we're going to be back in this room very soon. This map has many shortcomings, but they pale in comparison to the shortcomings of this process. It didn't have to be this way. It didn't have to be this way. Some of us worked in good faith, in a bipartisan way, to try to get a compromise. There are members of this committee who I do not believe worked in good faith to try to reach that compromise, but here we are.

{¶ 22} Governor DeWine similarly stated that he was disappointed and "very, very sorry" about where the commission ended up. He said:

I will vote to send this matter forward. But it will not be the end of it. We know that this matter will be in court. I'm not judging the bill one way or another. That's up for, up to a court to do. What I do, what I am sure in my heart is that this committee could have come up with a bill that was much more clearly, clearly constitutional. I'm sorry we did not do that.

{¶ 23} Auditor Faber also expressed disappointment about the process. He noted that "the reality is, compared to some of the other maps we've had a choice to go with, this map isn't that bad. It's not that good either." He intended to "vote yes with some apprehension."

{¶ 24} Sometime after midnight on September 16, the commission voted five to two, along party lines, to adopt the amendment as its final General Assembly–district plan. President Huffman estimated that under the plan, 62 seats in the Ohio House of Representatives would lean in favor of Republican candidates and 37 seats would lean in favor of Democratic candidates. In the Ohio Senate,

they estimated that 23 seats would lean Republican and 10 seats would lean Democratic.

*4. The commission adopts a statement required under Article XI, Section 8(C)(2)*

{¶ 25} After the vote, Senate President Huffman moved for the adoption of a statement, required under Article XI, Section 8(C)(2), explaining what the commission determined to be the statewide preferences of Ohio voters and how the commission's plan corresponded to those preferences. The statement indicated that after considering the results of 16 statewide state and federal partisan elections in the preceding ten years,

> the Commission determined that Republican candidates won thirteen out of sixteen of those elections resulting in a statewide proportion of voters favoring statewide Republican candidates of 81% and a statewide proportion of voters favoring statewide Democratic candidates of 19%. When considering the number of votes cast in each of those elections for Republican and Democratic candidates, the statewide proportion of voters favoring statewide Republican candidates is 54% and the statewide proportion of voters favoring statewide Democratic candidates is 46%. Thus, the statewide proportion of voters favoring statewide Republican candidates is between 54% and 81% and the statewide proportion of voters favoring statewide Democratic candidates is between 19% and 46%. * * * [T]he Commission adopted the final general assembly district plan, which contains 85 districts (64.4%) favoring Republican candidates and 47 districts (35.6%) favoring Democratic candidates out of a total of 132 districts. Accordingly, the statewide proportion of districts whose voters favor each political party corresponds closely to the statewide preferences of the voters of Ohio.

The statement further noted that the final plan complied with all the "mandatory requirements" in Sections 2, 3, 4, 5, and 7 and that the commission's "attempt to meet the aspirational standards" of Section 6 did not result in any violation of the "mandatory requirements."

{¶ 26} House Minority Leader Sykes submitted a statement on behalf of herself and Senator Sykes. Among other things, their statement opined that the commission's final plan failed to comply with Section 6 and that the majority's statement laid out an "absurd description of how it allegedly meets the requirements of Section 6(B)."

{¶ 27} The commission then accepted the majority's Section 8(C)(2) statement.

*5. Petitioners file three actions in this court*[2]

{¶ 28} Within 12 days of the commission's having adopted its final plan, three separate lawsuits were filed in this court against the commission and its members. First, the League of Women Voters of Ohio, the A. Philip Randolph Institute of Ohio, and six individual voters[3] filed a complaint alleging that the plan violates Sections 6(A) and 6(B) of Article XI. Second, ten individual voters[4] filed a complaint similarly alleging that the commission's plan violates Sections 6(A) and 6(B). Third, the Ohio Organizing Collaborative ("OOC"), the Ohio chapter of the

---

2. The parties refer to themselves as relators and respondents. However, these actions were not brought in the name of the state. *See* R.C. 2731.04; S.Ct.Prac.R. 12.03 (the party filing an action in mandamus, prohibition, procedendo, or quo warranto is referred to as a "relator"). Therefore, this opinion will refer to the parties bringing the actions as "petitioners."

3. The six voters in case No. 2021-1193 are Tom Harry, Tracy Beavers, Valerie Lee, Iris Meltzer, Sherry Rose, and Bonnie Bishop.

4. The ten voters in case No. 2021-1198 are Bria Bennett, Regina C. Adams, Kathleen M. Brinkman, Martha Clark, Susanne L. Dyke, Carrie Kubicki, Meryl Neiman, Holly Oyster, Constance Rubin, and Everett Totty.

Council on American-Islamic Relations, the Ohio Environmental Council, and six individual voters[5] filed a complaint, also alleging that the commission's plan violates Sections 6(A) and 6(B). The third group further alleges that the plan violates Section 3(B)(2), which requires the plan to "comply with all applicable provisions of the constitutions of Ohio and the United States and of federal law."

{¶ 29} Pursuant to a court-ordered schedule, the parties conducted discovery and submitted evidence and merit briefing. *See* 164 Ohio St.3d 1450, 2021-Ohio-3424, 173 N.E.3d 1248; 164 Ohio St.3d 1457, 2021-Ohio-3607, 174 N.E.3d 805. This court heard oral arguments in the cases on December 8, 2021. Following oral arguments, we sua sponte ordered the parties to file supplemental briefs on the question whether Article XI, Section 8(C)(1) of the Ohio Constitution has any effect on this court's authority to grant the relief requested by petitioners. 165 Ohio St.3d 1476, 2021-Ohio-4381, 177 N.E.3d 986; 165 Ohio St.3d 1476, 2021-Ohio-4381, 177 N.E.3d 986; 165 Ohio St.3d 1476, 2021-Ohio-4381, 177 N.E.3d 987. The parties filed their supplemental briefs on December 16 and 17.

## C. Evidence

{¶ 30} As evidence, the parties filed ten depositions, nine expert reports, multiple fact affidavits, and a voluminous number of additional documents. This evidence elucidates the activity that took place both before and in between the commission meetings.

### 1. *The commission's role in drawing a plan*

{¶ 31} The commission had no employees and did not itself engage in any map drawing. Instead, each pair of legislative caucuses was allocated $150,000 for redistricting purposes. Later, the Democratic caucuses requested and received an additional $200,000. No funds were allocated to the governor, the secretary of state, or the auditor.

---

5. The six voters in case No. 2021-1210 are Pierrette Talley, Samuel Gresham Jr., Ahmad Aboukar, Mikayla Lee, Prentiss Haney, and Crystal Bryant.

{¶ 32} The expectation—at least for the majority of the commission members—was that the legislative caucuses would draft and propose maps and that the commission members would thereafter negotiate and adopt a final plan. For example, Governor DeWine believed that the best way to adopt a ten-year plan was for the Democratic and Republican members of the commission to each come forward with their own maps "and then see where everybody was and then [he would] be a person that could try and pull this together." Senator Sykes and House Minority Leader Sykes, however, believed that the commission itself, not the political caucuses, should draw the maps. Secretary LaRose and Auditor Faber expected the caucuses to draw the initial maps, but they also assumed that they would have access to map-drawing software. Secretary LaRose also expected that he would have access to the map drawers.

### 2. Delays in receiving census data

{¶ 33} Although the United States Census Bureau was required to release Ohio's population data by April 1, 2021, it did not do so until August 12. The delay required the commission to adopt a plan under a significantly shortened timeframe. In June 2021, House Minority Leader Sykes and Senate Minority Leader Kenny Yuko asked Governor DeWine to convene the commission—despite the census delays—in order to address preliminary issues such as staffing and the adoption of procedural rules. The governor did not do so, because he did not see a reason to convene the commission long before the receipt of the census data.

### 3. The map drawers: DiRossi and Springhetti

{¶ 34} Senate President Huffman and House Speaker Cupp oversaw the process of drawing the district plan that the commission ultimately adopted. Senate President Huffman assigned DiRossi, the finance director for the Ohio Senate, and House Speaker Cupp assigned Springhetti, the finance director for the Ohio House of Representatives, as the map drawers. Springhetti had no prior map-drawing experience, but DiRossi was actively involved in drawing the maps for the 2001

and 2011 apportionment processes. Senate President Huffman did not think that hiring outside consultants was necessary, because according to him, DiRossi "might be the most qualified person in the United States."

{¶ 35} Before receiving the census data for their work on the map, Springhetti and DiRossi obtained licenses for Maptitude, mapping software that would help them design and draw districts. After receiving the census data, they began the map-drawing process.

### 4. Instructions to the map drawers

{¶ 36} Senate President Huffman and House Speaker Cupp instructed DiRossi and Springhetti to comply with certain provisions of the Constitution, but they did not instruct the map drawers to comply with Article XI, Section 6.

{¶ 37} Senate President Huffman testified during his deposition that because Article XI, Section 6 "is not mandatory" but is "aspirational," he did not have any specific conversations with DiRossi about that section. In distinguishing between mandatory and aspirational provisions in Article XI, Senate President Huffman explained: "Mandatory means you have to do it; aspirational means you don't. And of course that's why the word 'attempt' is in [Section 6]." When asked whether he "understood that as a commissioner [he] had a mandatory obligation to attempt to do the items that are listed in 6(A), (B), and (C)," Senate President Huffman responded, "No, I don't think that's correct." He believed that his "job was to attempt to draw a ten-year map through sincere and active negotiations with the other side." DiRossi testified that he did not know how to interpret Section 6, that Senate President Huffman told him not to focus on it, and that it was not DiRossi's "responsibility."

{¶ 38} According to Springhetti, House Speaker Cupp identified the mandatory sections of Article XI as Sections 2, 3, 4, 5, and 7. Springhetti did not have any communications with House Speaker Cupp about the meaning of "attempt" in Section 6. House Speaker Cupp testified that he was focused on the

14

"line drawing part" and the population requirements; he acknowledged that he did not specifically instruct Springhetti to follow or "look at Section 6." House Speaker Cupp believed that he had complied with Section 6 by attempting to negotiate with the Democratic members of the commission after the Republican-drawn plan was introduced on September 9.

### 5. *Access to the map drawers*

{¶ 39} Throughout the process, DiRossi and Springhetti reported their progress to Senate President Huffman and House Speaker Cupp, who occasionally visited the map drawers' office to view information on their computer screens. Other commission members had no direct access to DiRossi and Springhetti and had no role in drafting or creating the maps adopted by the commission. This frustrated some of the commission members, especially Secretary LaRose, who testified that he repeatedly asked to collaborate with, and have access to, the Republican-designated map drawers but was excluded from the process.

### 6. *Consideration of partisan data*

{¶ 40} In their depositions, DiRossi and Springhetti explained that when using Maptitude to draw district boundaries, a display window appeared on the computer screen showing information about the proposed district, including the partisan leaning of the district. When they changed the district's lines, that information also would change.

{¶ 41} DiRossi claims that he had not yet completed a partisan analysis of the Republicans' proposed plan before it was introduced at the commission's September 9 meeting. Therefore, when Senator Sykes inquired about the plan's compliance with Article XI, Section 6(B) on September 9, DiRossi answered that the analysis was "ongoing." DiRossi testified that he was unsure whether he ever completed that analysis; after the September 9 meeting, his focus shifted to supporting Senate President Huffman in his negotiations with the other commission members.

15

{¶ 42} Senate President Huffman testified that when the commission met on September 9, he was unaware of the proportion of districts that favored each political party and had not conducted his own analysis regarding whether the plan complied with Article XI, Section 6(B). The partisan breakdown of the plan became more important, Senate President Huffman said, when negotiating with the Democratic members of the commission. After September 9, Senate President Huffman asked DiRossi to change some Senate districts from Republican-leaning to Democratic-leaning and some competitive districts to Democrat-leaning in his effort to obtain a ten-year map.

{¶ 43} House Speaker Cupp and Springhetti similarly testified that before the September 9 plan was introduced, they had some conversations about the political leanings of certain House districts, but Springhetti had not yet analyzed—and they had not discussed—the overall partisan makeup of the plan. After September 9, Springhetti determined the number of seats favoring each political party. House Speaker Cupp testified that after receiving the expected partisan breakdown, he was surprised by the number of Republican-leaning House districts and was concerned that it would be unacceptable to the Democratic commission members. Out of 99 House districts, 67 leaned Republican.[6]

### 7. The Democratic caucuses also draw plans

{¶ 44} The Senate Democratic Caucus contracted with Project Govern—owned by Christopher Glassburn—to provide redistricting services. The House Democratic Caucus contracted with HaystaqDNA. According to Glassburn, very few of HaystaqDNA's suggestions were incorporated in the final maps proposed by the Democratic caucuses. The Democratic caucuses' maps were proposed to the other commission members on August 31, September 1, September 13, and

---

6. Currently, the Ohio House of Representatives consists of 64 Republican members and 35 Democratic members. *See* Ohio House of Representatives, 134th General Assembly, available at https://ohiohouse.gov/members/directory (accessed Dec. 21, 2021) [https://perma.cc/5ABV-TQ43].

September 15. After the Democratic commission members proposed their initial map, Secretary LaRose and Auditor Faber met with Glassburn and Democratic staffers. Senator Yuko and Senator Sykes asked Glassburn to integrate as many of Secretary LaRose's and Auditor Faber's requested changes as possible.

*8. The commission members' final negotiations*

{¶ 45} Although accounts vary about the sincerity of the negotiations, most commission members testified that between September 9 and 15, they met with other members of the commission with the goal of compromising to adopt a ten-year bipartisan map. The negotiations centered mostly around the acceptable number of Democratic- and Republican-leaning seats in the House of Representatives.

{¶ 46} All parties agreed that in statewide partisan elections over the past decade, Republican candidates had won 54 percent of the vote share and Democratic candidates had won 46 percent of the vote share. The Democrats' August 31 proposed plan almost exactly mirrored those percentages, with 44 out of 99 House seats leaning Democratic and 55 out of 99 House seats leaning Republican. By contrast, the Republicans' proposed plan—which the commission adopted as its proposed plan—predicted 32 Democratic-leaning House seats and 67 Republican-leaning House seats. The Sykeses' September 13 proposal decreased the number of Democratic-leaning House seats from their initial plan of 44 to 42 and increased the number of Republican-leaning House seats from 55 to 57.[7]

{¶ 47} At some point on September 14 or 15, House Speaker Cupp and Senate President Huffman circulated a proposed amendment reducing the number of Republican-leaning House seats from 67 to 62 and increasing the number of

---

7. The Sykeses also circulated a proposal on September 15, incorporating changes to certain district lines suggested by Secretary LaRose and Auditor Faber. But the partisan percentage breakdown did not change from the Sykeses' September 13 proposed plan. The Sykeses' September 15 proposal was not formally submitted during a commission meeting.

Democratic-leaning House seats from 32 to 37. According to House Speaker Cupp, they were prepared to go even further, but the Sykeses stopped negotiating. Senate President Huffman testified that they waited all day on September 15 for a counteroffer, but Senator Sykes and House Minority Leader Sykes refused to participate—even though Huffman's amendment had moved closer to the Democrats' proposal.

{¶ 48} Secretary LaRose, Auditor Faber, and Governor DeWine testified that in those final days, they attempted to mediate between the Republican and Democratic legislative camps but eventually concluded that neither side would budge from their positions. Secretary LaRose believed that the four legislative leaders were the least open to compromise. Auditor Faber believed that some commission members were posturing for litigation. He also testified that House Minority Leader Sykes had essentially shut down the negotiations by the night of September 14.

{¶ 49} For their part, both Senator Sykes and House Minority Leader Sykes believed that they had already compromised by accepting less than the Democratic-leaning proportion of the statewide voter share and that to agree to even fewer seats might be contrary to Article XI, Section 6. Leader Sykes testified that Governor DeWine had asked her if there was a specific number of seats that she would be willing to vote for but that she told him that her goal was to comply with Article XI, Section 6. Leader Sykes inquired whether Governor DeWine, Secretary LaRose, and Auditor Faber would be willing to "break ranks" with the Republican legislative leaders to join the Democratic commission members and adopt a ten-year plan. Auditor Faber acknowledged that Leader Sykes had suggested that idea, but he did not believe that such a deal was possible; he believed that the better approach was for Senate President Huffman, House Speaker Cupp, Leader Sykes, and Senator Sykes—the commission's legislative-branch members—to compromise.

{¶ 50} Senator Sykes was particularly frustrated with Secretary LaRose. According to the senator, the secretary admitted that Senate President Huffman's plan was unfair but said that he would not vote against his Republican colleagues. When the Sykeses realized that the statewide officeholders were unwilling to vote contrary to the Republican legislative leaders, they saw no reason to continue negotiating.

### 9. The Article XI, Section 8(C)(2) statement

{¶ 51} According to Senate President Huffman, when it became clear that the commission likely would be passing a four-year map, someone on his staff—it is unclear who—drafted the statement required under Article XI, Section 8(C)(2). Regardless of who drafted the statement, Senate President Huffman acknowledged that at some point, he suggested the idea of using the number of statewide elections won by Republican candidates over the last ten years—i.e., the 81 percent figure— as a way of determining the statewide preference of voters under Section 6(B). But he stated that he did not know that this idea would be included in the Section 8(C)(2) statement until the afternoon of September 15. Senate President Huffman also testified that September 15 was when he first learned what percentages of seats favoring each political party's candidates would be included in the statement.

{¶ 52} Governor DeWine had no role in drafting the Section 8(C)(2) statement and although he agreed with some of the statement's rationale, he did not believe that 81 percent was "any kind of mark that would indicate statewide preferences." But the governor voted for the statement because, he said, "it was the rationale that had been put forward by [the] [R]epublican legislative leaders." Secretary LaRose did not see the statement until one minute before voting on it and was not involved in drafting it. He voted in favor of the statement, he noted, merely to accept it into the record—not because he agreed with it. In a text-message exchange with his chief of staff before the vote, Secretary LaRose called the

statement "asinine," adding that it was the "second asinine thing I'm voting for tonight."

### D. Legislative history of Issue 1

{¶ 53} In addition to evidence relating to the commission's adoption of the plan, the parties also included evidence relating to the passage of Issue 1, the 2015 ballot issue approving the amendment of Article XI of the Ohio Constitution. Many of the current commission members were involved in that effort. Senate President Huffman and Senator Sykes—while they were members of the House of Representatives—sponsored the House joint resolution that placed the constitutional amendment on the ballot. Auditor Faber and Secretary LaRose—while they served as senators—were cosponsors in the Ohio Senate.

{¶ 54} During House debates, representatives stated that some portions of the new constitutional language were mandatory and some were "aspirational." Then-Representative Huffman stated:

> And so, again, the purpose of this is to clarify the rules. There have been a variety of rules in the Constitution that were unclear. * * *
>
> So now we have a clear order of things that are mandatory. We have other things that are aspirational in nature. And it's really the clarity in this, I think that will make sure that the majority must follow these rules or, of course, suffer a variety of penalties.

Democratic Representative Kathleen Clyde, while urging other representatives to vote in favor of the resolution, noted the concessions that the Democratic side of the General Assembly had made. She said: "Another concession by our side is that the fairness criteria are not required but are aspirational."

**{¶ 55}** After the legislature placed the issue on the ballot, Senate President Huffman and Senator Sykes formed Fair Districts for Ohio, an organization supporting Issue 1. The organization issued literature, including a flyer stating that the amendment would bring about the following reforms:

> ***Fairness***
> ✓ Protects against gerrymandering by prohibiting any district from primarily favoring one political party.
> ✓ Requires districts to closely follow the statewide preferences of the voters.
>
> ***Accountable***
> ✓ Creates a process for the Ohio Supreme court to order the commission to redraw the map if the plan favors one political party.

(Boldface and italics sic.) Although his name was on the flyer, Senate President Huffman testified that he had no recollection of being involved with the organization's literature and that some portions were factually inaccurate. Senator Sykes did not recall Senate President Huffman disputing the contents of the flyer at the time.

**{¶ 56}** The official ballot language, appearing as Issue 1 on the 2015 statewide general-election ballot, stated the following:

> **Issue 1**
> **Creates a bipartisan, public process for drawing legislative districts**
> **Proposed Constitutional Amendment**
> **Proposed by Joint Resolution of the General Assembly**

**To enact new Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 of Article XI and to repeal Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15 of Article XI of the Constitution of the State of Ohio.**

\* \* \*

**The proposed amendment would:**

End the partisan process for drawing Ohio House and Senate districts, and replace it with a bipartisan process with the goal of having district boundaries that are more compact and politically competitive.

Ensure a transparent process by requiring public meetings, public display of maps, and a public letter explaining any plan the Commission adopts by a simple majority vote.

Establish the bipartisan Ohio Redistricting Commission, composed of 7 members including the Governor, the Auditor of the State, the Secretary of State, and 4 members appointed by the majority and minority leaders of the General Assembly.

Require a bipartisan majority vote of 4 members in order to adopt any final district plan, and prevent deadlock by limiting the length of time any plan adopted without bipartisan support is effective.

(Boldface sic.)

## II.  ANALYSIS

### A.  Threshold matters

{¶ 57} Before analyzing the validity of the General Assembly–district plan under the Ohio Constitution, we address two threshold matters.  First, the statewide officeholders question whether they are proper parties in an action brought under

Article XI, Section 9 of the Ohio Constitution challenging the validity of a plan adopted by the redistricting commission. And second, as ordered by this court, the parties have submitted supplemental briefing on the question whether Article XI, Section 8(C)(1) has any effect on this court's authority to review a plan adopted by a simple majority of the commission.

*1. The statewide officeholders as proper parties*

{¶ 58} Governor DeWine, Secretary LaRose, and Auditor Faber argue that they should be dismissed from these cases because they are not proper parties. These statewide officeholders contend that only the commission may be sued in cases arising under Article XI because provisions within Article XI require the commission—not its individual members—to adopt a district plan.[8]

{¶ 59} We addressed a similar issue in *Wilson*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814. Under former Article XI, a group of five individuals—referred to in *Wilson* as "the apportionment board"—were responsible for establishing General Assembly districts. *See* former Article XI, Section 1, Ohio Constitution (effective Nov. 7, 1967, to Jan. 1, 2021). The relators in *Wilson* had named as the respondents only the four individual board members who had voted to approve a new district plan. *Wilson* at ¶ 5, 7. The apportionment board itself and the dissenting board member were not named as parties. *Id*.

{¶ 60} We held that the apportionment board and the dissenting board member were not "necessary and indispensable" parties under Civ.R. 19. *Id*. at ¶ 10. But we suggested that the board and all the board members were *proper* parties, explaining that "it remains better practice in this type of action to name the board and all its members as parties." *Id*. We noted that former Article XI, Section 13 would have required "the persons responsible for apportionment by a majority of their number" to establish a new district plan if the existing plan were declared invalid. *Id*.

8. None of the legislative members of the commission argues that he or she is not a proper party to these actions.

23

**{¶ 61}** *Wilson* is instructive here, although the amendment of Article XI changes which parties are necessary and which are merely proper. In *Wilson*, the four individuals named as the respondents were necessary parties because a declaration that the existing plan was invalid would have required a majority of those responsible for apportionment to adopt a new plan. *Id.*; *see also* former Article XI, Section 13, Ohio Constitution. Article XI, Section 9(B) now requires the commission—not its individual members—to adopt a new district plan if this court declares the existing plan invalid. Following the logic of *Wilson*, the current scheme makes the commission the only necessary respondent, but the "better practice," *Wilson* at ¶ 10, is to name the commission's members as respondents, too.

**{¶ 62}** This litigation demonstrates why the individual respondents are proper parties. Although the commission is a respondent in these cases, its one-page merit brief merely "adopts and incorporates" the statements and arguments that the Republican commission members made in their briefs. And in its response to the various discovery motions filed by petitioners, the commission represented to this court that it "is not in possession, custody, or control of any document or any information potentially responsive to discovery requests served in any of these matters that is not in the possession, custody, and control of one or more of its individual members."

**{¶ 63}** We therefore hold that individual commission members are proper parties in these cases. Therefore, we do not dismiss the statewide officeholders as respondents.

2. *Article XI, Section 8(C)(1)(a) does not bar this court's review of the plan*

**{¶ 64}** Article XI, Section 8(C)(1)(a) of the Ohio Constitution provides:

> Except as otherwise provided in division (C)(1)(b) of this
> section, if the commission adopts a final general assembly district

24

plan in accordance with division (A)(3) of this section[9] by a simple majority vote of the commission, and not by the vote required to adopt a plan under division (B)(3) of Section 1 of this article, the plan shall take effect upon filing with the secretary of state and shall remain effective until two general elections for the house of representatives have occurred under the plan.

{¶ 65} All the respondents acknowledged in their initial merit briefs that this court has authority to invalidate a four-year district plan passed by a simple majority vote under Section 8(C)(1)(a) and order the commission to adopt a new plan. After oral argument in these cases, we ordered supplemental briefing on the following issue: "What impact, if any, does Article XI, Section 8(C)(1) of the Ohio Constitution have on the Supreme Court of Ohio's authority to grant the relief requested by relators when the Ohio Redistricting Commission adopted the district plan by a simple majority vote of the commission?" *See* 165 Ohio St.3d 1476, 2021-Ohio-4381, 177 N.E.3d 986.

{¶ 66} In their supplemental brief, Senate President Huffman and House Speaker Cupp argue that Article XI, Section 8(C)(1) "could" be reasonably construed to divest this court of any authority to review a four-year plan passed under Section 8(C)(1)(a). But they concede that other language in Section 9 could be reasonably interpreted to authorize this court to review a four-year plan, albeit in limited circumstances. The remaining respondents, along with all the petitioners, argue that Section 8(C)(1) does not limit this court's remedial authority to review a four-year plan passed under Section 8(C)(1)(a).

---

9. One could argue that the district plan was *not* adopted "in accordance with division (A)(3)" of Article XI, Section 8, because division (A)(3) requires that any Section 8(C)(1)(a) plan be adopted "not later than the fifteenth day of September of a year ending in the numeral one." As noted above, the plan was adopted on September 16, 2021.

{¶ 67} The second dissenting opinion seizes on the argument raised by Senate President Huffman and House Speaker Cupp that this court *could* conclude that it may not review the district plan, because Article XI, Section 8(C)(1)(a) does not state that a four-year plan adopted under that section shall remain effective "except as provided in Section 9 of this article." In contrast, the "except as provided in Section 9" language is included in Sections 8(B) and 8(C)(1)(b), which relate to ten- and six-year plans adopted by the commission, respectively. The second dissenting opinion concludes that the absence of a cross-reference to Section 9 in Section 8(C)(1)(a) means that four-year plans are insulated from this court's review.

{¶ 68} The second dissenting opinion's interpretation, however, requires readers of Article XI to ignore certain parts of it. We must read Article XI as a whole. *See State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 12. And several features of Article XI cut against the second dissenting opinion's conclusion that we lack authority to review a four-year plan adopted under Section 8(C)(1)(a).

{¶ 69} For starters, Article XI, Section 8 does not address this court's authority to order remedies. Section 9 addresses that topic. Section 9(A) confers on this court "exclusive, original jurisdiction *in all cases* arising under" Article XI of the Ohio Constitution, and Section 9(B) refers to this court's authority to invalidate "*any general assembly district plan* made by the Ohio redistricting commission." (Emphasis added.) Section 8(C)(1)(a) does not expressly remove this court's authority to consider the validity of "any" plan that the commission adopts. And if this court determines that a General Assembly–district plan or "any district" within the plan is invalid, then "*notwithstanding any other provisions of this constitution*," the commission must be reconstituted as provided in Article XI, Section 1 to adopt a new plan "to be used until the next time for redistricting" occurs. (Emphasis added.) Ohio Constitution, Article XI, Section 9(B).

26

{¶ 70} The term "notwithstanding" means " 'without prevention or obstruction from or by; in spite of.' " *State ex rel. Carmean v. Hardin County Bd. of Edn.*, 170 Ohio St. 415, 422, 165 N.E.2d 918 (1960), quoting *Webster's Second New International Dictionary* 1669 (1954). Provisions included in a clause invoking that term override any conflicting provisions. *See Ohio Neighborhood Fin., Inc. v. Scott*, 139 Ohio St.3d 536, 2014-Ohio-2440, 13 N.E.3d 1115, ¶ 35. Thus, Article XI, Section 9(B) overrides other sections of Article XI that "could" be construed as conflicting with this court's remedial authority under that section, despite both dissenting opinions' protestations to the contrary.

{¶ 71} Second, Article XI, Section 8(C)(1)(a) must be read together with Section 9(D)(3)(c), which refers to this court's "considering a plan *adopted under division (C) of Section 8 of this article*" and speaks to remedies that this court "shall order" if it determines that such a plan violates the provisions specified in Section 9(D)(3)(c). (Emphasis added). Section 9(D)(3)(c) thus contemplates judicial review of four-year plans. Indeed, the statewide-officeholder respondents point to Section 9(D)(3) as the reason that we "should not read Section 8(C)(1) as an absolute barrier to judicial relief against a four-year map." To do so would run afoul of our duty to construe the Ohio Constitution in a manner that makes it internally consistent and gives effect to all of its provisions. *See Smith v. Leis*, 106 Ohio St.3d 309, 2005-Ohio-5125, 835 N.E.2d 5, ¶ 59.

{¶ 72} Third, even if the second dissenting opinion were correct that a conflict exists between Article XI, Section 8(C)(1) and Section 9, the latter section prevails: Section 9 more specifically addresses this court's jurisdiction and remedial authority. *See MacDonald v. Cleveland Income Tax Bd. of Review*, 151 Ohio St.3d 114, 2017-Ohio-7798, 86 N.E.3d 314, ¶ 27 ("when there is a conflict between a general provision and a more specific provision in a statute, the specific provision controls"). The second dissenting opinion seizes on this canon of construction, contending that Section 8(C)(1)(a) is the specific provision applicable

to four-year plans while Section 9 is a general provision applicable to our jurisdictional and remedial authority. But the second dissenting opinion misapplies the canon: *Section 9 is the specific provision*, because it governs this court's jurisdictional and remedial authority while Section 8(C) governs a different matter, namely, the duration of a district plan.

{¶ 73} Moreover, Article XI, Section 9(D)(3)(c) specifically contemplates review of a plan adopted under Section 8(C), so it cannot be the case that voters (or the General Assembly) intended to foreclose review of plans adopted under Section 8(C)(1)(a). The axiom that one does not "hide elephants in mouseholes" is apt here. *See Whitman v. Am. Trucking Assns.*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.E.2d 1 (2001). That is, the omission of the phrase "except as provided in Section 9" in a section concerning a four-year plan's duration is not a logical way to curtail this court's jurisdiction granted under Section 9. If it had been intended that this court not have jurisdiction to review a four-year plan, it would have been more logical for that limitation to appear in Section 9, the section that specifically deals with this court's jurisdiction and remedial authority. It is little wonder, then, that until we ordered supplemental briefing, none of the parties took the position that Section 8(C)(1)(a) forecloses judicial review of a four-year plan's validity. (And even then, only one set of respondents has made that argument—and in equivocal fashion at that.)

{¶ 74} Finally, it is difficult to overlook the absurd result that would arise from the second dissenting opinion's interpretation of Article XI, Section 8(C)(1)(a) as a limitation on this court's jurisdiction. It would mean that a four-year plan could violate any of Article XI's requirements (e.g., by drawing multimember districts or noncontiguous districts or by violating any of the other neutral map-drawing requirements) and still not be subject to a court challenge. Further, as the second dissenting opinion notes, Article XI, Section 1(C) provides for the commission's adoption of a ten-year plan by September 1 (i.e., before the

28

impasse procedures are triggered under Section 8), but like Section 8(C)(1)(a), Section 1(C) does not include the limiting phrase "except as provided in Section 9 of this article." The second dissenting opinion embraces the notion that a plan passed with bipartisan support under Section 1(C) would not be reviewable either, regardless of any defects that run afoul of Article XI's requirements. That is, a ten-year plan adopted with bipartisan support by September 1 would not be subject to judicial review, but a ten-year plan adopted with bipartisan support by September 15 would be reviewable—a result with no plausible justification. Likewise, there is no reason why a four-year plan passed by a partisan majority under Section 8(C)(1)(a) should escape judicial review while a plan that replaces it for the remaining six years under Section 8(C)(1)(b)—perhaps even the *same* plan passed again by a partisan majority—could be reviewed.

{¶ 75} For these reasons, we hold that this court has authority under Article XI, Section 9 to review a four-year district plan passed by the commission under Article XI, Section 8(C)(1)(a).

### B. The burden and standard of proof

{¶ 76} In *Wilson*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, at ¶ 18-24, we noted that apportionment is a legislative task and that an adopted apportionment plan—like enacted legislation—is presumptively constitutional. We therefore held that "[t]he burden of proof on one challenging the constitutionality of an apportionment plan is to establish that the plan is unconstitutional beyond a reasonable doubt. In the absence of evidence to the contrary, we presume that the apportionment board properly performed its duties in a lawful manner." *Id.* at paragraph two of the syllabus.

{¶ 77} Several distinct concepts are embedded within that holding. Fundamentally, the standard allocates the burden of proof, which itself "is a composite burden that 'encompasses two different aspects of proof: the burden of going forward with evidence (or burden of production) and the burden of

persuasion.' " *Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, 163 Ohio St.3d 337, 2020-Ohio-5371, 170 N.E.3d 768, ¶ 20, quoting *Chari v. Vore*, 91 Ohio St.3d 323, 326, 744 N.E.2d 763 (2001). The standard also defines the burden of proof for factual issues as beyond a reasonable doubt.

{¶ 78} Petitioners argue that they should not be required to prove factual issues beyond a reasonable doubt, because these cases arise under the original jurisdiction of this court and the rule in ordinary civil cases is that facts must be proved by a preponderance of the evidence. But these are not ordinary civil cases. When legislative action is the subject of a facial constitutional challenge, it is well settled that the challenging party faces "the highest standard of proof, which is also used in criminal cases, proof beyond a reasonable doubt," *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 21.

{¶ 79} Petitioners dispute the premise that these cases should be treated as facial constitutional challenges. But in doing so, petitioners do not attack the primary reasons for the *Wilson* court's holding—i.e., that apportionment is a legislative task (albeit now delegated by the Ohio Constitution to the redistricting commission) and that the public officers are presumed to have properly carried out their duties. *See Wilson*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, at ¶ 20-21. Petitioners therefore must prove factual issues beyond a reasonable doubt.

{¶ 80} Application of this standard of proof on factual issues does not prevent us from independently assessing the constitutionality of the commission's plan. In emphasizing the "strong presumption of constitutionality" of legislation, we typically invoke the rule that "a statute will be upheld unless proven beyond a reasonable doubt to be unconstitutional." *State v. Romage*, 138 Ohio St.3d 390, 2014-Ohio-783, 7 N.E.3d 1156, ¶ 7. This rule borrows terminology usually associated with the proof of facts, referring to the quantum of evidence needed to convict a defendant in a criminal case. But the ultimate question here remains a

legal one: does the commission's adoption of its plan " 'clear[ly] and irreconcilabl[y] conflict with some express provision of the constitution' "? *Ohio Congress of Parents & Teachers* at ¶ 20, quoting *Spivey v. Ohio*, 999 F.Supp. 987, 999 (N.D.Ohio 1998). Petitioners express concern that we will consider that question with a rubber-stamp form of review, but that concern is misplaced. And contrary to the suggestion of Senate President Huffman and House Speaker Cupp, the presumption and high burden of proof do not require us to defer to the commission's interpretation of Article XI. The presumption of constitutionality and the application of a high standard of proof do not prevent this court from "say[ing] what the law is," *Marbury v. Madison*, 5 U.S. 137, 177, 2 L.Ed. 60 (1803), or from "conduct[ing] an independent review," *Ohio Congress of Parents & Teachers* at ¶ 20.

### C. Article XI, Section 6

{¶ 81} Petitioners in all three cases argue that the adopted plan is invalid because it fails to comply with Article XI, Section 6 of the Ohio Constitution. Petitioners contend that the adopted plan was drawn primarily to favor the majority party of the General Assembly and disfavor the minority party, in violation of Article XI, Section 6(A), and that the proportional political leaning of the districts within the plan does not correspond closely to the statewide preferences of Ohio voters, in violation of Article XI, Section 6(B). Petitioners argue that the commission did not even attempt to comply with Sections 6(A) and 6(B) despite the mandatory language in Section 6 stating that it must do so.

{¶ 82} Senate President Huffman, House Speaker Cupp, and the statewide officeholders respond to petitioners' challenge to the adopted plan with three arguments. They first argue that Article XI, Section 6 is not mandatory but merely "aspirational." They next argue that a district plan may not be challenged based solely on an alleged violation of Section 6, because the remedies provided in Article XI, Section 9(D)(3) require a predicate violation of Section 2, 3, 4, 5, or 7 before

this court may evaluate compliance with Section 6. And finally, they argue that they attempted to comply with Section 6 by negotiating with Senator Sykes and House Minority Leader Sykes to try to adopt a ten-year bipartisan plan.

{¶ 83} As explained below, the evidence—much of which is undisputed—shows that the commission did not attempt to comply with the standards stated in Article XI, Section 6(A) or 6(B). Moreover, respondents' arguments are unpersuasive. Section 6 imposes enforceable duties on the commission. And the inclusion of specific remedies in Section 9(D)(3) if a plan fails to comply with other sections does not preclude us from declaring a plan invalid if it fails to comply with Section 6.

### *1. Article XI, Section 6 requires an attempt*

{¶ 84} When interpreting constitutional language, we generally apply the same rules of construction that govern the interpretation of statutes. *See Toledo City School Dist. Bd. of Edn. v. State Bd. of Edn.*, 146 Ohio St.3d 356, 2016-Ohio-2806, 56 N.E.3d 950, ¶ 16. We must begin by looking at the language of the provision itself. *Id.* We consider "how the words and phrases would be understood by the voters in their normal and ordinary usage." *Centerville v. Knab*, 162 Ohio St.3d 623, 2020-Ohio-5219, 166 N.E.3d 1167, ¶ 22, citing *Dist. of Columbia v. Heller*, 554 U.S. 570, 576-577, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In other words, "[i]n construing constitutional text that was ratified by direct vote, we consider how the language would have been understood by the voters who adopted the amendment." *Knab* at ¶ 22.

{¶ 85} The opening sentence of Section 6 states that the commission "shall attempt" to draw a district plan that complies with the standards set forth in divisions (A) through (C) of that section. Ohio Constitution, Article XI, Section 6. We have interpreted similar language as imposing mandatory obligations. In *State ex rel. Republic Steel Corp. v. Ohio Civ. Rights Comm.*, 44 Ohio St.2d 178, 339 N.E.2d 658 (1975), this court interpreted a former version of R.C. 4112.05(B),

which stated that the Ohio Civil Rights Commission, after finding that an unlawful discriminatory practice had occurred, "shall endeavor to eliminate such practices by informal methods of conference, conciliation, and persuasion."  Am.Sub.H.B. No. 610, 135 Ohio Laws, Part I, 1884, 1892.  We held that this language required "a completed and unsuccessful attempt by the Ohio Civil Rights Commission to eliminate unlawful discriminatory practices by conference, conciliation, or persuasion" as "a jurisdictional prerequisite" to the commission's issuance of a complaint.  *Republic Steel* at syllabus.  In other words, we determined that the phrase "[s]hall endeavor" was mandatory language: it required the Ohio Civil Rights Commission to exhaust other means of eliminating an unlawful practice before it could initiate legal proceedings.  *Id.* at 184.

{¶ 86} The phrase" in Article XI, Section 6 also has a plain meaning: it directs the commission to take affirmative steps to comply with the standards stated in divisions (A) through (C).  *See State ex rel. Cincinnati Enquirer v. Lyons*, 140 Ohio St.3d 7, 2014-Ohio-2354, 14 N.E.3d 989, ¶ 28 ("We have repeatedly recognized that use of the term 'shall' in a statute or rule connotes a mandatory obligation unless other language evidences a clear and unequivocal intent to the contrary"); *Webster's Third New International Dictionary* 140 (2002) ("attempt" means "to make an effort to do, accomplish, solve, or effect").  Thus, when drawing a district plan, the commission must attempt to meet the standards set forth in Section 6.

{¶ 87} This of course raises the question: What constitutes an "attempt" to meet the standards provided in Article XI, Section 6(A) through 6(C)?  And could the commission comply with Section 6 without achieving a plan that meets that section's standards?

{¶ 88} The final sentence of Article XI, Section 6 provides the answer.  It states, "Nothing in this section permits the commission to violate the district standards described in Section 2, 3, 4, 5, or 7 of this article."  This sentence

acknowledges that there might be circumstances that make it impossible for the commission to meet the standards of Section 6 while also following the map-drawing requirements of Sections 2, 3, 4, 5, and 7. Read together, the first and last sentences of Section 6 clarify that the standards of Section 6 are subordinate to the map-drawing requirements in Sections 2, 3, 4, 5, and 7. If it is possible for a district plan to comply with Section 6 *and* Sections 2, 3, 4, 5, and 7, the commission must adopt a plan that does so.[10]

{¶ 89} Senate President Huffman and House Speaker Cupp make much of the legislative debate that preceded the amendment of Article XI. They point to a statement made by Democratic Representative Kathleen Clyde, who advocated for the constitutional amendment during a legislative debate, that described the criteria in Article XI, Section 6 as "aspirational." Senate President Huffman, who was then a House member, agreed with that characterization during the debate, stating that there is "a clear order of things that are mandatory [and] other things that are aspirational in nature." Senate President Huffman and House Speaker Cupp argue that this confirms that the fairness criteria in Sections 6(A) and 6(B) are aspirational.

{¶ 90} But legislative debate does not inform a proper reading of Article XI, Section 6. For one thing, views of individual legislators do not determine what a provision means. *See State v. Toney*, 81 Ohio St. 130, 140, 90 N.E. 142 (1909) ("the enactment receives its vigor and force as law by reason of its enactment by the general assembly, no matter from what source the inspiration came"); *see also Nichols v. Villareal*, 113 Ohio App.3d 343, 349, 680 N.E.2d 1259 (4th Dist.1996)

---

10. The first dissenting opinion accuses us of ignoring the "attempt" language in Section 6 and rewriting the provision to mean: "The Ohio redistricting commission shall, ~~attempt to~~ *if it is possible*, F." Dissenting opinion of Kennedy, J., at ¶ 248. We are doing no such thing. Rather, we are giving effect to both (1) the "shall attempt" language in the beginning of Section 6 and (2) the expression in the final sentence of Section 6 that those provisions are subordinate to Sections 2, 3, 4, 5, and 7. The latter gives meaning to the former. The attempt to comply with Section 6 might be unsuccessful if to do so would run afoul of Section 2, 3, 4, 5, or 7.

(courts "must determine the intent of the Ohio General Assembly not from the expressions of a single legislator, but from the expression of the legislative body as a whole"). But more importantly, we will not use legislative debate "to muddy clear statutory language." *Milner v. Dept. of the Navy*, 562 U.S. 562, 572, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011). And here, clear language in Section 6 establishes that the section's standards are not merely aspirational. "Aspirational" denotes a *desire* to achieve something. *See Webster's Third New International Dictionary* at 130 (defining "aspirational" as "of relating to aspiration," which itself is defined as "a strong desire for realization," *id.*). Section 6 speaks not of desire but of direction: the commission *shall attempt* to achieve the standards of that section. While Section 6 contemplates that the standards set forth in it may not come to fruition, it nevertheless requires the commission to try to achieve them.

*2. Article XI, Section 6 claims are actionable*

{¶ 91} Senate President Huffman, House Speaker Cupp, and the statewide officeholders also argue that the claims based on Section 6 must be dismissed because Article XI does not provide a specific remedy for the commission's failure to comply with Section 6. They focus on Section 9(D)(3), which prescribes the scope of this court's remedial power for certain violations of Article XI:

> If the supreme court of Ohio determines that a general assembly district plan adopted by the commission *does not comply with the requirements of Section 2, 3, 4, 5, or 7 of this article*, the available remedies shall be as follows:
>
> (a) If the court finds that the plan contains one or more isolated violations of those requirements, the court shall order the commission to amend the plan to correct the violation.
>
> (b) If the court finds that it is necessary to amend not fewer than six house of representatives districts to correct violations of

those requirements, to amend not fewer than two senate districts to correct violations of those requirements, or both, the court shall declare the plan invalid and shall order the commission to adopt a new general assembly district plan in accordance with this article.

(c) If, in considering a plan adopted under division (C) of Section 8 of this article, the court determines that both of the following are true, the court shall order the commission to adopt a new general assembly district plan in accordance with this article:

(i) The plan significantly violates those requirements in a manner that materially affects the ability of the plan to contain districts whose voters favor political parties in an overall proportion that corresponds closely to the statewide political party preferences of the voters of Ohio, as described in division (B) of Section 6 of this article.

(ii) The statewide proportion of districts in the plan whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party does not correspond closely to the statewide preferences of the voters of Ohio.

(Emphasis added.)

{¶ 92} Senate President Huffman, House Speaker Cupp, and the statewide officeholders argue that Article XI, Section 9(D)(3) limits our jurisdiction and remedial power by permitting us to invalidate a plan *only* when the plan violates Section 2, 3, 4, 5, or 7. Section 6, they contend, comes into play only if we are reviewing a four-year plan adopted under Section 8(C). And they argue that even then, we may review only whether the plan complies with Section 6(B)—and still only if there was a predicate violation of Section 2, 3, 4, 5, or 7. Thus, they contend

that Article XI does not allow this court to invalidate a plan when the challengers allege only a failure to comply with Section 6.

{¶ 93} This argument misunderstands the scope of our jurisdiction and general remedial power under Article XI, Section 9. Section 9(A) grants this court "exclusive, original jurisdiction" in all cases arising under Article XI. This broad grant of jurisdiction is not limited to claims alleging violations of certain sections of Article XI. Indeed, Section 9(B) identifies the general remedy that is available when this court determines that a district plan is invalid:

> In the event that any section of this constitution relating to redistricting, *any general assembly district plan made by the Ohio redistricting commission*, or any district *is determined to be invalid* by an unappealed final order of a court of competent jurisdiction then, *notwithstanding any other provisions of this constitution*, *the commission shall be reconstituted as provided in Section 1 of this article*, convene, and ascertain and determine a general assembly district plan in conformity with such provisions of this constitution as are then valid, including establishing terms of office and election of members of the general assembly from districts designated in the plan, to be used until the next time for redistricting under this article in conformity with such provisions of this constitution as are then valid.

(Emphasis added.) Section 9(B) contemplates that this court may declare a district plan invalid in the exercise of Section 9(A) jurisdiction.

{¶ 94} Because neither Section 9(A) nor Section 9(B) limits the bases on which this court may declare a plan invalid, Section 9(A) allows review of a district plan for compliance with *any* provision in Article XI, including Section 6. This

conclusion—which gives meaning to the mandatory language in Section 6—is consistent with the settled principles that no part of the Constitution "should be treated as superfluous unless that is manifestly required" and that we should avoid any construction that makes a provision "meaningless or inoperative," *State ex rel. Myers v. Spencer Twp. Rural School Dist. Bd. of Edn.*, 95 Ohio St. 367, 373, 116 N.E. 516 (1917).

{¶ 95} We further reject the notion that Article XI, Section 9(D)(3) is a specific remedial provision that precludes us from invoking Section 9(B) to declare a plan invalid for failure to comply with Section 6. "Where provisions of the Constitution address the same subject matter, they must be read *in pari materia* and harmonized if possible." *Toledo Edison Co. v. Bryan*, 90 Ohio St.3d 288, 292, 737 N.E.2d 529 (2000). That is, when possible, we must construe constitutional provisions to give each provision reasonable and operable effect. *State ex rel. Toledo v. Lucas Cty. Bd. of Elections*, 95 Ohio St.3d 73, 78, 765 N.E.2d 854 (2002).

{¶ 96} It is not difficult to harmonize Section 9(B) and Section 9(D)(3). Section 9(B) contemplates that this court may declare a plan invalid and order the commission to adopt an entirely new plan. Section 9(D)(3) speaks to certain violations of Article XI and gives this court remedial options other than declaring a plan entirely invalid. According to Section 9(D)(3)(a) and (b), we do not have to declare a plan entirely invalid if violations of Section 2, 3, 4, 5 or 7 are isolated or would require amendments regarding relatively few districts.[11] And for a four-year

---

11. The first dissenting opinion argues that we mischaracterize Section 9(D)(3) and that under our "reading of these provisions, Section 9(B) adds nothing to the remedies afforded by Section 9(D)(3)." Dissenting opinion of Kennedy, J., at ¶ 229. It is that opinion, however, that mischaracterizes Section 9. Section 9(A) grants this court jurisdiction over all cases arising under Article XI. In the exercise of that jurisdiction, Section 9(B) authorizes the court to declare a plan invalid. Section 9(D)(3) begins with the phrase, "If the supreme court of Ohio determines that a general assembly district plan adopted by the commission does not comply with the requirements of Section 2, 3, 4, 5, or 7 of this article, the available remedies shall be as follows." Ohio Constitution, Article XI, Section 9(D)(3). Section 9(D)(3) therefore instructs us to take specific courses of action *in the event that* we find a violation of Section 2, 3, 4, 5, or 7. Section 9(D)(3)

plan that might not otherwise be declared invalid under Section 9(D)(3)(a) or (b), this court may still order the commission to adopt a new plan if the adopted plan violates Section 2, 3, 4, 5, or 7 in a manner that causes it to run afoul of the partisan-proportionality standard set forth in Section 6(B). Ohio Constitution, Article XI, Section 9(D)(3)(c). Section 9(D)(3) covers these specific circumstances. It says nothing of this court's authority to examine whether the commission has complied with some *other* section of Article XI or of what remedy this court may provide if it determines that a plan is invalid for violating another section.

**{¶ 97}** Further, the language and structure of former Article XI cut against the reading of Article XI, Section 9(D)(3) proposed by Senate President Huffman, House Speaker Cupp, and the statewide officeholders. Much of the language of Sections 9(A) and 9(B) was imported from former Article XI, Section 13.[12] Before Article XI was amended, former Section 13 was the only provision that referred to this court's jurisdiction and remedial power in apportionment cases. In *Wilson*, this court never suggested that Article XI did not authorize it to declare a plan invalid or to order an appropriate remedy. *See* 134 Ohio St.3d 221, 2012-Ohio-5367, 981

---

limits our otherwise broad authority to invalidate plans. Importantly, that limitation does not apply here, because no violation of Section 2, 3, 4, 5, or 7 has been alleged or found.

12. Former Article XI, Section 13, Ohio Constitution (effective Nov. 7, 1967, to Jan. 1, 2021), provided:

> The supreme court of Ohio shall have exclusive, original jurisdiction in all cases arising under this Article. In the event that any section of this Constitution relating to apportionment or any plan of apportionment made by the persons responsible for apportionment, by a majority of their number, is determined to be invalid by either the supreme court of Ohio, or the supreme court of the United States, then notwithstanding any other provisions of this Constitution, the persons responsible for apportionment by a majority of their number shall ascertain and determine a plan of apportionment in conformity with such provisions of this Constitution as are then valid, including establishing terms of office and election of members of the general assembly from districts designated in the plan, to be used until the next regular apportionment in conformity with such provisions of this Constitution as are then valid.

N.E.2d 814, at ¶ 10.  Section 9(A) gives this court jurisdiction, and Section 9(B) provides for a remedy, just as former Section 13 did.  The fact that Section 9(D) provides specific remedies for *some* violations of Article XI does not remove this court's remedial power to declare a plan invalid for violations not specified there.  Were this court's remedial power limited in such a fashion, Section 9 would have spelled it out expressly, as it did in Section 9(D)(1) and (2), which expressly state what this court shall *not* do.

{¶ 98} Article XI, Section 9(B) recognizes this court's authority to determine whether a plan is invalid for *any* reason and specifies what must happen if it does.  This general power to invalidate a plan is limited by Section 9(D)(3) but only as to violations of Section 2, 3, 4, 5, or 7.  Section 9(D)(3) does nothing more.

{¶ 99} The first dissenting opinion argues that Article XI contains no specific enforcement mechanism for Section 6 and that Section 6 therefore is merely a direction to the commission's members that they are "duty bound to comply with," dissenting opinion of Kennedy, J., at ¶ 240, not a mandate that can be enforced by this court.  However, as just explained, Article XI *does* contain a mechanism for enforcing compliance with Section 6.  Moreover, in support of its argument that this court cannot enforce compliance with the section, the first dissenting opinion relies on *In re Nowak*, 104 Ohio St.3d 466, 2004-Ohio-6777, 820 N.E.2d 335, ¶ 37-38—a case that undermines the dissent's own argument.  In *Nowak*, we held that manifestly gross and fraudulent violations of the "one subject" rule in Article II, Section 15(D) of the Ohio Constitution can be enforced in a court of law and that because the provision was capable of invalidating an enactment, it was *not* directory in nature.  *Nowak* at paragraph one of the syllabus.  Similarly, here, Senate President Huffman, House Speaker Cupp, and the first dissenting opinion all concede that a redistricting plan *can* be invalidated under Section 6(B) in some circumstances—specifically, they allow that a violation of Section 6(B) is actionable if there is also a violation of Section 2, 3, 4, 5, or 7.  Accordingly, under

*Nowak*—and even setting aside the application of Article XI, Sections 9(A) and 9(B)—*Section 6 is not merely directory.*

{¶ 100} Despite Article XI, Sections 9(A) and 9(B)'s clear grant of authority to review and invalidate a redistricting plan, both dissenting opinions suggest that there is no judicial remedy for a violation of Section 6. The second dissenting opinion goes so far as to assert that if the commission adopts a plan contrary to the anti-gerrymandering provisions that Ohio voters included in the revised Article XI, Ohio voters must continue to live with the gerrymandered districts unless and until the statewide electorate replaces the governor, secretary of state, or auditor of state at the ballot box or the voters in the home districts of the commission's legislative members choose to replace those members.

{¶ 101} The suggestion that the solution to unconstitutional partisan gerrymandering is simply to vote out its perpetrators is disingenuous. Partisan gerrymandering entrenches the party in power. *See, e.g.*, *Gill v. Whitford*, ___ U.S. ___, ___, 138 S.Ct. 1916, 1935, 201 L.Ed.2d 313 (2018) (Kagan, J., concurring). If the legislative members of the commission that adopted the instant plan are voted out of office, the party that appointed them will simply appoint different partisans. And common sense dictates that notwithstanding attrition based on term limits or any other reasons, the officeholders will stand for reelection primarily on the basis of their performance in those offices, not as members of the redistricting commission. The notion that the voters who overwhelmingly approved the amendment of Article XI meant to hinge the eradication of partisan gerrymandering on the election of various officeholders simply holds no water. This is so particularly in light of the fact that Fair Districts for Ohio—the organization formed by the amendment's sponsors, including Senate President Huffman—told Ohio voters that Article XI would "[p]rotec[t] against gerrymandering," "[r]equir[e] districts to closely follow the statewide preferences of voters," and "[c]reat[e] a process for the Ohio Supreme Court to *order* the commission to redraw the map if

the plan favors one political party." (Emphasis added.) Similarly, the official ballot language informed voters that the amendment would "[e]nd the partisan process for drawing Ohio House and Senate districts," yet the dissenting opinions would make the process partisan again by requiring voters to change the party controlling the majority of seats on the commission in order to effect any real change. We reject the notion that Ohio voters rallied so strongly behind an anti-gerrymandering amendment to the Ohio Constitution yet believed at the time that the amendment was toothless. As explained above, that conclusion is not supported by the plain text of Article XI. It is also supported neither by the information given to voters in 2015 nor by common sense.

### 3. *The commission did not attempt to meet the standard set forth in Article XI, Section 6(B)*

{¶ 102} Petitioners have shown beyond a reasonable doubt that the commission did not attempt to draw a district plan that meets the standard articulated in Article XI, Section 6(B). Undisputed evidence shows not only that the individuals who drew the plan did not try to comply with the Section 6(B) standard but also that they did not have the right target in mind.

{¶ 103} To start, funding for redistricting was allocated only to the legislative caucuses involved, and the commission members from the executive branch were not given access to the mapping programs that would have allowed them to meaningfully participate in the drawing of the maps. Even under this arrangement, only two commission members—Senate President Huffman and House Speaker Cupp—were involved when the plan that was ultimately adopted was drawn. Thus, the commission did not demonstrate a correct understanding of what was required in drawing the maps.

{¶ 104} As to the specific requirement of Section 6(B), the commission must attempt to draw a plan that corresponds to the statewide preferences of Ohio voters: "The statewide proportion of districts whose voters, based on statewide state

and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." Ohio Constitution, Article XI, Section 6(B).

{¶ 105} This standard requires the calculation—and then the comparison—of two things. The commission must first calculate the statewide proportion of districts whose voters favor each political party. In making this calculation, the commission must determine how voters in the proposed districts are likely to vote in future elections by examining the statewide federal and state partisan election results from the previous ten years. The evidence submitted shows that map-drawing software performed this calculation for the map drawers recruited by the Republican legislative members of the commission. The commission acknowledged in its Article XI, Section 8(C)(2) statement that 64.4 percent of all districts in the adopted plan favored Republican candidates during the specified period. Depending on the measures used, Senate President Huffman and House Speaker Cupp's expert concluded, the number of districts in the plan favoring Republican House seats is between 61 and 68 percent.

{¶ 106} The second calculation that must be made by the commission is the statewide preferences of the voters of Ohio. Senate President Huffman and House Speaker Cupp argue that one way to determine statewide voter preferences is to calculate the percentage of statewide partisan races won by candidates from each party during the last ten years. That method leads to the conclusion that 81 percent of Ohio voters prefer Republican candidates, because Republican candidates won 13 of 16 statewide partisan contests during the last ten years. Using this approach in conjunction with a measure of the proportional number of votes cast for each party in those elections, Senate President Huffman and House Speaker Cupp assert that the proportion of Ohio voters favoring Republican candidates is between 54 and 81 percent. This is the methodology that the commission adopted in its Article XI, Section 8(C)(2) statement.

{¶ 107} This methodology, however, does not tell us the "statewide preferences of the voters of Ohio." Calculating the percentage of statewide election victories over the last ten years does not indicate the preferences of individual Ohio voters. The "statewide preferences of the voters of Ohio" must be determined by examining how the voters voted—i.e., by totaling the votes cast in statewide partisan elections and calculating the percentages of votes received by candidates of each political party. Senate President Huffman and House Speaker Cupp's approach looks not to votes cast but to statewide offices won, which is a measure that does not comport with Article XI, Section 6(B).

{¶ 108} As used in Article XI, Section 6(B) of the Ohio Constitution, the term "statewide preferences of the voters of Ohio" means the percentages of votes received by the candidates of each political party based on the total votes cast in statewide state and federal partisan elections during the preceding ten years. In this case, there is no dispute that under this methodology, which looks at votes cast in statewide elections over the relevant period, about 54 percent of Ohio voters preferred Republican candidates and about 46 percent of Ohio voters preferred Democratic candidates. Accordingly, under Section 6(B), the commission is required to attempt to draw a plan in which the statewide proportion of Republican-leaning districts to Democratic-leaning districts closely corresponds to those percentages.

{¶ 109} The misunderstanding of what Article XI, Section 6(B) requires, as expressed in the commission's Section 8(C)(2) statement, demonstrates that the commission did not attempt to comply with the standard set forth in that section. But even if Senate President Huffman and House Speaker Cupp had had the right target in mind, the evidence shows that they never asked the principal map drawers—DiRossi and Springhetti—to try to comply with Section 6. DiRossi and Springhetti testified that they had access to partisan data during the map-drawing process by using a computer program that allowed them to see the anticipated Republican and

44

Democratic voting percentages for each district they drew. The program allowed them to see how the percentages changed as they changed the district lines. Yet DiRossi and Springhetti testified that they were never told to attempt to comply with Section 6. Senate President Huffman and House Speaker Cupp confirmed that they instructed DiRossi and Springhetti to focus on complying with other provisions of Article XI but not on those in Section 6.

{¶ 110} Senate President Huffman and House Speaker Cupp nevertheless argue that they *did* attempt to satisfy Article XI, Section 6(B)—after their plan was first introduced on September 9—by negotiating with the Democratic members of the commission and modifying their original proposal. Governor DeWine, Secretary LaRose, and Auditor Faber also argue that they "attempted to achieve a bipartisan ten-year plan" before September 15. But when the evidence offered to show that an "attempt" had been made under Section 6 is nothing more than the political negotiations between commission members, the evidence falls short in demonstrating that the commission has drawn a plan that complies with the requirements of the section.

{¶ 111} Article XI, Section 6(B) does not require the majority-party members of the commission to try to draw a plan that is acceptable to the minority-party members of the commission or vice versa. It requires *all* members of the commission to attempt to draw a plan in which the proportional favor to each political party's candidates "correspond[s] closely" to statewide voter preferences over a defined period. In fact, even if commission members of the minority party agreed to a proposed plan, this does not necessarily mean that the agreed-upon plan would comply with Section 6.

{¶ 112} Moreover, petitioners have introduced substantial expert evidence showing that the commission could have drawn a more proportional plan. One expert, Dr. Kosuke Imai, a professor in Harvard University's departments of government and of statistics, who has expertise in developing simulation

algorithms for evaluating legislative redistricting, employed a redistricting simulation algorithm using the Article XI criteria to generate 5,000 possible district plans, none of which favored a party as strongly as the plan adopted by the commission. Dr. Imai's analysis showed that the plan adopted by the commission was an outlier, displaying a greater degree of disproportionality than any of the simulated maps he generated. Petitioners have also offered the expert report of Dr. Jonathan Rodden, a professor of political science at Stanford University with expertise in the analysis of geospatial data, including research on the relationship between the patterns of political representation, geographic location of demographic and partisan groups, and the drawing of electoral districts. Dr. Rodden drew a plan that was compliant with Article XI and that is more proportional to the statewide voter preferences than the plan adopted by the commission.

{¶ 113} Respondents offer little to dispute this evidence. In fact, Senate President Huffman and House Speaker Cupp respond to it in their brief by conceding that "[Petitioners'] experts can easily draw simulated maps after the fact that provide exact proportionality by making exact proportionality one of their criteria for drawing maps." They argue that there are no manageable standards for this court to apply in determining how "fair" a plan must be. But Article XI, Section 6(B) recognizes that fairness is measured by efforts taken to achieve close proportionality; it requires the commission to *attempt* to draw a plan in which the statewide proportion of districts corresponds closely with the statewide preferences of Ohio voters "based on statewide state and federal partisan general election results during the last ten years," Ohio Constitution, Article XI, Section 6(B). Petitioners' expert evidence further supports the conclusion that the commission did not attempt to meet the standard set forth in Section 6(B).

46

{¶ 114} Based on the evidence presented, we conclude beyond a reasonable doubt that the commission did not attempt to draw a district plan that meets the standard articulated in Article XI, Section 6(B) of the Ohio Constitution.

*4. The commission did not attempt to meet the Article XI, Section 6(A) standard*

{¶ 115} Under Article XI, Section 6(A), the commission must attempt to meet the standard that "[n]o general assembly district plan shall be drawn primarily to favor or disfavor a political party." To understand what Section 6(A) requires, it is again helpful to look to this court's decision in *Wilson.*

> The words used in [former] Article XI do not explicitly require political neutrality, or for that matter, politically competitive districts or representational fairness, in the apportionment board's creation of state legislative districts. Unlike Ohio, some states specify in either constitutional or statutory language *that no apportionment plan shall be drawn with the intent of favoring or disfavoring a political party.* * * * Therefore, Article XI does not prevent the board from considering partisan factors in its apportionment decision.

(Emphasis added.) *Wilson*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, at ¶ 14.

{¶ 116} Thus, in holding that former Article XI did not require partisan fairness in the drawing of state legislative districts, this court found it significant that the Ohio Constitution did not include language forbidding a plan from being drawn with the intent to favor or disfavor a political party. The Ohio Constitution now contains language that is almost identical to the language that this court found to be missing from former Article XI. This language does not prohibit a district plan from favoring or disfavoring a political party. It prohibits a plan *from being*

*drawn primarily to favor or disfavor a political party.* The language, by necessity, requires this court to discern the map drawers' intent.

{¶ 117} Courts have found that direct or circumstantial evidence may establish that a districting plan was drawn primarily to favor one political party over another. *See League of Women Voters of Florida v. Detzner*, 172 So.3d 363, 375-376 (Fla.2015); *see also Ohio A. Philip Randolph Inst. v. Householder*, 373 F.Supp.3d 978, 1096 (S.D.Ohio 2019), *vacated on other grounds sub nom. Chabot v. Ohio A. Philip Randolph Inst.*, __ U.S. __, 140 S.Ct. 102, 205 L.Ed.2d 1 (2019), *by Rucho v. Common Cause*, __ U.S. __, 139 S.Ct. 2484, 204 L.Ed.2d 931 (2019), quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ("Plaintiffs may prove discriminatory partisan intent using a combination of direct and indirect evidence because 'invidious discriminatory purpose may often be inferred from the totality of the relevant facts' ").

{¶ 118} A map-drawing process may support an inference of predominant partisan intent. The evidence here demonstrates that Senate President Huffman and House Speaker Cupp controlled the process of drawing the maps that the commission ultimately adopted. No other commission members had access to DiRossi and Springhetti; nor did other commission members have any role in drawing the plan. Senate President Huffman and House Speaker Cupp did not instruct DiRossi and Springhetti to comply with Article XI, Section 6. Indeed, Senate President Huffman and House Speaker Cupp do not view Section 6 as mandatory. Although DiRossi and Springhetti testified that they were focused on Article XI's technical line-drawing requirements, they acknowledged that while drafting the proposed plan, a window on their computer screens displayed the partisan leanings of potential districts.

{¶ 119} This is not the process that Article XI contemplates. Section 1(C) provides that the commission "shall draft the proposed plan in the manner prescribed in" Article XI, and Section 1(B)(2) allows the commission to hire its

own staff to do so. Despite this language, the commission itself did not engage in any map drawing or hire independent staff to do so. Instead, the legislative caucuses of the two major political parties—i.e., the groups with the most self-interest in protecting their own members—drew maps for the commission to consider.

{¶ 120} At bottom, the process that culminated in the adopted plan, having been directed and controlled by one political party's legislative leaders, was not an attempt to comply with Section 6(A) or 6(B) standards. When a single party exclusively controls the redistricting process, "it should not be difficult to prove that the likely political consequences of the reapportionment were intended." *Davis v. Bandemer*, 478 U.S. 109, 129, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (plurality opinion), *abrogated on other grounds by Rucho*, __ U.S. __, 139 S.Ct. 2484, 204 L.Ed.2d 931.

{¶ 121} Further, the expert evidence supports the conclusion that the adopted plan's partisan skew cannot be explained solely by nondiscriminatory factors. Under the adopted plan, Republicans are favored to win between 61 and 68 House seats and between 20 and 24 Senate seats. The expert report of Dr. Michael Latner, a professor of political science at California Polytechnic State University with expertise in electoral-system design and statistical methods in elections and in designing electoral districts, shows that the plan substantially favors Republican voters through targeted "cracking" and "packing" of Democratic voters that "did not occur by chance or accident."[13] Using a partisan-symmetry analysis, a metric that is broadly accepted by political scientists to measure partisan bias, Dr. Latner

---

13. "A 'cracked' district is one in which a party's supporters are divided among multiple districts, so that they fall short of a majority in each; a 'packed' district is one in which a party's supporters are highly concentrated, so they win that district by a large margin, 'wasting' many votes that would improve their chances in others." *Rucho*, __ U.S. at ___, 139 S.Ct. at 2492, 204 L.Ed.2d 931.

concluded that the plan adopted by the commission significantly discriminates against Democratic voters to the advantage of Republican voters.

{¶ 122} "Partisan symmetry" measures whether each party would receive the same share of legislative seats assuming that each had identical percentage vote shares. Dr. Latner's analysis showed that if Republican candidates won 54 percent of the statewide vote under the adopted plan, they would win 64 House seats (a supermajority). In contrast, with the same statewide vote-share percentage, Democratic candidates would not win even a bare majority of the House seats under the adopted plan. Similarly, for statewide vote shares ranging from 45 percent to 55 percent—within the swing of actual Ohio voting patterns—Dr. Latner projected that under the Senate map that was adopted, the Republican candidates would win an average of 17 percent more seats than Democratic candidates for the same vote share.

{¶ 123} Dr. Latner further opined that "discretionary choices," as opposed to the necessity of complying with Article XI's objective map-drawing criteria, were the reasons for the asymmetry. His analysis showed that many district boundaries in the plan conform to partisan precincts in a precise manner, which supports the conclusion that the drawers of the plan relied on the partisan makeup of the districts and attempted to draw districts to favor one political party over the other. Dr. Latner identified counties throughout the state (Cuyahoga, Lucas, Summit, Hamilton, and Montgomery) where boundaries were unnecessarily drawn to create "safe seats" for Republican candidates.

{¶ 124} Dr. Imai's work also supports the conclusion that the adopted plan's partisan skew is not due to Ohio's political geography. Using Article XI's map-drawing criteria, Dr. Imai generated 5,000 possible district plans. Of those simulated plans, *none* was as favorable to Republicans as the adopted plan. The fact that the adopted plan is an outlier among 5,000 simulated plans is strong evidence that the plan's result was by design.

{¶ 125} Dr. Imai also performed a detailed analysis of districts in Hamilton, Franklin, and Cuyahoga-Summit-Geauga counties.[14] Using data from 13 statewide elections from 2012 to 2020, Dr. Imai found that the adopted plan had a pattern of packing disproportionately large numbers of Democratic voters into some districts while turning other districts into Republican safe seats. This targeted packing and cracking of Democratic voters allowed the adopted plan to gain Republican House seats in these counties. And among all possible compliant Senate plans that included these counties, the adopted plan was an outlier: none of the simulations projected as many legislative seats being won by Republican candidates.

{¶ 126} Dr. Rodden's expert report similarly demonstrates that the adopted plan was drawn primarily to favor Republican candidates and to disfavor Democratic candidates. Dr. Rodden compared the adopted plan to other plans, including a plan that he created. Though Dr. Rodden acknowledged the challenges presented by Ohio's political geography, he concluded that the partisan skew of the adopted plan was not a product of those challenges. In his view, the adopted plan resulted from (1) strategic packing and cracking of Democratic voters in metropolitan areas, (2) splitting proximate groups of Democratic voters to scatter them across majority-Republican rural and exurban districts (e.g., the Cincinnati and Dayton metropolitan areas), and (3) keeping proximate groups of Democratic voters apart to carve out majority-Republican districts within urban counties.[15] Indeed, when Dr. Rodden drew his district plan that adhered to traditional redistricting principles, complied with Article XI, and did not endeavor to help or harm any political party, the result was much different: a plan with more compact

---

14. Dr. Imai analyzed Cuyahoga, Summit, and Geauga counties as a "cluster." Multiple House districts in the adopted plan stretched across county lines in this area.

15. As examples, Dr. Rodden cited District 10 in southwest Franklin County, District 27 in eastern Hamilton County, District 39 outside Dayton, and District 17 in southern Cuyahoga County. He discerned a strategy to configure districts with "long, narrow strips hugging the county boundary in sparsely populated exurban areas."

districts and in which the partisan split in Republican candidates' favor was 57 percent to 43 percent in the House and 55 percent to 45 percent in the Senate.

{¶ 127} Senate President Huffman and House Speaker Cupp argue that the Republican advantage in the adopted plan results from the changing voting and residential patterns of Ohioans. They cite both Dr. Rodden—one of petitioners' experts—and their own experts to show that Democratic voters are highly clustered in urban areas while Republican voters are scattered more evenly throughout the state. This clustering, they say, creates a "natural disadvantage" for Democratic candidates when legislative districts are drawn, with the result being that Democratic candidates have far fewer counties in which they can be competitive.

{¶ 128} There is no dispute among the experts that Ohio's political geography poses challenges in the drawing of overall Article XI-compliant districts. But the testimony of respondents' experts does not rebut the key point established by petitioners' experts: it is possible to draw a plan that is compliant with Article XI and that does not favor the majority party to the overwhelming extent that the adopted plan does.

{¶ 129} To show that the adopted plan's partisan skew was due to the political geography of the state, Senate President Huffman and House Speaker Cupp submitted expert testimony from Dr. Michael Barber, a professor of political science at Brigham Young University with expertise in advanced statistical methods for analyzing election data, and Sean P. Trende, a doctoral candidate in political science at the Ohio State University and an analyst with RealClearPolitics. Dr. Barber and Trende mainly compared the adopted plan to plans introduced by Senator Sykes on September 1 and September 15. They point out the various ways in which Senator Sykes's plans are pro-Democratic gerrymanders. Similarly, an affidavit submitted by DiRossi details the ways in which Senator Sykes's September 15 plan and a plan offered by a citizen group do not comply with Article XI. But showing that other plans are pro-Democratic gerrymanders or

noncompliant with Article XI does not validate the adopted plan. Nor does it show that the commission attempted to comply with Article XI, Section 6(A) when it drew the adopted plan.

{¶ 130} Senate President Huffman and House Speaker Cupp offer additional expert testimony addressing whether the adopted plan has a partisan bias. Trende questions the metrics used by petitioners' experts to measure partisan bias, opining that it is not clear what this court must infer from those metrics. Trende does not, however, offer an alternative way to measure partisan bias. More importantly, he does not offer testimony rebutting Dr. Rodden's or Dr. Imai's evidence that it is possible for the commission to draw a district plan that is compliant with Article XI and that does not favor Republican candidates so heavily.

{¶ 131} Although respondents have presented evidence showing that Ohio's political geography and the map-drawing requirements of Article XI, Sections 3 and 4 may naturally lead to a district map's favoring the Republican candidates, the evidence shows that these factors did not dictate as heavy a partisan skew as there is in the adopted plan. Petitioners have shown beyond a reasonable doubt that the commission did not attempt to draw a districting plan that meets the standard articulated in Section 6(A).[16]

_____

16. The second dissenting opinion concedes that our analysis of what constitutes an attempt to comply with Article XI, Section 6 is plausible but also takes the position that the commission members' efforts to comply with that provision, as chronicled in the first dissenting opinion, is also plausible. The plausibility of these competing interpretations, according to the second dissenting opinion, means that petitioners cannot satisfy their burden of proving beyond a reasonable doubt that the plan is unconstitutional. For this proposition, the second dissenting opinion relies on *Ohio Grocers Assn. v. Levin*, 123 Ohio St.3d 303, 2009-Ohio-4872, 916 N.E.2d 446, ¶ 24, in which we held that "it is not enough to show that one plausible reading requires [a] statute to be stricken as unconstitutional, when another plausible reading permits it to survive." *See also Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37 ("The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid"). The second dissenting opinion's reliance on the analysis applicable to facial challenges to the constitutionality of statutes is misplaced. We do not have before us two competing interpretations of a statute, one of which would make it unconstitutional and the other constitutional. Rather, we have (as the second dissenting opinion highlights) competing interpretations of the *constitutional provision itself*, i.e., what the term "shall attempt" means as used in Section 6. To

## D. Article XI, Section 3(B)(2)

{¶ 132} Article XI, Section 3(B)(2) of the Ohio Constitution provides, "Any general assembly district plan adopted by the commission shall comply with all applicable provisions of the constitutions of Ohio and the United States and of federal law." Petitioners OOC et al. argue that the adopted district plan violates this provision because it does not comply with the Ohio Constitution's guarantees of equal protection (Article I, Section 2), assembly (Article I, Section 3), and free speech (Article I, Section 11). They argue that the plan violates the Equal Protection Clause by diluting the weight of Democratic votes and that it violates the Assembly and Free Speech Clauses by burdening Democrats' political and associational activities.

{¶ 133} Because we invalidate the plan under Article XI, Sections 6(A) and 6(B), we do not reach these claims. We express no opinion on whether a plan could comply with the requirements of Article XI yet still violate the Equal Protection, Assembly, or Free Speech Clauses of the Ohio Constitution.

{¶ 134} A final note. Our analysis and conclusion in these cases would be the same regardless of which political party makes up the majority of the commission or drives the map-drawing process. And any disagreement between the members of this court about the legal interpretation of words in the Ohio Constitution does not undermine the integrity of the court or Ohioans' confidence in it, as the second dissenting opinion fears. It is a hallmark of an independent judiciary, made up here of seven jurists, that principled legal disagreements may arise. When disagreements do arise and are addressed intelligently and truthfully by the justices, confidence in the judicial branch of our government is strengthened.

---

prevail on their challenge in these cases, petitioners must prove beyond a reasonable doubt that the plan violates Section 6 as we definitively interpret it; they do not have to prove that the plan is unconstitutional under some other interpretation of Section 6 not adopted by this court. *See Wilson*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, at ¶ 48 ("we consider the plan against the requirements of the United States and Ohio Constitutions, *as interpreted by federal and state decisional law*" [emphasis added]).

But when they are addressed with dire predictions and what appears to be unreasonable characterizations, we cannot help but wonder whether such aspersions will shake the public's confidence in our court.

### E. Remedy

{¶ 135} For the reasons set forth above, we hold that the redistricting commission did not comply with Article XI, Section 6. We therefore declare the plan invalid and order the commission to be reconstituted and to adopt a plan in conformity with the Ohio Constitution.

{¶ 136} We are mindful of the imminent 2022 election cycle, which starts with the February 2, 2022 deadline for candidates for legislative offices to submit petitions and declarations of candidacy. *See* R.C. 3513.05. And because the election cycle should not proceed with a General Assembly–district map that we have declared invalid, it is appropriate to issue further remedial orders in an effort to have the redistricting commission adopt a plan that complies with Article XI in time for the plan to be effective for the 2022 election cycle. *See* Ohio Constitution, Article IV, Section 2(B)(1)(f); *State v. Steffen*, 70 Ohio St.3d 399, 407, 639 N.E.2d 67 (1994) (interpreting Section 2(B)(1)(f) "to authorize judgments in this court that are necessary to achieve closure and complete relief in actions pending before the court").

{¶ 137} Therefore, in addition to declaring the plan invalid and ordering the commission to reconvene to adopt a new plan, we direct the commission to adopt a new plan within ten days of this judgment. We also retain jurisdiction to review the plan that the commission adopts for compliance with our order.

### III. CONCLUSION

{¶ 138} Because the commission did not attempt to meet the standards set forth in Article XI, Sections 6(A) and 6(B) of the Ohio Constitution, we declare invalid the General Assembly–district plan adopted on September 16, 2021. Pursuant to Article XI, Section 9(B), we order the commission to be reconstituted under

Article XI, Section 1, to convene, and to ascertain and adopt a General Assembly–district plan in conformity with the Ohio Constitution. The commission's plan shall comply with the standards set forth in Sections 6(A) and 6(B) as we have explained them above.

{¶ 139} We further order the commission to adopt a new plan within ten days of this judgment, and we retain jurisdiction for the purpose of reviewing the new plan adopted by the commission. Petitioners shall file any objections to the new plan within three days of the plan's adoption.

Relief granted.

DONNELLY, J., concurs.

O'CONNOR, C.J., concurs, with an opinion joined by BRUNNER, J.

BRUNNER, J., concurs, with an opinion.

KENNEDY, J., dissents, with an opinion joined by DEWINE, J.

FISCHER, J., dissents, with an opinion.

———————————

**O'CONNOR, C.J., concurring.**

{¶ 140} I concur fully in the majority opinion.

{¶ 141} I write separately because readers should understand they have the power to again amend the Ohio Constitution to ensure that partisan politics is removed from the drawing of Ohio Senate and House districts that takes place every ten years.

{¶ 142} And, if upon reading the court's decision today, readers determine that Article XI of the Ohio Constitution is not living up to its promise—in light of the map-drawing process presented to the court in these cases (or the dissenting opinions' assertion that Article XI has no discernable or enforceable effect to curb gerrymandering in the state of Ohio)—and that leaving the redistricting process to partisan-elected officials will not achieve the desired outcome, readers should know that other models of the redistricting process exist. In other states, voters have

elected ballot measures that strip redistricting authority from state legislatures and partisan officeholders and place it instead with nonpartisan redistricting commissions. Indeed, "independent redistricting commissions are increasingly synonymous with *citizen* redistricting commissions, where ordinary citizens serve as commissioners," because staffing commissions with career politicians, including legislators, "still permitted informal, careerist, and political interests to permeate the redistricting process." (Emphasis sic.) Emily Rong Zhang, *Bolstering Faith with Facts: Supporting Independent Redistricting Commissions with Redistricting Algorithms*, 109 Cal.L.Rev. 987, 989-990 (2021), citing Bruce E. Cain, *Redistricting Commissions: A Better Political Buffer?*, 121 Yale L.J. 1808, 1817-1821 (2012).

{¶ 143} While not free from their own vulnerabilities, independent redistricting commissions have become "the premier institutional solution to the problem of partisan gerrymandering" because they increase the degree of separation between map-drawers and partisan politics. Zhang, 109 Cal.L.Rev. at 1000. They shift the power to redistrict away from partisan actors who have an incentive to gerrymander in order to maintain or expand their political power. Christopher Esposito, *Gerrymandering and the Meandering of Our Democratic Principles: Combating Partisan Gerrymandering After* Rucho, 30 S.Cal. Interdisc.L.J. 195, 211 (2021). States that have enacted citizen-led, independent redistricting commissions include Arizona, California, Michigan, and Colorado. Zhang, 109 Cal.L.Rev. at 990.

{¶ 144} In 2000, in an effort to end the practice of gerrymandering, Arizona voters adopted Proposition 106, an initiative that amended the state's constitution to shift redistricting authority from the state legislature to the Arizona Independent Redistricting Commission ("AIRC"). *See Arizona State Legislature v. Arizona Independent Redistricting Comm.*, 576 U.S. 787, 792, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015). The resulting constitutional amendment provides for a five-member

commission, with each member chosen from a pool of nominees established by the state's commission on appellate-court appointments. Arizona Constitution, Article IV, Part 2, Section 1(3) through (6). The first four members of the AIRC are chosen by the majority and minority party leaders in the state legislature, who each select one member from the nomination pool. *Id.* at Section 1(6). Those four named commission members then choose the final member from the same nomination pool; the final member may not be registered with any political party already represented on the commission. *Id.* at Section 1(8). Except for school-board members and officers or candidates for school board, current holders of, or candidates for, public office may not serve on the AIRC, and no more than two of the commission's five members may be affiliated with the same political party. *Id.* at Section 1(3). The Arizona initiative required that AIRC's redistricting plans "start from scratch, modifying an initial grid plan according to traditional criteria such as compactness, contiguity, and community of interest, and to the extent possible relying on visible geographic features and undivided census tracts," without considering incumbency or using political data in the construction of the initial grid. Cain, 121 Yale L.J. at 1830.

{¶ 145} The California Redistricting Commission operates similarly to the AIRC, but its redistricting plans take effect only if approved by public referendum. *Arizona State Legislature* at 798, citing California Constitution, Article XXI, Section 2 and Cal.Govt.Code Ann. 8251-8253.6 (West Supp.2015); *see also* Cain, 121 Yale L.J. at 1823. "The unstated assumption behind the California effort was that a bipartisan panel of citizens, unconnected to incumbent legislators and relying on neutral criteria, would create fair and competitive district boundaries without explicit instructions to do so and without using political data. In other words, partisan fairness and competition would be the indirect effect of the commission's composition and adherence to designated neutral formal criteria (e.g., compactness, respect for city and county boundaries, following communities of interest, etc.)."

Cain, 121 Yale L.J. at 1823-1824. The multi-step process for choosing the 14 commission members in California was " 'designed to be extraordinarily fair and impartial, and lead to a group of commissioners who would meet the very high standards of independence and would reflect the population of [the state].' " *Id.* at 1824, quoting California Citizens Redistricting Commission, *Final Report on 2011 Redistricting* 2 (2011).

{¶ 146} More recently, in 2018, Michigan voters passed a proposal to amend that state's constitution " 'to establish a commission of citizens with exclusive authority to adopt district boundaries for the Michigan Senate, Michigan House of Representatives and U.S. Congress.' " *Daunt v. Benson*, 999 F.3d 299, 303 (6th Cir.2021), quoting Michigan Board of State Canvassers, *Official Ballot Wording approved by the Board of State Canvassers, August 30, 2018, Voters Not Politicians*,
https://www.michigan.gov/documents/sos/Official_Ballot_Wording_Prop_18-2_632052_7.pdf. The Michigan commission consists of 13 registered voters, randomly selected by the secretary of state from eligible applicants. *Id.* at 304. It must include four members who are affiliated with each of the state's two major political parties and five members who are unaffiliated with those parties. *Id.* Partisan officeholders and candidates, their employees and certain relatives, and lobbyists are prohibited from serving on the commission. *Id.* And a final decision by the commission to adopt a redistricting plan requires a majority vote that includes at least two commissioners who affiliate with each major political party and two commissioners who do not affiliate with either major party. *Id.* at 305, citing Michigan Constitution Article IV, Section 6(14)(c).

{¶ 147} Having now seen firsthand that the current Ohio Redistricting Commission—comprised of statewide elected officials and partisan legislators—is seemingly unwilling to put aside partisan concerns as directed by the people's vote, Ohioans may opt to pursue further constitutional amendment to replace the current

commission with a truly independent, nonpartisan commission that more effectively distances the redistricting process from partisan politics.

BRUNNER, J., concurs in the foregoing opinion.

_____

**BRUNNER, J., concurring.**

{¶ 148} I fully join the majority opinion invalidating the 2021 redistricting plan for the Ohio General Assembly under Article XI, Section 6(B) of the Ohio Constitution. In addition, I would find the plan invalid under Article XI, Section 3(B)(2), as argued by petitioners Ohio Organizing Collaborative, the Ohio chapter of the Council on American-Islamic Relations, the Ohio Environmental Council, and six individual voters[17] (collectively, "the OOC") in Supreme Court case No. 2021-1210. Article XI, Section 3(B)(2) provides that "[a]ny general assembly district plan adopted by the commission shall comply with all applicable provisions of the constitutions of Ohio and the United States and of federal law." I agree with the OOC that the plan violates Article I, Section 2 of the Ohio Constitution, which concerns equal protection, and therefore violates Article XI, Section 3(B)(2). There can be no debate about this court's jurisdiction to review the Ohio Redistricting Commission's four-year plan under Article XI, Section 9 for an alleged violation of Article XI, Section 3, *see* Article XI, Section 9(D)(3), and, despite the contentions of the dissenting opinions, I concede no jurisdictional deficiency as to the matters reviewed in the majority opinion.

{¶ 149} The OOC's argument is that the legislative redistricting plan does not comply with the Ohio Constitution's guarantees of equal protection (Article I, Section 2), freedom of assembly (Article I, Section 3), and freedom of speech (Article I, Section 11). It contends that the plan violates the Equal Protection Clause by diluting the weight of Democratic votes and that they violate the Assembly and Free

_____

17. The six voters in case No. 2021-1210 are Pierrette Talley, Samuel Gresham Jr., Ahmad Aboukar, Mikayla Lee, Prentiss Haney, and Crystal Bryant.

Speech Clauses by burdening Democrats' political and associational activities. I focus solely on the OOC's equal-protection claims regarding the dilution of Democratic votes in reviewing the plan under Article I, Section 2.

*I. The plan violates petitioners' rights to vote on equal terms*

{¶ 150} Both of the dissents in this case argue that this court has no power to review the four-year plan for legislative redistricting that was adopted by the Ohio Redistricting Commission in late 2021. The dissents argue that voters in newly reconstituted, gerrymandered districts may vote out of office their elected legislative representatives if they do not believe their leaders have honored their oaths to the Ohio Constitution requiring fair legislative districts. While "vote them out of office" is an oft-used, convenient mantra of political laissez-faire, Ohio voters did not vote to "let it be." The dissents dissect and wring from Article XI a ban against this court's acting to address what is our exclusive responsibility concerning a four-year redistricting plan. By providing a remedy to petitioners under this new Article XI of our Constitution, we are neither exercising "judicial fiat," dissenting opinion of Kennedy, J., at ¶ 277, nor undermining the public's confidence in this court nor harming the judicial branch of Ohio's government "for generations," dissenting opinion of Fischer, J., at ¶ 351. Instead, we are exercising our constitutionally required jurisdiction under Article XI, Section 9(A), to do what we are commanded to do by the people of Ohio in their spoken word through our state's Constitution. The majority opinion correctly explains our authority to act and provides a necessary remedy. This separate opinion explains another reason why we are obliged to act—to provide for the equal protection and benefit of the people under Article I, Section 2 of the Ohio Constitution.

{¶ 151} Gerrymandering at its core prevents voters from voting on equal terms to alter or reform their government. Article I, Section 2 provides: "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same,

whenever they may deem it necessary." This language is broader than the language of the Fourteenth Amendment to the United States Constitution,[18] which contains proscriptions against taking or denying benefits, especially by the states. The OOC's dependence on Article I, Section 2, is well-founded because that provision builds into the Ohio Constitution foundational reasons for the existence of state government—for the equal protection and benefit of the people. *Id.*

{¶ 152} The right to vote is at the core of this provision, as altering and reforming the government is done most directly and most commonly by casting a ballot. *See Hamilton v. Fairfield Twp.*, 112 Ohio App.3d 255, 275, 678 N.E.2d 599 (12th Dist.1996) ("the right to vote or otherwise choose whether to form a municipal corporation is a fundamental right that is guaranteed by Section 2, Article I of the Ohio Constitution"); *see also State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 55 ("Ours is still a representative democracy in which legislators derive their authority from the citizens of our state").

{¶ 153} When describing this right to vote, state law routinely uses the term "elector." An elector is a person who has "the qualifications provided by law to be entitled to vote." R.C. 3501.01(N). When an elector "votes at an election," he or she becomes a "voter." R.C. 3501.01(O). Electors' rights may not be interfered with, and electors may not be harassed while registering or voting, R.C. 3501.90. Electors sign petitions that permit candidates and issues to appear on local and statewide ballots. R.C. 3501.38(A). Electors file election protests, because they have standing to contest a candidacy that is the subject of the protest. *See* R.C. 3501.39; R.C. 3513.05 ("Protests against the candidacy of any person filing a

---

18. "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Fourteenth Amendment to the U.S. Constitution.

declaration of candidacy for party nomination or for election to an office or position, as provided in this section, may be filed by any qualified elector who is a member of the same political party as the candidate and who is eligible to vote at the primary election for the candidate whose declaration of candidacy the elector objects to, or by the controlling committee of that political party"); *State ex rel. Bender v. Franklin Cty. Bd. of Elections*, 157 Ohio St.3d 120, 2019-Ohio-2854, 132 N.E.3d 664, ¶ 8 ("only the controlling committee of a political party *or a qualified elector* who is a member of the same political party as the protested candidate and who is eligible to vote for the candidate in the primary election may protest a candidate's petition" [emphasis added]). Electors collectively decide taxation issues when they vote. *See, e.g.*, R.C. 5748.09. When they vote, electors participate in the determination of questions involving local economic development. R.C. 715.691. Electors decide questions involving the transfer of school-district territory and more. *See, e.g.*, R.C. 3311.22.

{¶ 154} Article XI, Section 6(B) requires that "[t]he statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." When electors are assigned to legislative districts by a plan that does not closely correspond to the statewide preferences of all Ohio voters, the effect of the votes for parties' candidates is either disproportionately diminished or disproportionately legitimized. Some electors of the disproportionately diminished party may choose not to become voters at that election, believing that their vote in a severely gerrymandered district is of little or no consequence. When an elector, for example, is asked by her employer to work late on Election Day and working extra may jeopardize her ability to arrive at the polling place before it closes at 7:30 p.m., she may simply shrug and say, "Oh, well, my vote really doesn't count anyway." On the other hand, a similarly situated voter in the disproportionally legitimized party

in a gerrymandered district might also work late and choose not to vote, thinking, "They do not need my vote; there are so many people already voting for the candidate or issue I care about." In this scenario, under the adopted redistricting plan, there would be less impact on Republican Party candidates than on Democratic Party candidates. And it goes without saying that legislative representatives can use the power they have to cement their power by changing the very laws that provide electors and voters the opportunities to participate in their own governance through the vote.

{¶ 155} With depressed voter turnout, all electors and voters are affected. This may result in doubt and lack of confidence in the democratic process—that is, whether the outcome of an election by so few voters as compared to electors is truly the will of the people.

{¶ 156} Gerrymandering and its resulting effects undermine a government that is intended for the benefit and equal protection of the people. *See* Ohio Constitution, Article I, Section 2. Gerrymandering is not beneficially foundational. *See id.* Gerrymandering damages voter confidence and that fragile thing we call democracy. Gerrymandering is unconstitutional, because it denies Ohioans equal protection in the exercise of their voting power. *See* Ohio Constitution, Article I, Section 2 and Article XI, Section 3.

{¶ 157} Undeniably, " '[t]he right to vote includes the right to have one's vote counted on equal terms with others.' " *State ex rel. Skaggs v. Brunner*, 120 Ohio St.3d 506, 2008-Ohio-6333, 900 N.E.2d 982, ¶ 58, quoting *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir.2008). A law—and in this case, the Ohio Redistricting Commission's plan—that decreases the weight or dilutes the power of a group of citizens' votes relative to their ability to achieve representative influence in the legislature may impermissibly burden that right when the outcomes relating to one class of voters are not proportional to the votes cast. *See Common Cause v. Lewis*, N.C.Super. No. 18 CVS 014001, 2019 WL

4569584, *116 (Sept. 3, 2019) ("There is nothing 'equal' about the 'voting power' of [one political party's] voters when they have a vastly less realistic chance of winning a majority in either chamber under the enacted plans"). There is no allowance in Article I, Section 2 to create a favored (or disfavored) class of voters. *See Lucas Cty. Bd. of Commrs. v. Waterville Twp. Bd. of Trustees*, 171 Ohio App.3d 354, 2007-Ohio-2141, 870 N.E.2d 791, ¶ 25-26, 32, 41 (6th Dist.) (holding that such favored and disfavored classes of voters are forbidden by, among other authorities, the Ohio Constitution). In short, when legislative maps are adopted in a manner that manipulates electoral constituencies to favor and entrench the legislative control of one party and disfavor another, creating unequal classes of voters, this affects the weight and power of each person's vote and violates Article I, Section 2.

### II. *Three-prong test to prove an equal-protection violation*

{¶ 158} In adjudicating the OOC's claims that the adopted legislative-district plan violates Article XI, Section 3(B)(2) of the Ohio Constitution, it is appropriate to employ the three-prong test developed by a federal district court and applied to Ohio's 2012 congressional map in finding it invalid just two years ago. *See Ohio A. Philip Randolph Inst. v. Householder*, 373 F.Supp.3d 978, 1093 (S.D.Ohio 2019).[19] That *Ohio A. Philip Randolph Inst.* was vacated on jurisdictional grounds does not vitiate the viability of its integrity or logic for application here. The holding of the federal trial court in *Ohio A. Philip Randolph*

---

19. In *Chabot v. Ohio A. Philip Randolph Inst.*, __ U.S. __, __, 140 S.Ct. 102, 205 L.Ed.2d 1 (2019), the United States Supreme Court vacated the district court's judgment in *Ohio A. Philip Randolph Inst.* and remanded the matter to the district court for further consideration in light of its decision in *Rucho v. Common Cause*, ___ U.S. ___, ___, 139 S.Ct. 2484, 204 L.Ed.2d 931 (2019), in which the high court held that partisan-gerrymandering claims present political questions beyond the reach of the federal courts, *id.* at ___, 139 S.Ct. at 2506-2507. The Supreme Court noted that these claims may be justiciable in state courts because "[p]rovisions in state statutes and state constitutions can provide standards and guidance for state courts to apply." *Id.* at __, 139 S.Ct. at 2507. On remand, however, the district court in *Ohio A. Philip Randolph Inst.* dismissed the case for lack of jurisdiction in light of the decision in *Rucho*. *See Ohio A. Philip Randolph Inst. v. Householder*, S.D.Ohio No. 1:18-cv-357, 2019 U.S. Dist. LEXIS 186944 (Oct. 29, 2019).

*Inst.* forms a persuasive, cogent basis for analyzing how our state constitutional provisions may be used to perform an equal-protection analysis of the 2021 state legislative maps. The federal court's analysis was specifically applied to Ohio's 2011 congressional redistricting map for 2012, and ten years later, the new constitutional provisions in Article XI for state legislative redistricting now specifically require the representational fairness discussed and sought in *Ohio A. Philip Randolph Inst*. at 1092-1150.

{¶ 159} The United States Supreme Court in *Rucho v. Common Cause* made clear that gerrymandering is an issue that cannot be solved by federal courts, because there is "no plausible grant of authority in the [federal] Constitution" allowing such an inquiry. ___ U.S. ___, ___, 139 S.Ct. 2484, 2507, 204 L.Ed.2d 931 (2019). However, the court noted that its holding did not "condemn complaints about districting to echo into a void," because state courts interpreting provisions of *state law* that provide for fair districts were held to be capable of providing that relief. *Id.* at __, 139 S.Ct. at 2507-2508 (noting constitutional amendments and legislation in Florida, Missouri, Iowa, Delaware, Colorado, and Michigan).

{¶ 160} Thus, under the framework set forth in *Ohio A. Philip Randolph Inst*., we should require that the OOC, to establish a violation of the Equal Protection Clause of the Ohio Constitution, "demonstrate that those in charge of the redistricting 'acted with an intent to "subordinate adherents of one political party and entrench a rival party in power." ' " 373 F.Supp.3d at 1093, quoting *Common Cause v. Rucho*, 318 F.Supp.3d 777, 862 (M.D.N.C.2018), *vacated by Rucho*, __ U.S. __, ___ 139 S.Ct. 2484, 204 L.Ed.2d 931, quoting *Arizona State Legislature v. Arizona Indep. Redistricting Comm*, 576 U.S. 787, 791, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015). This goes to the fundamental protection of ensuring that state government will continue to be instituted for Ohioans' benefit and equal protection under Article I, Section 2, especially when relating to access to voting and its equal import no matter where a person resides in the state.

**{¶ 161}** Second, we should require that the OOC prove the plan's discriminatory effect, demonstrating that the plan will have the effect of "diluting the votes of members of the disfavored party." *Ohio A. Philip Randolph Inst.* at 1096. In light of Article I, Section 2, "[a]ll political power is inherent in the people" and it must be equally so. Any plan that is proved to have the effect of "diluting the votes of members of the disfavored party" violates Article I, Section 2.

**{¶ 162}** Finally, if subordination and entrenchment along with vote dilution are proved, the burden should shift to the respondents "to present evidence that legitimate legislative grounds provide a basis for the way in which [the map] was drawn." *Id.* at 1098. In *Wilson v. Kasich,* 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 80-82, Justice McGee Brown noted in her dissent that

> [o]ther states have also shifted the burden of proof to the parties responsible for the apportionment plan to justify their departure from certain constitutional provisions once [the] relators established that the plan is unconstitutional in some respect. *See In re Legislative Districting of the State*, 370 Md. [312,] 368, 805 A.2d 292 [2002] (when apportionment plan raised sufficient issues with respect to its compliance with state constitutional requirements, court placed burden of proof on the state to justify the plan); *In re Reapportionment of Colorado Gen. Assembly*, 45 P.3d 1237, 1241 (Colo.2002) (court held that if an apportionment plan does not comply with the county-boundary requirement of the Colorado Constitution, the reapportionment commission must make an adequate factual showing that less drastic alternatives could not have satisfied the equal-population constitutional requirement); *In re Legislative Districting of Gen. Assembly of Iowa*, 193 N.W.2d 784, 791 (Iowa 1972) (state failed to sustain burden of proof to show

why state legislative reapportionment plan could not comply with state constitution's compactness requirement).

This approach is logical. The respondents who crafted and approved the apportionment plan are in the best position to know the basis for any noncompliance with [former] Article XI.

Therefore, I would hold that once [the] relators make a prima facie showing beyond a reasonable doubt that [the] respondents have violated a provision of [former] Article XI of the Ohio Constitution, the burden of proof shifts to [the] respondents to justify that violation based on the avoidance of a violation of another superior or coequal legal requirement. *Id.*

{¶ 163} The application of the three-part test also would be favored based on the plain language of Article I, Section 2, which indicates that the interests of the people are paramount and that the people have the right to abolish their government. Moreover, this provision of the state Constitution has been interpreted as requiring "that the government treat all similarly situated persons alike." *Sherman v. Ohio Pub. Emps. Retirement Sys.*, 163 Ohio St.3d 258, 2020-Ohio-4960, 169 N.E.3d 602, ¶ 14, citing *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 6. "When a claim involves a fundamental right or a suspect class, the government's action is subject to a higher level of scrutiny." *Id*. Thus, the legislature and the Ohio Redistricting Commission should bear the burden of explaining their actions when there is proof that they are acting in violation of the equal protection and benefit guaranteed by the state Constitution. Application of the *Ohio A. Philip Randolph Inst.* three-prong test to the evidence and stipulations in this case follows.

{¶ 164} For the first prong, that the state acted with an intent to subordinate adherents of one political party and entrench a rival party in power, intent " 'is

rarely provable by direct evidence' " and " 'generally must be inferred from the totality of the circumstances.' " *Aztec Internatl. Foods, Inc. v. Duenas*, 12th Dist. Clermont No. CA2012-01-002, 2013-Ohio-450, ¶ 42, quoting *Fairbanks Mobile Wash, Inc. v. Hubbell*, 12th Dist. Nos. CA2007-05-062, CA2007-05-068, 2009-Ohio-558, ¶ 22; *see, e.g.*, *State ex rel. Floyd v. Formica Corp.*, 140 Ohio St.3d 260, 2014-Ohio-3614, 17 N.E.3d 547, ¶ 16. In a partisan-gerrymandering case, an intent to dilute votes to entrench a party in power may be demonstrated by

> the timeline and logistics of the map-drawing process, the map drawers' heavy use of partisan data, contemporaneous statements made by the map drawers about their efforts, the characteristics of the map itself (including the irregular shape of the districts, their lack of compactness, and the high number of county and municipality splits), and finally, the outlier partisan effects that the map has produced since its enactment.

*Ohio A. Philip Randolph Inst.*, 373 F.Supp.3d at 1099. The evidence discussed by the majority supports the conclusion that the district plan adopted by the commission was drawn purposely to entrench one political party's power and control over the General Assembly by diluting the votes of the other party's voters. *See* majority opinion at ¶ 121-123 (discussing the expert report of Dr. Michael Latner). The adopted plan indisputably makes it easier for voters favoring one major party, the Republican Party, to transform their votes into legislative seats than it does for voters favoring the other major party, the Democratic Party. The objective difference between the statewide preference of voters over the last ten years and the ratio of Republican-leaning versus Democratic-leaning districts under the plan adopted is evidence beyond a reasonable doubt of vote dilution through gerrymandering.

{¶ 165} The depositions of Drs. Latner, Kosuke Imai, and Jonathan Rodden also plainly show that the Ohio Redistricting Commission could have drawn and adopted maps that are compliant with the Ohio Constitution and that do not impermissibly dilute the votes of either party for either chamber of the General Assembly. *See id.* at ¶ 121-126.

{¶ 166} The process followed by the commission provides evidence of an intent to entrench one party in power at the expense of voters supporting the other party. The commission ceded its responsibility and power to the four members of the legislative branch, and when adopting the final plan and the statement under Article XI, Section 8(C)(2), it acquiesced to the two Republican leaders of the General Assembly. In none of the meetings of the commission was any provision made or any vote held to delegate the commission's map-drawing duties to any particular people. The commission did not hire an independent, nonpartisan map drawer or use any of the dozens of other publicly submitted maps as a starting point. Instead, funds were simply allocated to the legislative members of the commission and their respective caucuses to use as they saw fit. While the minutes of the commission reflect the adoption of rules on August 31, 2021, the rules did not appear on the commission's website, https://www.redistricting.ohio.gov/assets/ organizations/redistricting-commission/events/commission-meeting-august-31-2021-16/ohio-redistricting-commission-rules.pdf (accessed Jan. 8, 2022) [https://perma.cc/6C3U-3AV2], until after the passage of 2021 Sub.H.B. 92, which enacted R.C. 3521.04, a statute providing for the creation of the commission's website. The effective date of R.C. 3521.04 was September 29, 2021—almost two weeks *after* the commission had adopted the legislative redistricting plan that is the subject of these actions.

{¶ 167} And when the Republican legislative leaders' map was presented for the commission's review on September 9, 2021, the members of the commission used that map as a starting point to negotiate between the opposing partisan

caucuses of the legislature a ten-year map, while the executive branch of state government was left to stand by benignly, encouraging the two parties' leaders to try to come to some meeting of the minds. Basically, the commission permitted past decades' business as usual and mapping behind closed doors, despite new and specific constitutional provisions requiring a more fair and transparent process that were adopted by the voters in order to create fair legislative districts.

{¶ 168} The commission even failed to use ten years of statewide data to reach its determination of statewide proportions of somewhere between 54 and 81 percent Republican and 19 and 46 percent Democratic. The opposing partisan caucuses of the legislature even negotiated what data actually was used to determine the statewide proportion of votes between the parties, unconstitutionally settling on four years' worth, despite the constitutional requirement of ten years of data. *See* Ohio Constitution, Article XI, Section 6(B). Ray DiRossi, Senate President Matthew Huffman's designee who performed map drawing for that chamber of the legislature, referred in his deposition to consultants that he used in the map-drawing process, stating, "My data consultant was Clark Benson, and my technical consultant from [Ma]ptitude was John Morgan." DiRossi testified that during the map-drawing process, Morgan and Benson provided nonpublic data for 2012 and 2014 Democratic and Republican "vote percentages." DiRossi explained that this nonpublic data "made Maptitude work" but that the 2012 and 2014 data were "ultimately not used," because negotiations had begun on the September 9, 2021 map submitted to the commission by Senate President Huffman. Eventually the opposing partisan caucuses of the legislature negotiated and agreed that only election-results data from 2016, 2018, and 2020 were to be used by the commission. This affected how the "statewide preferences of the voters of Ohio" was determined—using a period of just four years—even though the Ohio Constitution requires that the determination be based on "statewide state and federal partisan general election results during the last ten years" and that the proportionality of the

districts whose voters favor each political party "correspond closely to" that statewide preference. Ohio Constitution, Article XI, Section 6(B). The commission could have used ten years of data, but it did not—apparently because, according to DiRossi, "negotiations" had started on the September 9, 2021 plan for which four years of data had been used.

{¶ 169} The record indicates that ten years of data was at least consulted in the mapmaking process by DiRossi and that the 2012 and 2014 data not used by the commission was needed to make Maptitude work. Necessary and reliable data is essential to accurate results. The parties here arbitrarily "negotiated" which data they would rely on to determine the statewide proportion of voter preferences. While Article XI, Section 6(B) directed the members of the commission to use statewide state and federal partisan general election results *during* the last ten years, there is no objective data or evidence in the record to support why they did not use the data they had for the entire ten-year period.

{¶ 170} Consider the Ohio Court of Claims' resolution of a reimbursement dispute based on data completeness and accuracy between a charter school and the Ohio Department of Education. The dispute involved the accuracy of the department's calculation of the school's full-time equivalent number of students. Finding for the school, the Court of Claims determined that the department had failed to gather sufficient data to perform an accurate calculation. The court held that without complete data, the department of education could not perform an accurate "desk review." *Harmony Community School v. Ohio Dept. of Edn.*, 125 Ohio Misc.2d 42, 2003-Ohio-5312, 797 N.E.2d 1058 (Ct. of Cl.), ¶ 15-16. Here, respondents' failure to use ten years' worth of election results to determine the statewide preferences of the voters of Ohio without sufficient evidence to justify a reason not to do so violated Article XI, Section 6(B) beyond a reasonable doubt.

{¶ 171} Based on the evidence discussed in the majority opinion, the Article XI, Section 8(C)(2) statement introduced by Senate President Huffman evidences

beyond a reasonable doubt an aim to favor Republican voters and disfavor Democratic voters. The statement offered the figure of 81 percent of voters favoring Republican statewide candidates as a measure of the "statewide preferences of the voters of Ohio," skimming the top line or total vote of Republican to Democrat winners by political party in partisan statewide races during the last ten years. Thus, with Republicans having won 81 percent of statewide contests in the last ten years, the statewide proportion of voter preference could be as much as 81 percent, according to respondents. The OOC argues that under this commission model, if the Republican Party won 100 percent of statewide elections with 50.1 percent of the vote, it would be a proportional outcome for Republicans to win 100 percent of General Assembly districts.

{¶ 172} The second element of the test—whether the plan has the effect of substantially diluting votes for a group's candidates—is also satisfied here beyond a reasonable doubt based on the evidence previously discussed in this opinion and relied on in the majority opinion. Dr. Latner's proportionality analysis alone shows that under the commission's plan, statewide Democratic candidates' vote totals will not translate into representation at the same rate as will Republican candidates' vote totals. *See* majority opinion at ¶ 121-123.

{¶ 173} Finally, respondents in their various arguments have not demonstrated that there is a legitimate, nonpartisan justification for their redistricting plan. The evidence in the record demonstrates that the commission could have drawn maps that were proportional and that did not disfavor one party yet still complied with other requirements, such as the county- and city-split requirements in Article XI, Sections 3 and 4. Respondents did not do this, and their justification for why they did not, is not credible. In fact, not even all the members of the commission believed that the Article XI, Section 8(C)(2) statement provided justification for the readily apparent lack of close correspondence with statewide voter preferences, *see* Ohio Constitution, Article XI, Section 6(B).

{¶ 174} The plan violates petitioners' rights to vote on equal terms and thus violates the equal-protection guarantee of Article I, Section 2 of the Ohio Constitution. As a result, the plan also violates Article XI, Section 3(B)(2), which states that "[a]ny general assembly district plan adopted by the commission shall comply with all applicable provisions of the constitutions of Ohio and the United States."

### III. *"Judicially manageable standards" for judging claims of gerrymandering*

{¶ 175} The statewide officeholders, along with counsel for the commission, argue that no judicially manageable standards exist to enable courts to judge claims of gerrymandering under Article I, Section 2 or Article XI. In particular, they assert that if a court cannot identify the "precise" line separating an extreme gerrymander from one that is not extreme, then all gerrymandering must be permitted, no matter how extreme. Their argument is tantamount to saying that the electorate's overwhelming 71 percent vote to pass Issue 1 in 2015 and thereby amend Article XI to put an end to gerrymandering in Ohio basically has no bearing on the need to end gerrymandering and that it lends no support to following the state Constitution requiring a plan with a statewide proportion of districts that closely corresponds to statewide voter preferences. But nothing in Article XI, Section 6 even contemplates the type of precision on which respondents insist. Section 6 requires an "attempt" based on standards of partisan fairness, statewide proportionality, and compactness for evaluating the commission's plan and requires that the plan "closely correspond" with statewide voter preferences determined according to votes cast over the preceding ten years.

{¶ 176} The expert evidence presented here and discussed in the majority opinion provides this court with numerous ways of evaluating how closely the redistricting plan meets these standards. Early federal caselaw applying the one-person, one-vote rule has resulted in malapportioned maps being invalidated without identifying a threshold for how much deviation from the 1-to-1 ratio

between districts is permitted. *See Reynolds v. Sims*, 377 U.S. 533, 545-546, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (involving population-variance ratios of up to 41 to 1); *Wesberry v. Sanders*, 376 U.S. 1, 2, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (involving population-variance ratios of up to 3 to 1). When legislative maps involve extreme gerrymandering, they, too, are invalid. And with respect to a threshold, it is likewise appropriate to permit the development of "a body of doctrine on a case-by-case basis" concerning maps drawn and adopted under Article XI of the Ohio Constitution. *See Reynolds* at 578.

{¶ 177} Regarding Florida's state districting scheme, the nation's high court stated in *Rucho*:

> In 2015, the Supreme Court of Florida struck down that State's congressional districting plan as a violation of the Fair Districts Amendment to the Florida Constitution. *League of Women Voters of Florida v. Detzner*, 172 So.3d 363 (2015). The dissent wonders why we can't do the same. * * * The answer is that there is no "Fair Districts Amendment" to the Federal Constitution.

*Rucho* at __, 139 S.Ct. at 2507, 204 L.Ed.2d 931.

{¶ 178} Like Florida and unlike the federal Constitution, the Ohio Constitution contains provisions explicitly guaranteeing fair districts based on statewide voter preferences as expressed by specified voting patterns during the last ten years. This required proportionality between political parties was approved by Ohio voters in 2015 when they adopted by popular vote the amendments to Article XI of the Ohio Constitution. These state constitutional guarantees are enforceable with or without enforceable principles of federal law, and this court, as the sole repository of "exclusive, original jurisdiction in all cases arising under" those

provisions, must see to it that they are enforced. Ohio Constitution, Article XI, Section 9(A); *see also* Ohio Constitution, Article I, Section 2.

### IV. *Preventing gerrymandering in Ohio in the future*

{¶ 179} Despite proponents' and voters' best intentions for systemic government change in approving the ballot measure to amend the state Constitution in 2015, the evidence shows that the leaders of the majority party in Ohio's veto-proof gerrymandered legislature managed to create a plan through the new bipartisan (as opposed to independent) redistricting commission that would have the effect of extending their party's dominance in even more impactful ways than in 2011— giving their party a supermajority of the legislature for another four years—just by adopting the plan by a simple majority of the commission vote without bipartisan support. What the dissents seem to be conceding, without expressly saying so, is that the voters were "duped" when the legislature presented them with a jointly recommended "bipartisan" proposed constitutional amendment for their adoption. Under the rationale of the dissents, new Article XI has given Republican legislators a "free pass" for four more years of outsized Republican dominance not matching a voting proportionality that, in itself, was not determined in conformity with constitutional requirements.

{¶ 180} The real takeaway from this four-year plan is that the Ohio Redistricting Commission should not be composed of people for whom the temptation may be too great to place political self-preservation above selfless service, regardless of party affiliation. What is needed in Ohio is an independent redistricting commission. Then, no matter who holds the pen, the district lines drawn will more likely be fair and reflect population changes of the state over ten-year swaths of time based on changes identified by the decennial United States Census. What is an "independent redistricting commission"?

An Independent Redistricting Commission (IRC) is a body separate from the legislature that is responsible for drawing the districts used in congressional and state legislative elections. In most states, the state legislature is responsible for drawing and approving electoral districts with a simple majority subject to a gubernatorial veto. Because this process—known as redistricting—generally involves political actors whose careers depend on how the lines are drawn, both major political parties have used the process to unfairly strip voters of their voice.

* * *

* * * The structure of IRCs var[ies] from state to state, but IRCs are meant to make the redistricting process more transparent and impartial by establishing standards for who can serve on the commission and criteria that must be followed when drawing district maps.

Effective IRCs require the commissioners to adhere to strict criteria, such as complying with federal and state constitutions, equal population, protecting language and racial minorities, partisan fairness, compactness, and contiguity, among others. Effective IRCs also require the commission to hold public hearings, make the data being used to draw maps publicly available, accept public comments, and allow voters to submit maps to the commission online.

In 2018, voters in four states—Colorado, Michigan, Missouri, and Utah—approved ballot measures creating IRCs, and Ohio also passed a bipartisan redistricting reform measure. States

such as Arizona, California, and Iowa also have commissions that remove politicians from directly drawing the lines and that require consensus.

Campaign Legal Center: Advancing Democracy through Law, *Independent Redistricting Commissions*, https://campaignlegal.org/democracyu/accountability/independent-redistricting-commissions (accessed Jan. 4, 2022) [https://perma.cc/7PRS-P8FB].

{¶ 181} Other states have devised and adopted independent redistricting commissions as the means to accomplish this higher calling for fair representation. They have amended their state constitutions to require nonpartisan, citizen-led redistricting commissions to implement constitutional formulas and methodologies that stop elected officials from choosing their voters and that place voters in the best position possible to fully choose their elected officials.

{¶ 182} Ohio's redistricting efforts in 2021 were the first test of Ohio's "bipartisan commission" under Article XI. The plan we have reviewed was not based on a fair process and perhaps could not have been, given the makeup of the commission established by Article XI—and this does not seem to be lost on either the majority or the dissenting justices. The stark differences among the views of the members of this court regarding the court's power to fashion a remedy bears witness to the unworkability of Ohio's new model. Since Ohio voters retain the power to change their government by popular vote, perhaps this 2021 experiment may supply motivation to do more.

{¶ 183} The people of Ohio, in exercising their inherent political power, have on numerous occasions used the ballot box to effect the change they wish to see in their government. They have reserved that power to themselves in the state's

Constitution. *See* Ohio Constitution, Article II, Section 1 ("but the people reserve to themselves the power to propose to the general assembly laws and amendments to the constitution, and to adopt or reject the same at the polls on a referendum vote as hereinafter provided. They also reserve the power to adopt or reject any law, section of any law or any item in any law appropriating money passed by the general assembly, except as hereinafter provided; and independent of the general assembly to propose amendments to the constitution and to adopt or reject the same at the polls"); *id*. at Section 1a ("The first aforestated power reserved by the people is designated the initiative, and the signatures of ten per centum of the electors shall be required upon a petition to propose an amendment to the constitution").

{¶ 184} When statewide petition drives result in statewide ballot measures either to propose laws, stop laws from taking effect, or amend the very document from which Ohio government flows, the Ohio Constitution, the legislative response has often been to tighten the rules of populist engagement through the power of legislation delegated to the legislature by the Constitution, making it harder (perhaps unconstitutionally) for voters to exercise these reserved powers. *See id.* at Section 1g ("The foregoing provisions of this section shall be self-executing, except as herein otherwise provided. Laws may be passed to facilitate their operation, but in no way limiting or restricting either such provisions or the powers herein reserved"). Perhaps if Ohio voters choose to amend the state Constitution once more—in favor of a truly independent redistricting commission—they should also curb the power of the legislature to restrain their efforts through onerous and oppressive legislation that effectively curbs ballot-issue access in the expression of their freedoms of self-governance.

{¶ 185} One example of such an effort by Ohio voters—and a response by the legislature designed to nullify that effort—can be seen in Ohioans' attempt in 2011 and 2012 to repeal 2011 Am.Sub.H.B. No. 194 ("H.B. 194"), a comprehensive bill designed to revise the election laws, including laws governing

the constitutional initiative and referendum process. *See* https://publicfiles.ohiosos.gov/free/publications/SessionLaws/129/129HB-194.pdf (accessed Jan. 5, 2022). Ohioans opposed to H.B. 194 successfully obtained enough signatures to have a statewide referendum on the repeal of the law on the ballot for the November 2012 general election. *See* Terri L. Enns, Commentary: *Thoughts on HB 194 and Ohio's Referendum Process* (Apr. 3, 2012), available at https://law.osu.edu/electionlaw/comments/index.php?ID=9075 (accessed Jan. 5, 2022) [https://perma.cc/J84G-38U8]. However, even though in December 2011, "the Ohio Secretary of State certified that the referendum proponents had successfully gathered the requisite number of valid signatures to place the bill onto the November 2012 ballot," *id*., the portions of H.B. 194 that had not taken effect were repealed by the legislature in August of 2012 in Sub.S.B. No. 295, effective August 15, 2012, before the November 2012 general election, *see* Ohio Legislative Serv. Comm., *Final Analysis Sub.S.B. 295*, https://www.lsc.ohio.gov/documents/gaDocuments/analyses129/12-sb295-129.pdf (accessed Jan. 8, 2022) [https://perma.cc/7DD7-VXK2]. The referendum was not placed on the November 2012 ballot by the secretary of state, *see* cleveland.com, *Ohio House votes to repeal controversial election law* (May 8, 2012), available at https://www.cleveland.com/open/2012/05/ohio_house_votes_to_repeal_con.html (accessed Jan. 3, 2022) [https://perma.cc/GY46-XD29] ("The unprecedented nature of Tuesday's action left some confusion over whether the referendum would actually appear on the November ballot. Ohio Secretary of State Jon Husted, a Republican, released a statement that said the legislature's repeal of HB 194 leaves no law to put before voters. 'Referendums determine if laws passed by the legislature should be upheld,' Husted said in his statement. 'With the law at the heart of the referendum on HB 194 having been repealed, there is no longer a question to place before the voters' "). Yet, and incredibly, portions of the law contained in H.B. 194 were later reenacted by the legislature. *See, e.g*.,

2013 Sub.S.B. No. 47 (enacting amendment to R.C. 3519.16 with the same language from H.B. 194 that was repealed by 2012 Sub.S.B. 295, relating to jurisdiction over challenges to petitions circulated pursuant to Article II, Section 1g of the Ohio Constitution); *see also* Ohio Legislative Service Commission, *Document #262031*, https://codes.ohio.gov/assets/laws/revised-code/authenticated /35/3519/3519.16/6-21-2013/3519.16-6-21-2013.pdf (accessed Jan. 8, 2022) [https://perma.cc/5PG6-2PSM]. Enough said.

*V. Conclusion*

{¶ 186} I concur in the majority's determination that the Ohio Redistricting Commission did not comply with Article XI, Section 6 and, for the reasons stated above, I would further find that the redistricting plan violates Article XI, Section 3(B)(2). The evidence discussed above establishes that the violation of Section 3(B)(2) is so significant that it clearly meets the standard for the remedy set forth in Article XI, Section 9(D)(3)(c). Thus, Article XI, Section 9(B) requires that the commission be reconstituted to adopt a plan in conformity with the Ohio Constitution for the reasons stated by the majority and in this opinion.

_____

**KENNEDY, J., dissenting.**

{¶ 187} Article XI of the Ohio Constitution gives this court an important but limited role in reviewing a General Assembly-district plan. The majority today, though, finds the constitutionally imposed limits unduly constraining, so it chooses to disregard them. But in my view, in determining whether the General Assembly–district plan is constitutional, we must apply the Ohio Constitution as it is written.

{¶ 188} Article XI seeks to incentivize compromise by providing that a district plan with bipartisan support shall remain in effect for ten years, while one that lacks such support shall remain in effect for only four years. It imposes a set of neutral map-drawing requirements that the Ohio Redistricting Commission must absolutely meet, including, for example, population requirements and restrictions

on the division of political subdivisions.  Article XI, Sections 2, 3, 4, 5, and 7, Ohio Constitution.  It also requires the commission to comply with all applicable provisions of the Ohio and United States Constitutions and federal law, including the federal Voting Rights Act, 52 U.S.C. 10101 et seq., 10301 et seq., 10501 et seq., and 10701 et seq.  Article XI, Section 3(B)(2).  In addition, it provides directory requirements that the drafters "shall attempt" to meet, including that no "plan shall be drawn primarily to favor" a political party and that the proportion of districts that "favor each political party shall correspond closely to the statewide preferences of the voters of Ohio."  *Id.* at Section 6(A) and (B).

{¶ 189} Article XI is explicit in detailing this court's authority.  Article XI, Section 9(D)(3) provides that "[i]f the supreme court of Ohio determines that a general assembly district plan adopted by the commission does not comply with [the neutral map-drawing criteria provided in] Section 2, 3, 4, 5, or 7,"  it may invalidate the plan in whole or in part.  Conspicuously absent from this list of violations for which this court may invalidate a plan—a list that includes all the neutral map-drawing requirements and constitutional and federal statutory protections for voter rights—is the failure to meet the directives set forth in Article XI, Section 6 relating to attempts to avoid partisan favoritism and to create a statewide proportion of districts that closely corresponds to the statewide preferences of Ohio voters.

{¶ 190} Instead of applying the inconvenient textual limits on this court's authority set forth in Section 9(D)(3), the majority ignores them in favor of its own policy preferences.  The majority then rewrites the plain language of Section 9(B), which provides for the reconstitution of the commission after a plan has been found invalid, to make itself the object of the provision and grant this court sweeping authority to review any challenge to the General Assembly-district plan, even without a predicate violation of Section 2, 3, 4, 5, or 7.  But Section 9(B) has nothing to do with judicial review.  That section simply provides that *after* this court or a

federal court decides that a redistricting plan is invalid, the commission is reconstituted as a matter of law and must adopt a new plan. Because Section 9(B) does not address any action that a court is required to take, it cannot be an independent source of judicial power to review and invalidate a plan.

{¶ 191} Lastly, any claim that the General Assembly-district plan violates the rights to equal protection, freedom of speech, and freedom of assembly as guaranteed by the Ohio Constitution is not well taken. Nothing in the text of the Ohio Constitution or our precedent provides support for the proposition that proportional representation in the General Assembly is constitutionally required. And on its face, the plan does not limit speech or deny Ohio voters the ability to associate.

{¶ 192} Because in my view our authority as members of the judiciary is limited by the Ohio Constitution, I dissent.[20]

### I. BACKGROUND

*A. Overview of General Assembly Redistricting in Ohio*

{¶ 193} In December 2014, the General Assembly adopted Am.Sub.H.J.R. No. 12, which placed on the ballot an amendment to the Ohio Constitution establishing a new process for drawing Ohio's General Assembly districts. The amendment would replace the Ohio Apportionment Board with the Ohio Redistricting Commission, comprised of the governor, the auditor of state, the secretary of state, one person appointed by the speaker of the House of Representatives, one person appointed by the House minority leader, one person appointed by the Senate president, and one person appointed by the Senate minority

---

20. The second dissenting opinion would decide this case by addressing the supplemental question posed by this court regarding whether a four-year plan adopted pursuant to Article XI, Section 8(C)(1)(a) may be challenged in this court. However, because this case may be resolved by answering the propositions of law originally presented, it is not necessary to reach that question today.

leader.  Although the ballot language indicated a "goal" of producing Ohio House and Senate districts that are more politically competitive and drawn in a bipartisan process, the amendment entrusted the role of drawing district maps to partisan elected officials.  The people of Ohio ratified the amendment in November 2015.

{¶ 194} As amended, Article XI recognizes that it is difficult, if not impossible, to wholly divorce partisanship from the redistricting process and that the members of the redistricting commission from the two major political parties might not be able to agree on a General Assembly–district plan.  It therefore provides that a district plan may be adopted by a party-line vote of the commission. *See* Article XI, Section 8(C), Ohio Constitution.  But when the majority vote does not include at least two members from each of the two largest political parties in the General Assembly, the plan remains in effect for a shortened period—until two general elections for the House of Representatives have occurred under the plan. *Id.* at Section 8(C)(1)(a).  Article XI therefore expressly contemplates that a plan that favors one political party over the other might be adopted, but it encourages bipartisanship by limiting the amount of time that one party's plan is in effect—putting partisan advantage today at the risk of partisan disadvantage tomorrow.

{¶ 195} The Ohio Constitution controls how the redistricting commission may draw a district plan by imposing mandatory requirements for the commission to follow in drawing districts' boundaries.  Article XI, Section 2 of the Ohio Constitution provides that there may be only one representative in each House district and one senator in each Senate district, preventing at-large voting.  The process that the commission must use in drawing district maps requires that each district be composed of contiguous territory with a boundary consisting of a single, nonintersecting, continuous line. *Id.* at Section 3(B)(3).

{¶ 196} The redistricting commission must determine the number of people who will be represented in each House and Senate district and the number of districts that each county may contain. *Id.* at Section 3(A).  This is accomplished

by dividing the total population of the state (here, 11,799,448 according to the 2020 federal decennial census) by 99 for House districts (the result of which is 119,186.34) and by 33 for Senate districts (the result of which is 357,559.03). *Id.* Each House and Senate district must contain a population between 95 percent and 105 percent of those amounts, respectively. *Id.* at Section 3(B)(1). Then, starting from the most populous county and proceeding to the least populous, the commission draws the districts. *Id.* at Section 3(C)(1). For example, Franklin County, the most populous county, has a population of 1,323,807 according to the 2020 federal decennial census; dividing its population by 119,186.34 yields 11.107 House districts (that is, 11 House districts wholly within the county with a small fraction of the county sharing a district with another county). That small fraction of the population may be made part of only one adjoining House district. *See id.* In contrast, Wayne County has a population of 116,894 according to the 2020 federal decennial census, which is less than 119,186.34, which yields 0.98 House districts. Nonetheless, Wayne County gets its own district because its population falls between 95 percent and 105 percent of 119,186.34. *See id.* at Section 3(C)(2). And Miami County, the first county with a population less than 95 percent of 119,186.34, must share a district with an adjoining county or counties. *See id.* at Section 3(C)(3) ("The remaining territory of the state shall be divided into representative districts by combining the areas of counties, municipal corporations, and townships. Where feasible, no county shall be split more than once"). Article XI also requires the commission to draw House districts in a way that minimizes the division of municipal corporations and townships. *Id.* at Section 3(D)(2) and (3).

{¶ 197} Senate districts are comprised of three contiguous House districts. Article XI, Section 4(A), Ohio Constitution. Like House districts, counties that are populous enough to have at least one whole Senate district must have as many whole Senate districts as its Senate ratio of representation permits, with any fraction

of that ratio made part of only one adjoining district. *Id.* at Section 4(B)(1). "Counties having less than one senate ratio of representation, but at least one house of representatives ratio of representation, shall be part of only one senate district." *Id.* at Section 4(B)(2). If the commission is not able to comply with these requirements, the plan does not violate Section 4(B)(1) and (2) if the commission draws the Senate districts "so as to commit the fewest possible violations of those divisions." *Id.* at Section 4(B)(3).

{¶ 198} Article XI, Section 5 provides the procedure followed when a new General Assembly–district plan results in a changed Senate-district boundary of a senator whose term will not expire within two years of the time that the plan becomes effective. And under Article XI, Section 7, the plan must also use the boundaries of counties, municipal corporations, and townships "as they exist[ed] at the time of the federal decennial census on which the redistricting is based, or, if unavailable, on such other basis as the general assembly has directed."

{¶ 199} Article XI, Section 6 directs the commission to "attempt" to draw a General Assembly–district plan without the primary purpose of favoring or disfavoring a political party, *id.* at Section 6(A), and in which the statewide proportion of districts favoring one political party corresponds closely to the statewide preferences of Ohio voters, *id.* at Section 6(B). It also directs the commission to attempt to draw compact districts. *Id.* at Section 6(C). However, the attempt to comply with Section 6 may not result in violations of Article XI, Section 2, 3, 4, 5, or 7. Article XI, Section 6.

{¶ 200} Article XI, Section 1(B)(3) states that "[t]he affirmative vote of four members of the commission, including at least two members of the commission who represent each of the two largest political parties represented in the general assembly shall be required to adopt any general assembly district plan." If the commission's vote satisfies Section 1(B)(3), then the plan is effective for ten years. However, if the commission fails to adopt a plan by the requisite bipartisan

vote by September 1 of a year ending in the numeral one, it "shall introduce a proposed general assembly district plan by a simple majority vote of the commission." Article XI, Section 8(A)(1), Ohio Constitution. The commission must then conduct a public hearing on the proposed plan, *id.* at Section 8(A)(2), and then adopt the plan by either a bipartisan vote or a simple majority, *id.* at Section 8(A)(3). If the plan is adopted by the bipartisan vote required to adopt a plan under Article XI, Section 1(B)(3), then the plan is effective for ten years. *Id.* at Section 8(B). But if the plan is adopted by a simple majority of the commission that does not include at least two members from each of the two largest political parties in the General Assembly, the plan "shall remain effective until two general elections for the house of representatives have occurred under the plan." *Id.* at Section 8(C)(1)(a).

### B. The Commission Adopts a Four-Year Plan

{¶ 201} In his statements before the redistricting commission and in his testimony during his deposition, Ray DiRossi explained that as he helped to draw the maps, he sought first to comply with the mandatory requirements of Article XI. This focus included the required population of each district, contiguity requirements, and minimizing the division of counties, cities, and townships. The plan started with the most populous counties and proceeded to the least populous counties, and it split counties when required by the Constitution but otherwise minimized the division of political subdivisions. Ohio's political geography, however, made it difficult to draw the maps, and that sometimes had a negative impact on Republican officeholders because it paired incumbents in the same district. DiRossi explained that he had not been tasked with considering the partisan makeup of each district, because that responsibility belonged to the commission. DiRossi noted that he did not consider the partisan makeup of the districts until President of the Senate Matthew Huffman, in search of a compromise in which the commission would adopt a ten-year plan by a bipartisan vote,

instructed DiRossi to switch certain districts that leaned Republican so that they leaned Democratic.

{¶ 202} Similarly, Blake Springhetti, who also worked on drafting the district maps, explained that Speaker of the House Robert Cupp had sought a compromise by creating more Democratic-leaning districts and adopting the Democratic members' priorities, such as maintaining Cincinnati in three districts and Dayton in two districts. House Speaker Cupp and Senate President Huffman therefore proposed a plan that created five more Democratic-leaning districts. House Speaker Cupp expected that the plan would comply with Article XI, Section 6 due to his negotiations with the Democratic members of the commission.

{¶ 203} In the end, the attempts at compromise failed and the proposed plan that would have created more Democratic-leaning districts was not adopted. The votes in favor of the plan did not include at least two members of the commission from each of the two major political parties represented in the General Assembly.

### C. Challenges to the District Plan

{¶ 204} This matter involves three separate complaints. In the first two complaints, petitioners the League of Women Voters of Ohio et al., and Bria Bennett et al., allege that the plan that the commission adopted violates Article XI, Section 6(A) and (B) of the Ohio Constitution. Those complaints do not allege that the plan violates any other provision of Article XI. In the third complaint, the Ohio Organizing Collaborative, the Ohio chapter of Council on American-Islamic Relations, the Ohio Environmental Council, and the individual petitioners (collectively, the "OOC") allege that in addition to violating Sections 6(A) and 6(B), the plan that the commission adopted violates Article XI, Section 3(B)(2) and the Ohio Constitution's guarantees of equal protection under Article I, Section 2, assembly under Article I, Section 3, and free speech under Article I, Section 11.

{¶ 205} This case presents two issues for this court's consideration: Does Article XI grant this court the authority to invalidate a General Assembly–district

plan based on stand-alone violations of Article XI, Section 6? And has the OOC demonstrated that the commission violated Article XI, Section 3(B)(2) and the Ohio Constitution's guarantees of equal protection, assembly, and free speech? The answer to both of those questions is no.

## II. ANALYSIS

### A. Interpreting the Constitution

{¶ 206} "The purpose of our written Constitution is to define and limit the powers of government and secure the rights of the people." *Cleveland v. State*, 157 Ohio St.3d 330, 2019-Ohio-3820, 136 N.E.3d 466, ¶ 16 (lead opinion). Its language controls, as written, unless it is changed by the people through the amendment procedures established by Article XVI of the Ohio Constitution. The Ohio Constitution is the paramount law of this state, and we recognize that its framers chose its language carefully and deliberately, employed words in their natural sense, and intended what the words said. *See Gibbons v. Ogden*, 22 U.S. 1, 188, 6 L.Ed. 23 (1824); *Lawnwood Med. Ctr., Inc. v. Seeger*, 990 So.2d 503, 510 (Fla.2008).

{¶ 207} Therefore, in construing the Ohio Constitution, our duty is to determine and give effect to the meaning expressed in its plain language, *State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 50, and " '[w]here the meaning of a provision is clear on its face, we will not look beyond the provision in an attempt to divine what the drafters intended it to mean,' " *Toledo City School Dist. Bd. of Edn. v. State Bd. of Edn.*, 146 Ohio St.3d 356, 2016-Ohio-2806, 56 N.E.3d 950, ¶ 16, quoting *State ex rel. Maurer v. Sheward*, 71 Ohio St.3d 513, 520-521, 644 N.E.2d 369 (1994). We give undefined words in the Constitution their usual, normal, or customary meaning, *Toledo City School Dist. Bd. of Edn.* at ¶ 16, and we may go beyond the text to consider other sources of meaning, such as the purpose of an amendment, the history of its adoption, or its attending circumstances, only "when the language being construed

is 'obscure or of doubtful meaning,' " *State ex rel. Wallace v. Celina*, 29 Ohio St.2d 109, 112, 279 N.E.2d 866 (1972), quoting *Cleveland v. Bd. of Tax Appeals*, 153 Ohio St. 97, 103, 91 N.E.2d 480 (1950). *See also Maurer* at 522 ("we will not look to the history of a provision where * * * the language of the provision is clear").

{¶ 208} Interpreting the constitutional provisions at issue here is complex. It requires this court to examine, independently and in context, various sections that cross-reference one another. In considering petitioners' claims that the General Assembly-district plan adopted by the commission violates Article XI, Section 6, the initial focus is on three provisions establishing our power to review and invalidate the plan: Article XI, Sections 9(A), 9(B), and 9(D).

*B. Reviewability of a General Assembly-District Plan*

**1. Article XI, Section 9(A)**

{¶ 209} Article XI, Section 9(A) vests this court with "exclusive, original jurisdiction in all cases arising under this article." This general grant of subject-matter jurisdiction establishes that this court is the proper forum to hear a challenge to a General Assembly-district plan. The question is: When does this court have the authority to exercise judicial review over a case arising under this article?

**2. Article XI, Section 9(B)**

{¶ 210} The majority claims to find the answer in Article XI, Section 9(B). That provision states:

> In the event that any section of this constitution relating to redistricting, any general assembly district plan made by the Ohio redistricting commission, or any district is determined to be invalid by an unappealed final order of a court of competent jurisdiction then, notwithstanding any other provisions of this constitution, the commission shall be reconstituted as provided in Section 1 of this article, convene, and ascertain and determine a general assembly

district plan in conformity with such provisions of this constitution as are then valid, including establishing terms of office and election of members of the general assembly from districts designated in the plan, to be used until the next time for redistricting under this article in conformity with such provisions of this constitution as are then valid.

{¶ 211} According to petitioners and the majority, this provision, standing alone, gives this court unlimited authority to review any alleged violation of Article XI in the adoption of a General Assembly-district plan. I disagree.

{¶ 212} Reliance on Article XI, Section 9(B) as a source of judicial power is unavailing. Grammatically speaking, the subject of this provision is the redistricting commission, not this court or any court. It simply states that if the General Assembly-district plan is invalidated in whole or in part by a court, then the redistricting "commission shall be reconstituted" to adopt a new plan. *Id.*

{¶ 213} Nothing in that language represents an affirmative grant of power to this court—or any other court of competent jurisdiction—to invalidate a four-year plan adopted under Article XI, Section 8(C)(1)(a). Section 9(B) exists because "[f]our weeks after the adoption of a general assembly district plan or a congressional district plan, whichever is later, the commission shall be automatically dissolved." Article XI, Section 1(C), Ohio Constitution. Section 9(B) is not directed at any court at all, and it does not create any remedy that this court can order. Rather, Section 9(B) is self-executing, reconstituting the commission by operation of law and telling the commission what to do "[i]n the event"—i.e., *after*—a plan has been invalidated by a court. Therefore, Section 9(B) is not triggered unless some court of competent jurisdiction *first* decides that the plan adopted by the commission is unconstitutional. Until that happens, Section

9(B) is inoperative, and an inoperative provision plainly cannot be a source of judicial power.

{¶ 214} Contrary to the majority's chicken-or-egg approach, then, invalidation of the plan under some other provision of state or federal law *must always come first* before Article XI, Section 9(B) comes into play to reconstitute the commission to prepare a new plan. The majority points to no valid doctrine of constitutional interpretation that would permit us to assume that the game-changing power wielded by the majority today is secreted in a provision in which a court is not even the subject of the provision. Instead, the no-elephants-in-mouseholes canon teaches us that fundamental details of a statutory or constitutional scheme are not concealed in vague terms or ancillary provisions like Section 9(B). *See Bostock v. Clayton Cty., Georgia*, ___ U.S. ___, ___, 140 S.Ct. 1731, 1753, 207 L.Ed.2d 218 (2020), citing *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001).

{¶ 215} In crafting its "broad" power from the language of Section 9(B), majority opinion at ¶ 93, the majority fails to appreciate the impact that a similar provision has on the force of its argument. Like Section 9(B), Article XI, Section 8(D) requires the commission to be reconstituted by operation of law. But in contrast to Section 9(B), Section 8(D) does not depend on judicial action to trigger it. Rather, Section 8(D) comes into force when a four-year plan adopted pursuant to Section 8(C)(1)(a) expires. It cannot be reasonably asserted that this exact same language—which does not require judicial action in Section 8(D)—can be a source of judicial power in Section 9(B).

### 3. Article XI, Section 9(D)

{¶ 216} It might be inconvenient for the majority, but the plain language of Article XI, Section 9(D) limits our authority to review General Assembly-district plans. Section 9(D)(1) prohibits this court from ordering "the implementation or enforcement of any general assembly district plan that has not been approved by

92

the commission in the manner prescribed by this article." Section 9(D)(2) denies this court the power to "order the commission to adopt a particular general assembly district plan or to draw a particular district." And Section 9(D)(3) provides the remedies available when this court determines that a plan "does not comply with the requirements of Section 2, 3, 4, 5, or 7 of" Article XI, which includes the neutral map-making requirements and all applicable provisions of the Ohio and United States Constitutions and federal law.

> (a) If the court finds that the plan contains one or more isolated violations of *those requirements*, the court shall order the commission to amend the plan to correct the violation.
>
> (b) If the court finds that it is necessary to amend not fewer than six house of representatives districts to correct violations of *those requirements*, to amend not fewer than two senate districts to correct violations of those requirements, or both, the court shall declare the plan invalid and shall order the commission to adopt a new general assembly district plan in accordance with this article.

(Emphasis added.) Article XI, Section 9(D)(3), Ohio Constitution. This specific remedy stands in stark contrast to the lack of any remedial language in Sections 9(A) and (B).

{¶ 217} Section 9(D)(3)(a) therefore authorizes this court to invalidate a General Assembly-district plan, but only if we first determine that the plan violates Article XI, Section 2, 3, 4, 5, or 7. If violations of Section 6 were intended to be actionable, one would naturally expect Section 9(D) to say so. But that language is conspicuously absent.

{¶ 218} Notwithstanding this specific remedial provision, the majority claims that "Section 9(B) recognizes this court's authority to determine whether a

plan is invalid for *any* reason and specifies what must happen if it does." (Emphasis sic.) Majority opinion at ¶ 98. Yet, couched in a footnote, it pulls back from that assertion of power, saying that Section 9(D)(3) nonetheless "limits" the court's "otherwise broad authority" with respect to violations of Section 2, 3, 4, 5, or 7, majority opinion at ¶ 96, fn. 11, so that "Section 9(D) provides specific remedies for *some* violations of Article XI," (emphasis sic) *id.* at ¶ 97. What the majority discounts as "some violations" refers to the neutral map-making requirements—the core function of Article XI—and all applicable provisions of the Ohio Constitution, the United States Constitution, and federal law, which are incorporated by Article XI, Section 3(B)(2). This supposed "limit" on our "otherwise broad authority" includes practically all claims typically brought in voting-rights litigation and redistricting challenges, such as those premised on equal protection; the rights to freedom of speech, association, and assembly; one-person, one-vote; the prohibition on racial gerrymandering; and the requirements of the Voting Rights Act.

{¶ 219} Plainly, little is left for the court to evaluate under its "otherwise broad authority" to declare a district plan invalid without a predicate violation of Article XI, Section 2, 3, 4, 5, or 7. What the majority calls the "limited" provision, majority opinion at ¶ 97, is in fact more expansive than what it calls its "otherwise broad authority," *id.* at ¶ 96, which must be limited to remedying violations of Sections 1, 6, 8, and 9. Indeed, under the majority's reading, this court would have more power to invalidate a General Assembly-district plan when the plan does not violate Section 2, 3, 4, 5 or 7 than when the plan does violate one or more of those sections.

{¶ 220} And because its "otherwise broad authority" can possibly apply only to violations of Article XI, Sections 1, 6, 8, and 9, the majority would presumably permit this court to strike down a plan for a technical violation of any of those provisions, even if that violation had no palpable effect on the plan itself

and did not violate any constitutional or federal voter-rights protections. For example, Article XI, Section 1(C) requires the governor to convene the first meeting of the redistricting commission, but under the majority's reasoning, a violation of this provision (e.g., by another commissioner convening the meeting) would justify the invalidation of a General Assembly-district plan. Similarly, the failure to "promptly" file the plan with the secretary of state could permit this court to invalidate it as well. Article XI, Section 1(C). And as the majority points out in a footnote, the commission adopted the plan at issue here in violation of Article XI, Section 8(A)(3), which requires that a Section 8(C)(1)(a) plan be adopted "not later than the fifteenth day of September of a year ending in the numeral one." Technically, using its "otherwise broad authority," the majority could have used this violation to invalidate the General Assembly-district plan because it was adopted a day late—on September 16, 2021.

{¶ 221} But would any plain reading of the provisions of Article XI of the Ohio Constitution afford this court such "otherwise broad authority"? The answer is "no." But that is the logical consequence of the majority's analysis and the sweeping power of judicial review that the majority grasps to declare a General Assembly-district plan invalid under Article XI, Section 6. Were Article XI intended to afford this court unlimited judicial review, then it would have said so. But like the date by which the General Assembly is directed to adopt a General Assembly-district plan ("not later than the fifteenth day of September of a year ending in the numeral one," Article XI, Section 8(A)(3)), Section 6, as discussed below, is merely directory.

{¶ 222} Article XI, Section 9(D)(3)(c) provides this court with additional authority to remedy a district plan adopted by the commission through the impasse procedure:

If, in considering a plan adopted under division (C) of Section 8 of this article, the court determines that both of the following are true, the court shall order the commission to adopt a new general assembly district plan in accordance with this article:

(i) The plan significantly violates *those requirements* in a manner that materially affects the ability of the plan to contain districts whose voters favor political parties in an overall proportion that corresponds closely to the statewide political party preferences of the voters of Ohio, as described in division (B) of Section 6 of this article.

(ii) The statewide proportion of districts in the plan whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party does not correspond closely to the statewide preferences of the voters of Ohio.

(Emphasis added.)

{¶ 223} The existence of this provision further showcases how impossible it is to square the majority's position with the words of the Constitution. If the majority is correct that Article XI, Section 9(B) grants this court authority to remedy stand-alone violations of Section 6 when the redistricting commission does not make an attempt at proportional representation, then why does Section 9(D)(3)(c) require a predicate violation of Section 2, 3, 4, 5, or 7 before this court can strike down a district plan for actually failing to provide proportional representation? To ask the question is to answer it.

{¶ 224} There are two prerequisites that must be satisfied before this court can reach the question whether the General Assembly-district plan is disproportionate to the statewide political-party preferences of Ohio voters. *See*

Article XI, Section 9(D)(3)(c)(ii). First, the plan must violate the requirements of Section 2, 3, 4, 5, or 7, and second, the plan must "significantly violate[] those requirements in a manner that materially affects the ability of the plan to contain districts whose voters favor political parties in an overall proportion that corresponds closely to the statewide political party preferences of the voters of Ohio, as described in division (B) of Section 6 of this article." Article XI, Section 9(D)(3)(c)(i).

{¶ 225} This language, which limits the court's authority to invalidate a General Assembly-district plan, cannot be reconciled with the majority's assertion that a plan may be invalidated solely because the commission failed to attempt to adopt a plan in which "[t]he statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio," Article XI, Section 6(B).

{¶ 226} As written, Article XI, Section 9(D)(3)(c)(i) refers to Section 6(B) for descriptive and definitional purposes, not as a separate grant of judicial authority to invalidate a General Assembly-district plan. For in the end, the actual language of Section 9(D)(3)(c)(i) refers to proportionality "as *described* in division (B) of Section 6" (emphasis added), not as *required* in division (B) of Section 6. Section 9(D)(3)(c) provides that a plan that fails to provide proportional representation is not reviewable absent a predicate violation of Section 2, 3, 4, 5, or 7 that materially affects the ability of the plan to provide proportional representation. Were any violation of Article XI intended to be actionable, including the failure to attempt to draw a proportional plan, Section 9(D)(3) would have been written differently.

{¶ 227} In sum, contrary to the majority's constitutional construction, the negative implication of Article XI, Section 9 is obvious. Section 9(D) is a provision that limits the authority of this court in reviewing a General Assembly-district plan. It prohibits this court from ordering the commission to adopt a specific plan and

97

from drawing the districts ourselves. And that same provision provides that this court may invalidate a General Assembly district-plan in whole or in part only if we first find a violation of Article XI, Section 2, 3, 4, 5, or 7. Reading the words adopted by the people of this state in context leads to the inescapable conclusion that the existence of a specific remedy in Section 9(D)(3) necessarily implies the exclusion of all others. *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012).

{¶ 228} The majority's holding that Section 9(A) and (B) confer raw judicial power to address the universe of ways that a plan can violate state and federal law—*without ever saying so*—baldly renders the specific, targeted remedies actually provided by the Ohio Constitution in Article XI, Section 9(D) wholly superfluous. However, we have long held that "effect should be given to every part of the instrument as amended, and in the absence of a clear reason to the contrary no portion of a written Constitution should be regarded as superfluous." *Steele, Hopkins & Meredith Co. v. Miller*, 92 Ohio St. 115, 120, 110 N.E. 648 (1915).

### 4. The Majority's Other Interpretive Arguments

{¶ 229} The majority resorts to the in pari materia canon of construction in an attempt to read Article XI, Section 9(B) as extending judicial review beyond that provided by Section 9(D). The in pari materia rule applies when some doubt or ambiguity exists in an instrument. *See Herman v. Klopfleisch*, 72 Ohio St.3d 581, 585, 651 N.E.2d 995 (1995). But the majority points to no ambiguity in Section 9(B) or (D)(3), nor can it. Instead, it recasts its disregard of constitutional language as merely "harmoniz[ing] Section 9(B) and Section 9(D)(3)," majority opinion at ¶ 96. It concludes that these provisions address different violations of Article XI and provide different remedies: "Section 9(B) contemplates that this court may declare a plan invalid and order the commission to adopt an entirely new plan. Section 9(D)(3) speaks to certain violations of Article XI and *gives this court remedial options other than declaring a plan entirely invalid.*" (Emphasis added.)

Majority opinion at ¶ 96.  But those statements mischaracterize the remedy afforded by Section 9(D)(3), because Section 9(D)(3)(a) and (b) permit this court to *both* order the commission to amend the plan to correct isolated violations and "to *declare the plan invalid* and * * * order the commission to adopt *a new general assembly district plan*."  (Emphasis added.)  Article XI, Section 9(D)(3)(b) expressly permits this court to declare a plan invalid in its entirety, which is why it authorizes this court to order the adoption of a new plan rather than merely an amendment to the old one.  Even under the majority's reading of these provisions, Section 9(B) adds nothing to the remedies afforded by Section 9(D)(3).

{¶ 230} Although the majority is correct that the context of these provisions matters, "[l]et us not forget, however, *why* context matters: It is a tool for understanding the terms of the law, not an excuse for rewriting them."  (Emphasis sic.)  *King v. Burwell*, 576 U.S. 473, 501, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015) (Scalia, J., dissenting).

{¶ 231} Lastly, the majority's comparison of Article XI, Section 9 to former Article XI, Section 13 undermines its own reasoning.  Former Section 13 was silent on the scope of this court's review of a General Assembly-district plan.  It stated only that "[t]he Supreme Court of Ohio shall have exclusive, original jurisdiction in all cases arising under this Article."  Article XI, Section 13, Ohio Constitution (repealed 2015).  In contrast, Section 9(D) of the current version of Article XI places express limits on our review by requiring the finding of a violation of Section 2, 3, 4, 5, or 7 before this court may invalidate a plan.  It is therefore not reasonable to conclude that Section 9 provides the same authority to invalidate a plan as former Section 13 when Section 9 now expressly constricts this court's review.  After all, the use of different words signals a different meaning.  *See Obetz v. McClain*, 164 Ohio St.3d 529, 2021-Ohio-1706, 173 N.E.3d 1200, ¶ 21.

{¶ 232} Therefore, the majority's assertion that Article XI, Section 6 is independently enforceable is wrong.  And if one needs more evidence that Article

XI, Section 6 is not enforceable than that provided by text alone, one simply needs to look at the structure of Article XI in addition to the text. *See Ramos v. Louisiana*, ___ U.S. ___, ___, 140 S. Ct. 1390, 1395, 206 L.Ed. 2d 583 (2020) (relying on "text and structure" as primary tools of constitutional interpretation).

*C. The Structure of Article XI Reinforces the Conclusion that*

*Violations of Section 6 Are Not Judicially Enforceable*

{¶ 233} The structure of Article XI reinforces what is evident from a plain reading of the text—violations of Section 6 were never intended to be redressable by the judiciary.

{¶ 234} Central to Article XI is the idea that the political branches of government must play the dominant role when it comes to legislative mapmaking. Section 1(A) flatly provides that "[t]he Ohio redistricting commission shall be responsible for the redistricting of this state for the general assembly." Section 9(D)(1) reinforces this command, providing that "[n]o court shall order, *in any circumstance*, the implementation or enforcement of any general assembly district plan that has not been approved by the commission in the manner prescribed by this article." (Emphasis added.) And if the point is not clear enough, Section 9(D)(2) adds that "[n]o court shall order the commission to adopt a particular general assembly district plan or draw a particular district."

{¶ 235} Pursuant to this approach, Article XI offers a political, rather than a judicial, mechanism to resolve the lack of partisan agreement about a plan. If there is partisan consensus around a plan, the plan will last ten years. Article XI, Section 1(B)(3). But if the parties cannot agree, the default is not necessarily judicial intervention; rather, the outcome is that a plan will last only four years, Article XI, Section 8(C), unless this court determines that the plan violates the neutral map-drawing requirements of Sections 2, 3, 4, 5, and 7, or violates an applicable provision of the Ohio Constitution, the United States Constitution, or federal law. Article XI, Section 9(D)(3). This was a historic change in Ohio

redistricting, because as far back as 1851, Article XI stated that "[t]he apportionment of this State for members of the General Assembly, shall be made every ten years." Article XI, Section 1, Ohio Constitution (1851). The official ballot language for the proposed constitutional amendment in 2015 reflected that the threat of a four-year plan was meant to foster bipartisanship; the ballot language stated that Article XI would "prevent deadlock by limiting the length of time any plan adopted without bipartisan support is effective." Ballot Board: 2015, Ballot Issues for the 2015 November Election, Issue 1, Ballot Language, available at https://www.ohiosos.gov/legislation-and-ballot-issues/ballot-board/ballot-board-2015/ (accessed Jan. 10, 2022) [https://perma.cc/ZP9U-VN86]. The apparent hope was that the uncertainties and electoral vagaries that come with a four-year plan would motivate political actors to reach a consensus.

{¶ 236} Section 6 is part and parcel of this approach. Article XI, Section 6 provides:

> The Ohio redistricting commission *shall attempt* to draw a general assembly district plan that meets all of the following standards:
>
> (A) No general assembly district plan shall be drawn primarily to favor or disfavor a political party.
>
> (B) The statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio.
>
> (C) General assembly districts shall be compact.
>
> Nothing in this section permits the commission to violate the district standards described in Section 2, 3, 4, 5, or 7 of this article.

(Emphasis added.) Violations of these provisions are not coequal to violations of Section 2, 3, 4, 5, or 7; Section 6 states that in the event the commission's attempt to draw a General Assembly-district plan conflicts with Section 6's guideposts, the mandatory map-drawing criteria provided in Section 2, 3, 4, 5, or 7 will control.

### 1. Section 6 Imposes Directory Duties on the Commission

{¶ 237} The majority focuses on the use of the word "shall" in Section 6 as making a stand-alone violation of that section actionable. However, when a constitutional provision uses the word "shall," it can establish either a mandatory or a directory requirement. *See generally In re Nowak*, 104 Ohio St.3d 466, 2004-Ohio-6777, 820 N.E.2d 335, ¶ 37-38; *Ex parte Falk*, 42 Ohio St. 638, 639 (1885). Neither type of provision is intended to be disregarded by public officials. *See* 1A Norman Singer and Shambie Singer, *Sutherland Statutes and Statutory Construction*, Section 25:3 (7th Ed.Rev.2021). Their enforceability, however, differs.

{¶ 238} "A directory provision, by definition, involves no invalidating consequence for its disregard," *Nowak* at ¶ 37, and " 'an objection that [a directory provision was] not observed will be unavailing in the courts' " (brackets added in *Nowak*), *id.*, quoting *Falk* at 639. The safeguard against a public official violating a directory constitutional provision is his or her sense of duty and adherence to his or her oath to uphold the Constitution. *Miller v. State*, 3 Ohio St. 475, 484 (1854), *overruled on other grounds by State v. Morello*, 169 Ohio St. 213, 158 N.E.2d 525 (1959). There is no remedy created for a violation of a directory provision.

{¶ 239} In contrast, a violation of a mandatory provision invalidates the act or transaction, and compliance with the provision may be enforced in the courts. *See Nowak* at ¶ 37; 1A Singer and Singer at Section 25:3. Therefore, unlike a directory provision, a remedy is provided to redress the violation of a mandatory provision. For example, Sections 2, 3, 4, 5, and 7 of Article XI impose mandatory duties on the commission when drawing district maps because Section 9(D)(3)

102

*requires* this court to invalidate a district or a plan that does not sufficiently comply with any of those provisions.

{¶ 240} By adopting Article XI, Section 6 without providing any specific enforcement mechanism, no standard as to what constitutes an attempt, and no way to determine from the face of the plan whether an attempt had been made, the people of Ohio established a directory provision that members of the redistricting commission are duty bound to comply with in accordance with their oaths to uphold the Ohio Constitution.

{¶ 241} The majority asserts that House Speaker Cupp and Senate President Huffman concede that under Article XI, Section 9(D)(3)(c), "a violation of Section 6(B) is actionable if there is also a violation of Section 2, 3, 4, 5, or 7." Majority opinion at ¶ 99. The majority concludes that this proves that Section 6(B) is mandatory, not directory.

{¶ 242} But if Article XI, Section 6(B) is mandatory and independently enforceable, why does Section 9(D)(3)(c) require a predicate violation of Section 2, 3, 4, 5, or 7? If, as the majority concludes, a violation of Section 6(B) is actionable without a violation of Section 2, 3, 4, 5, or 7, how does that not render Section 9(D)(3)(c) superfluous? And by the majority's own analysis, then, Section 6(A) must itself be directory, because no provision in Section 9(D)(3) makes it enforceable. Nonetheless, the majority invalidates the General Assembly-district plan for an independent violation of Section 6(A), finding that the commission did not attempt to draw a map that would not favor or disfavor a political party.

{¶ 243} The majority's analysis of how Article XI, Section 9(D)(3)(c) operates to give this court authority to invalidate a General Assembly-district plan for an alleged violation of Section 6(B) is incorrect. Notably, Section 9(D)(3)(c)(i) does not incorporate Section 6(B) but, rather, refers to the standard for proportional representation "as described in division (B) of Section 6." Also notable is that as set forth above, it does not say, "as required by division (B) of Section 6." Our

judicial review requires the court to (1) look at the General Assembly-district plan itself and determine whether there are any significant violations of Section 2, 3, 4, 5, or 7 that materially affect the ability of the plan to contain proportionately drawn districts and, if so, to (2) decide whether the districts are proportional.

{¶ 244} Article XI, Section 6(B), however, does not require the drawing of proportional districts; it only directs the commission to attempt to do that. If Section 9(D)(3)(c) were referring to a violation of Section 6(B), it would point to the commission's failure to attempt to draw proportionate districts. But Section 9(D)(3)(c) does not mention a failure to attempt. Instead, Section 9(D)(3)(c) incorporates by reference the proportionality standards set forth in Section 6(B) as a measure of the significance of a violation of a failure to comply with Section 2, 3, 4, 5, or 7. In fact, the commission could "attempt" to draw a proportionate plan and thereby comply with Section 6(B), but this court could still invalidate the plan under Section 9(D)(3)(c)(i) if the plan violated Section 2, 3, 4, 5, or 7 to such a degree that it "materially affects the ability of the plan to contain districts whose voters favor political parties in an overall proportion that corresponds closely to the statewide political party preferences of the voters of Ohio, as described in division (B) of Section 6 of this article." The description in Section 6(B) fills in a blank that appears in Section 9(D)(3)(c)(ii)–the preference of voters is to be "based on statewide state and federal partisan general election results during the last ten years." In sum, Section 9(D)(3)(c) does not provide a remedy for a violation of Section 6(B); it refers to terminology from Section 6(B) to determine whether there has been a significant enough violation of Section 2, 3, 4, 5, or 7 under the impasse procedure.

{¶ 245} That the standards established by Article XI, Section 6 are directory and therefore not judicially enforceable does not make this provision superfluous. Rather, these standards create guidelines for the commission to follow in adopting a General Assembly-district plan. However, Section 6 makes manifest that these

standards are subordinate to the mandatory, neutral mapmaking requirements imposed by Sections 2, 3, 4, 5, and 7.

{¶ 246} Therefore, the structure of Article XI lends further support to the conclusion that this court lacks the authority to declare a district plan invalid for a stand-alone violation of Article 6. Article XI specifically distinguishes the provisions that are mandatory (Sections 2, 3, 4, 5, and 7) from the provision that is directory (Section 6). Article XI, Section 9(D) recognizes this distinction by making judicially enforceable violations only of the mandatory provisions.

### 2. The Commission Attempted to Comply with Section 6

{¶ 247} Having brushed aside the constitutional limits on its authority, the majority declares the district plan invalid by holding that the commission failed to attempt to draw a plan that does not primarily favor or disfavor a political party and that contains a statewide proportion of districts that closely corresponds to the statewide preferences of Ohio voters. The word "attempt" means "to make an effort to do, accomplish, solve or effect." *Webster's Third New International Dictionary* 140 (2002). The majority, however, disregards the meaning of "attempt" and says that the attempt required by Section 6 must be successful "[i]f it is possible," majority opinion at ¶ 88. But an attempt denotes the beginning of an effort and does not speak to whether the results of that effort are successful. For example, the sentence, "She attempted to swim across the swollen river," which suggests failure, is different from the sentence, "She swam across the swollen river."

{¶ 248} The majority's analysis therefore rewrites the plain language of Article XI, Section 6 by deleting the words "attempt to" from the provision and adding the words "[i]f it is possible," majority opinion at ¶ 88, as follows: "The Ohio redistricting commission shall, ~~attempt to~~ *if it is possible,* draw a general assembly district plan that meets all of the following standards." However, the authority to amend the Ohio Constitution is reserved to the people of this state pursuant to Article XVI, Section 1. That power does not belong to this court.

{¶ 249} Moreover, there is competing evidence to demonstrate that the commission did attempt to draw a plan that does not primarily favor or disfavor a political party and that contains a statewide proportion of districts that closely corresponds to the statewide preferences of Ohio voters. The majority picks and chooses among the evidence presented in these cases to support its conclusion that the commission failed to make an effort to adopt a map that complies with the standards established in Article XI, Section 6. But to reach this conclusion, the majority ignores the countervailing evidence presented.

{¶ 250} First, the commission was successful in its attempt to comply with Article XI, Section 6(A). The plan was not adopted by the commission with the primary purpose of favoring or disfavoring a political party. Rather, the evidence demonstrates that DiRossi and Springhetti drafted the plan with the primary purpose of complying with Article XI, Sections 2, 3, 4, 5, and 7, which they viewed as being mandatory requirements that the commission had to follow. House Speaker Cupp testified that they were focused on the "line drawing part" and the population requirements. And although the OOC claims that the plan violates the Ohio Constitution's Equal Protection Clause, none of the petitioners assert that the plan adopted by the commission violates any of the neutral map-drawing requirements of Section 2, 3, 4, 5, or 7.

{¶ 251} Second, the commission attempted to comply with Article XI, Section 6(B) because it sought to compromise on a plan that could be adopted through a bipartisan vote. The initial plan proposed by House Speaker Cupp and Senate President Huffman was projected to result in 67 Republican-leaning House seats and 32 Democratic-leaning House seats. The Democratic members of the commission proposed a plan in which there would be 55 Republican-leaning House seats and 44 Democratic-leaning House seats. They later amended their proposal to increase the number of Republican-leaning House seats to 57 and to decrease the number of Democratic-leaning House seats to 42. Speaker Cupp and President

Huffman then circulated a plan that reduced the number of House seats that were predicted to lean Republican from 67 to 62, an amount that was less than the 64 House seats the Republicans currently control. *See* Ohio House of Representatives, 134th General Assembly, *available at* https://ohiohouse.gov/members/directory (accessed Dec. 27, 2021) [https://perma.cc/J5SZ-CEV9]. Speaker Cupp testified that he and President Huffman were prepared to concede more seats but that the Democratic members of the commission stopped negotiating. Similarly, Governor DeWine, Secretary LaRose, and Auditor Faber each explained that they had sought to mediate a compromise between the legislative members of the commission. In the end, no compromise was reached, but these facts show that the commission attempted to adopt a plan that contained a statewide proportion of districts that more closely corresponds to the statewide preferences of Ohio voters.

### 3. Disposition of Claims Alleging Violations of Section 6

{¶ 252} The complaints filed in *League of Women Voters of Ohio v. Ohio Redistricting Comm.* (Supreme Court case No. 2021-1193) and *Bennett v. Ohio Redistricting Comm.* (Supreme Court case No. 2021-1198) do not allege that the plan the commission adopted violates Article XI, Section 2, 3, 4, 5, or 7 of the Ohio Constitution. And even if Section 6 were judicially enforceable, the petitioners in these two cases have failed to demonstrate that the commission violated its standards. Judgment should be entered against the petitioners in *League of Women Voters* and *Bennett*. It should also be entered against the petitioners in *Ohio Organizing Collaborative v. Ohio Redistricting Comm.* (Supreme Court case No. 2021-1210) to the extent that they assert stand-alone violations of Section 6.

### D. Alleged Violations of Section 3(B)(2)

{¶ 253} The complaint in *Ohio Organizing Collaborative* also alleges that the plan that the commission adopted violates Article XI, Section 3(B)(2) of the Ohio Constitution in addition to Section 6(A) and (B). Section 3(B)(2) provides that the plan adopted by the commission "shall comply with all applicable

provisions of the constitutions of Ohio and the United States and of federal law." Article XI, Section 3(B)(2), Ohio Constitution. The OOC maintains that the commission violated the Ohio Constitution's guarantees of equal protection under Article I, Section 2, assembly under Article I, Section 3, and free speech under Article I, Section 11. I disagree.

### 1. Equal Protection

{¶ 254} Article I, Section 2 of the Ohio Constitution provides: "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary * * *." The OOC contends that the General Assembly-district plan violates the Equal Protection Clause by diluting the votes of Democratic voters, thus denying them the right to vote on equal terms to alter or reform their government under the Ohio Constitution.

{¶ 255} However, the plan adopted by the commission does not affect the right to vote on equal terms to alter or reform the government under the Ohio Constitution. The right to vote is not created by Article I, Section 2. Rather, the right to vote emanates from Article V, Section 1 of the Ohio Constitution, which states who is "entitled to vote at all elections." Each qualified elector of this state enjoys the same right to vote, regardless of the district in which he or she lives. *See id.*; R.C. Chapter 3503. Yet the specific provision establishing the right to vote does not create a right to proportional representation.

{¶ 256} Further, the adopted district plan does not affect the right to alter or reform the state government, because such a vote would take place on a statewide basis to initiate a law, a constitutional amendment, or even a new constitution. *See* Article II, Sections 1a and 1b, and Article XVI, Ohio Constitution. The adopted district plan does not burden that right. Bootstrapping this right with equal-protection principles does not establish a right to vote with proportional representation. And that is the principle underlying the OOC's argument.

{¶ 257} The OCC maintains that the plan deprives some Democratic voters of the chance to elect their chosen candidate to office by diluting their voting strength. But as the United States Supreme Court has explained,

> [p]artisan gerrymandering claims rest on an instinct that groups with a certain level of political support should enjoy a commensurate level of political power and influence. Explicitly or implicitly, a districting map is alleged to be unconstitutional because it makes it too difficult for one party to translate statewide support into seats in the legislature. But such a claim is based on a "norm that does not exist" in our electoral system—"statewide elections for representatives along party lines."

*Rucho v. Common Cause*, ___ U.S. ___, ___, 139 S.Ct. 2484, 2499, 204 L.Ed.2d 931 (2019), quoting *Davis v. Bandemer*, 478 U.S. 109, 159, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (O'Connor, J., concurring). Applying the federal Equal Protection Clause, the United States Supreme Court has rejected the proposition that "each party must be influential in proportion to its number of supporters." *Id*. at ___, 139 S.Ct. at 2501. "It hardly follows from the principle that each person must have an equal say in the election of representatives that a person is entitled to have his political party achieve representation in some way commensurate to its share of statewide support." *Id.*

{¶ 258} Of course, the Ohio Constitution is a document of independent force and can provide greater protection than its federal counterpart. *Arnold v. Cleveland*, 67 Ohio St.3d 35, 42, 616 N.E.2d 163 (1993). But the people of Ohio adopted the Equal Protection Clause of Article I, Section 2 as part of the 1851 Constitution. In that same document, the people took reapportionment out of the hands of the General Assembly and provided for the governor, auditor, and

secretary of state to determine the number of representatives and senators that each county or district would receive. *See State ex rel. Herbert v. Bricker*, 139 Ohio St. 499, 508, 41 N.E.2d 377 (1942); *State ex rel. King v. Rhodes*, 11 Ohio St.2d 95, 99, 228 N.E.2d 653 (1967). We have explained that "[p]rior to the Constitution of 1851, the apportionments of legislative districts had been made by the General Assembly with the result that oftentimes political advantage was sought to be gained by the party in power." *Herbert* at 508. Therefore, we continued, "Article XI was incorporated in the Constitution for the purpose of correcting the evils of former days by placing the power of apportionment in the hands of a board composed of the Governor, the Auditor of State and the Secretary of State and making the provisions self-acting." *Id.*

{¶ 259} That is, "[t]he objective sought by the constitutional provisions was the prevention of gerrymandering," *id.* at 509, by "plac[ing] the function of apportionment in impartial hands and at the same time mark[ing] the way so that in the main at least the provisions of the Constitution would work automatically and the apportioning process [would] ordinarily be a mere matter of calculation," *id.*

{¶ 260} Although the framers of the 1851 Constitution included equal-protection language, they nonetheless established the remedy for gerrymandering for partisan advantage not in equal-protection principles but in a more specific provision addressing reapportionment. As Justice Rufus Ranney, a delegate at the 1851 Constitutional Convention, wrote for this court in 1853, "I am much mistaken if the system adopted by the convention [i.e., former Article XI] is not found entirely adequate to accomplish all the substantial purposes proposed, and one of the most valuable features of the constitution." *State ex rel. Evans v. Dudley*, 1 Ohio St. 437, 443 (1853); *see King* at 99. He noted that "[t]he state had been subjected to a most humiliating experience, while the [apportionment] power was left with the General Assembly; and the scenes of anarchy and confusion, which had marked its exercise there, undoubtedly determined the people to deprive that

body of it absolutely, so far as the election of their own members was concerned, for the future." *Evans* at 443. Rather than rely on Article I, Section 2 to limit political gerrymandering, the people adopted that protection in Article XI.

{¶ 261} In ratifying the current version of Article XI, the voters of Ohio did not change that calculus but rather provided additional language specifically aimed at gerrymandering. Article XI imposes both mandatory and directory requirements for the redistricting commission relating to the traditional rules of apportionment. For example, it requires districts of approximately equal populations that are contiguous and that minimize the division of political subdivisions. In addition, Article XI Section 6 provides directory requirements for the commission to attempt to draw districts that do not favor or disfavor a political party, Section 6(A), and to attempt to make the statewide propositions of districts closely correspond to the statewide preferences of Ohio voters, Section 6(B). Further, Section 6(C) directs the redistricting commission to attempt to draw districts that are compact. As the Supreme Court of Pennsylvania has explained, "the use of compactness, contiguity, and the maintenance of the integrity of the boundaries of political subdivisions maintains the strength of an individual's vote in electing a * * * representative." *League of Women Voters v. Commonwealth*, 645 Pa. 1, 120-121, 178 A.3d 737 (2018).

{¶ 262} Article XI of the Ohio Constitution specifically targets gerrymandering in drawing a General Assembly-district plan, but it does not expressly prohibit the adoption of a plan that provides for disproportional representation. Because a special constitutional provision controls a general one, *State ex rel. Maxcy v. Saferin*, 155 Ohio St.3d 496, 2018-Ohio-4035, 122 N.E.3d 1165, ¶ 10, we cannot construe Ohio's Equal Protection Clause as providing any greater remedy for gerrymandering than that provided specifically in Article XI. Put differently, we cannot hold that the specific remedial procedure provided by the Ohio Constitution itself violates another provision of the Ohio Constitution. For

these reasons, resort to equal-protection principles cannot be had when a General Assembly-district plan conforms to the mandatory requirements of Article XI.

{¶ 263} But if Article I, Section II really provided additional protections against gerrymandering, then the remedy proposed by the OOC would itself violate principles of equal protection.

{¶ 264} The partisan preferences of voters are not evenly distributed across the state of Ohio. Dr. Michael Barber's expert report describes the political geography of Ohio and explains that Democratic voters tend to live in more densely populated areas (i.e., in cities) while Republican voters tend to live in less populated (i.e., rural and suburban) areas. Further, Democrats tend to live in more homogeneous cities with a stronger partisan preference than Republicans, who tend to live in more heterogenous areas of the suburban and rural areas. As Dr. Barber explains, the Ohio Constitution requires "spatially contiguous, geographically compact electoral districts"; this occurs because of the mandatory requirement to minimize the division of political units and the directory requirement for compact districts. Compliance with these requirements leads to Democratic voters tending to be clustered in districts that result in so-called "wasted" votes in which Democratic candidates win by overwhelming numbers while Republicans tend to be in more competitive districts in which Republican candidates win by smaller margins.

{¶ 265} Dr. Barber's review of Ohio's political geography also reveals that 65 counties are uniformly Republican and that based on their population, they would be expected to control approximately one-third of the House seats. Seventeen counties are what he calls "purple cluster" counties—counties that are mostly Republican except that they have a small-to-medium-sized municipality that is majority Democratic. These represent 26 House districts, but only 5 could be drawn in compliance with the requirement to avoid splitting political units. That results in the purple-cluster counties tending to lean Republican. Lastly, Dr. Barber

identifies 6 "urban blue" counties, which split approximately 60 percent Democratic and 40 percent Republican and account for approximately 41 House districts.

{¶ 266} Based on this political geography, Dr. Barber explains, the various requirements of the Ohio Constitution for territorial continuity, district compactness, political-unit integrity, and proportionality come into tension. He opined that in order for the statewide proportion of House districts to closely correspond to the preferences of Ohio voters (i.e., 54 Republican seats and 45 Democratic seats), the commission would have to draw districts in the purple-cluster counties and the urban-blue counties in a way intended to give a political advantage to Democratic voters in those counties. That is, a plan that overcame the political geography of Ohio would provide Democrats greater representation in counties than the preferences of voters there would merit.

{¶ 267} This is shown in the report of the OOC's expert, Dr. Jonathan Rodden, who proposed a plan that more closely corresponded with the partisan divide of the state by taking urban areas that tend to vote strongly for Democratic candidates and combining them with more suburban and rural areas that tend to vote Republican. For example, Dr. Rodden intentionally drew 11 districts in Franklin County in such a way that all 11 districts would skew in favor of the Democratic Party. So, while the partisan divide of Franklin County is approximately 63 percent Democratic and 37 percent Republican, Dr. Rodden's plan would give 100 percent of the districts to the Democratic Party. The plan proposed by Senator Vernon Sykes and House Minority Leader Emilia Sykes eliminates Republican representation not only in Franklin County but also in Pickaway County, a rural county that gave President Donald Trump over 70 percent of the vote in 2020. Similarly, Hamilton County leans 55 percent Democratic and 45 percent Republican. Dr. Rodden's plan, however, would provide 6 out of 7 House districts (or approximately 85 percent) to Democrats by cracking

Republican-leaning areas of the county and packing them with the more Democratic urban areas.

{¶ 268} The alternative plans that the OOC presents, then, would dilute the votes of Republican voters in the areas surrounding cities. To the extent that the OOC seeks a remedy to the dilution of Democratic voters, the remedy would do so at the expense of other voters. Therefore, even if voter dilution were actionable under Article I, Section 2 of the Ohio Constitution, we could not direct the commission to remedy one constitutional violation by committing another. *See Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 38.

**2. Freedom of Speech, Assembly, and Association**

{¶ 269} Lastly, the OOC asserts that the commission's plan violates their rights to freedom of speech, assembly, and association. However, the plan does nothing to burden any of these rights. It does not limit speech, prohibit assembly, or deny Ohio voters the ability to associate with others. *See Rucho*, ___ U.S. at ___, 139 S.Ct. at 2504, 204 L.Ed.2d 931 ("there are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue. The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district").

{¶ 270} For these reasons, the OOC has failed to demonstrate a violation of Article XI, Section 3 of the Ohio Constitution, and it is not entitled to relief.

*E. The Majority's Final Note*

{¶ 271} In concluding its opinion, the majority strikes a "final note." Majority opinion at ¶ 134. The majority writes:

> A final note. Our analysis and conclusion in these cases would be the same regardless of which political party makes up the majority of the commission or drives the map-drawing process. And any disagreement between the members of this court about the legal

114

> interpretation of words in the Ohio Constitution does not undermine the integrity of the court or Ohioans' confidence in it, as the second dissenting opinion fears. It is a hallmark of an independent judiciary, made up here of seven jurists, that principled legal disagreements may arise. When disagreements do arise and are addressed intelligently and truthfully by the justices, confidence in the judicial branch of our government is strengthened. But when they are addressed with dire predictions and what appears to be unreasonable characterizations, we cannot help but wonder whether such aspersions will shake the public's confidence in our court.

*Id.* at ¶ 134.

{¶ 272} But the final note that the majority strikes is emblematic of the disharmony of our times.

{¶ 273} R.C. 3.23 requires judges to pledge an oath "to support the constitution of the United States and the constitution of this state, to administer justice without respect to persons, and faithfully and impartially to discharge and perform all the duties incumbent on the person as such judge, according to the best of the person's ability and understanding." Every justice of this court has pledged that oath, and I would never question a colleague's intent to abide by it in every case that he or she addresses, pursuant to his or her understanding of our Constitutions and laws.

{¶ 274} But the majority opinion signals that only it is faithfully and impartially discharging its duty in these cases because its analysis and conclusion would be the same regardless of "which political party makes up the majority of the commission or drives the map-drawing process," majority opinion at ¶ 134. This implies that the justices who are not joining the majority opinion are not faithfully and impartially discharging their duty in these cases.

{¶ 275} And the majority opinion's insinuation that the dissenting opinions are driven by political affiliations and political outcomes is difficult to harmonize with this court's recent decision in *Cleveland Metro. Bar Assn. v. Morton*, ___ Ohio St.3d ____, 2021-Ohio-4095, ___ N.E.3d ___. The same justices who are today implying that other justices of this court are guided by something other than fidelity to a sworn oath of office harshly disciplined an attorney who had "filed a pleading in which he accused this court of adjudicating based on political motives," *id.* at ¶ 45 (O'Connor, C.J., concurring). The four members of the majority here joined a concurring opinion in *Morton*, which stated that an attorney should be disciplined in order to "preserv[e] the integrity of *the* court—i.e., the judicial system as a whole—by maintaining public confidence in the court's impartiality and the rule of law." (Emphasis sic.) *Id.* at ¶ 41 (O'Connor, C.J., concurring). That concurring opinion stated that "accusing this court of furthering its own political agenda directly undermines this confidence." *Id.* at ¶ 42 (O'Connor, C.J., concurring). It also stated that "[p]reserving the integrity of the court depends on the public's confidence and respect for the judicial system and the long-standing disciplinary rules regulating attorneys' conduct in that system." *Id.* at ¶ 46 (O'Connor, C.J., concurring).

{¶ 276} When the attorney in *Morton* accused this court of having political motivations, the members of today's majority concluded that the attorney had committed an ethical violation by undermining confidence in this court's impartiality and the rule of law. But when today's majority opinion, by way of insinuation, suggests that the dissenters' views are politically motivated, it simply calls it a "final note," majority opinion at ¶ 134. So, these cases beg the question: Where is the ethical line?

### III. CONCLUSION

{¶ 277} Invariably, redistricting is a process of line drawing. And in drawing those lines, some Democratic voters must be placed in Republican-leaning

districts and some Republican voters must be placed in Democratic-leaning districts. Any plan will dilute or enhance the strength of some voters. The Ohio Constitution requires the redistricting commission to follow politically neutral map-drawing practices and directs the commission to attempt to adopt a plan that gives proportional representation, but it does not eliminate the dilution of some electors' voting strength. The remedy provided by the Constitution may not please all Ohio voters, but this court does not have license to demand by judicial fiat the adoption of a new General Assembly-district plan.

{¶ 278} In the end, none of the complaints filed in these three cases demonstrates petitioners' entitlement to the relief sought. Because the majority invalidates the General Assembly-district plan even though that power has been denied to this court by the Ohio Constitution, I dissent.

DeWine, J., concurs in the foregoing opinion.

_____

**Fischer, J., dissenting.**

{¶ 279} I must respectfully dissent. I agree with the conclusion stated in the first dissenting opinion that not one of the complaints filed in these three cases demonstrates that any petitioner is entitled to the relief sought. *See* dissenting opinion of Kennedy, J., at ¶ 278. I am strongly convinced, however, that it is not even necessary for us to engage in an analysis of the merits of these cases. The text of the Ohio Constitution is clear, and given the allegations in the complaints, this court lacks the authority to act as requested by the petitioners bringing these cases.

## I. The plain language of Article XI, Section 8(C)(1)(a) precludes this court from reviewing the plan in these cases

{¶ 280} Article XI, Section 8 of the Ohio Constitution sets forth the procedure that the Ohio Redistricting Commission must follow when it reaches an impasse. This section also sets forth when this court may review a final General Assembly–district plan adopted pursuant to the impasse procedures. And, please

note, as specifically set forth in all three complaints and conceded during oral argument, the impasse procedures of Section 8 *are controlling* in these cases. This fact is not disputed in the majority opinion.

{¶ 281} Under Article XI, Section 8(B), a final General Assembly–district plan adopted after an impasse with the votes of at least two commission members representing each of the two largest political parties (a "ten-year plan") "shall remain effective until the next year ending in the numeral one, *except as* provided in Section 9 of this article." (Emphasis added.)

{¶ 282} If, however, at least two commission members representing each of the two largest political parties do not vote for a final General Assembly–district plan after an impasse, Article XI, Section 8(C)(1)(a) provides that the plan (a "four-year plan") "shall remain effective until two general elections for the house of representatives have occurred under the plan."

{¶ 283} At the conclusion of that four-year term, if the commission, in adopting a new final General Assembly–district plan, is once again unable to obtain the votes of at least two commission members representing each of the two largest political parties, Article XI, Section 8(C)(1)(b) provides that the plan (a "six-year plan") "shall remain effective until a year ending in the numeral one, *except as* provided in Section 9 of this article." (Emphasis added.)

{¶ 284} Article XI, Section 9 sets forth this court's authority to determine the constitutionality of a General Assembly–district plan adopted by the redistricting commission. It is significant that while both the ten-year plan adopted pursuant to Section 8(B) and the six-year plan adopted pursuant to Section 8(C)(1)(b) remain in effect for the relevant time period "*except as* provided in Section 9 of this article" (emphasis added), Section 8(C)(1)(a) *contains no proviso* that the effectiveness of a four-year plan is subject to the provisions of Section 9. Section 8(C)(1)(a) instead provides that the plan "shall remain effective" for four years. Period. No exception for Section 9 is listed.

**{¶ 285}** Because the phrase "except as provided in Section 9 of this article" is not included in Article XI, Section 8(C)(1)(a), this court cannot review a four-year plan under Section 9. The absence of the phrase in Section 8(C)(1)(a) must mean something. In other words, this is a situation in which the interpretive canon expressio unius est exclusio alterius must apply. " '[T]he canon *expressio unius est exclusio alterius* does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an "associated group or series," justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence.' " *Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, 943 N.E.2d 522, ¶ 35, quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003), citing *United States v. Vonn*, 535 U.S. 55, 65, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002). As the Supreme Court of the United States has explained in regard to the canon:

> Just as statutory language suggesting exclusiveness is missing, so is that essential extrastatutory ingredient of an expression-exclusion demonstration, the series of terms from which an omission bespeaks a negative implication. The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which is abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded.

*Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 81, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002). Because Article XI, Section 8 has two provisions that specifically include the phrase "except as provided in Section 9 of this article" and a third provision that does not include the phrase, the exception in that phrase is not applicable when the third provision applies.

{¶ 286} We have two constitutional provisions in Article XI—Section 8(B) and 8(C)(1)(b)—that expressly create an exception under Article XI, Section 9 to the mandatory language requiring that a ten-year plan and a six-year plan reached after an impasse shall remain effective for the specified period. In between those two provisions, we have Section 8(C)(1)(a), under which a four-year plan is adopted and which obviously does not include the phrase "except as provided in Section 9 of this article." The omission of the phrase "support[s] a sensible inference that the term left out must have been meant to be excluded." *Chevron U.S.A., Inc.*, at 81. It logically follows that we must take the language of Section 8(C)(1)(a)—which was added to our Constitution by an overwhelming majority of Ohioans, *see* Ohio Secretary of State, Statewide Issue History, https://www.ohiosos.gov/elections/election-results-and-data/historical-election-comparisons/statewide-issue-history/ (accessed Jan. 2, 2022) [https://perma.cc/CK6W-2KUC]—on its own terms: a four-year plan "shall remain effective until two general elections for the house of representatives have occurred under the plan." No exceptions under Section 9 are stated. The majority opinion is unreasonably, unabashedly, and unlawfully altering the Ohio Constitution.

{¶ 287} It is telling that in analyzing the provisions of Article XI, Section 6, the majority opinion concludes that the phrase "shall attempt," as it is used in that section, connotes a mandatory obligation that requires the commission to attempt to meet the standards set forth in Section 6. Majority opinion at ¶ 86. If we are to read the "shall" in Article XI, Section 6 as mandatory, then we should also read the "shall" in Article XI, Section 8(C)(1)(a) as mandatory and requiring a four-year plan to remain effective for four years, and without any Section 9 exceptions.

{¶ 288} Ohio Senate President Matt Huffman and Ohio House Speaker Robert R. Cupp argue in their supplemental brief that this court "could reasonably construe Section 8(C)(1)(a) as divesting this Court of any authority to review or

enjoin four-year plans." The other parties in these cases and the majority opinion, however, fail to offer any reasonable explanation for what the absence of the phrase "except as provided in Section 9 of this article" in Article XI, Section 8(C)(1)(a) means. Instead, they illogically and baselessly ignore the phrase's absence in this provision and look to Article XI, Section 9's grant of general jurisdiction to this court as permitting this court to consider challenges to a four-year plan. This analysis is flawed because the specific and clear text of Article XI, Section 8(C) controls over the text of the much more general Article XI, Section 9, and, moreover, the text shows that Section 9 does not apply to plans adopted pursuant to Section 8(C)(1)(a).

{¶ 289} The Ohio Constitution, in other provisions, exposes the unreasoned and baseless flaw in ignoring the language of Section (8)(C)(1)(a). For example, Article I of the Ohio Constitution includes several exceptions in Sections 5, 9, 10, and 18. This court does not ignore these exceptions in cases involving those provisions, and it cannot, because it is the language and words used in the text of our state Constitution.

{¶ 290} Similarly, Article XIX is replete with the phrase "except as provided in Section 3 of this article." In Section 1 of Article XIX, this "except" phrase is used at least seven times. Should this court ignore similar language found here and in many places throughout the Ohio Constitution?

{¶ 291} And there is an important and revealing lack of parallelism in a provision found in Article XIX compared to a similar provision found in Article XI that unequivocally and absolutely supports the conclusion that the Section 9 language was not inadvertently omitted in Article XI, Section 8(C)(1)(a). Article XIX, Section 1(C)(3)(e) states: "[T]he plan shall remain effective until two general elections for the United States house of representatives have occurred under the plan, *except as* provided in Section 3 of this article" (emphasis added), while Article XI, Section 8(C)(1)(a) states: "[T]he plan shall take effect upon filing with the

secretary of state and shall remain effective until two general elections for the house of representatives have occurred under the plan." Note that no emphasis is added to the second quotation because no "exception" language is included at the end of the provision.

{¶ 292} The provision in Article XIX expressly states an exception: "except as provided in Section 3 of this article." The all but verbatim provision found in Article XI has *no* such provision for an exception at its end.

{¶ 293} Because the majority opinion ignores the difference in the language, it then also makes phrases such as "except as provided in * * *" found elsewhere in the Ohio Constitution superfluous. Under long-standing case law, this court is not permitted to make constitutional language superfluous, because "[i]t is a basic rule of constitutional construction that 'the whole section should be construed together, and *effect given to every part* and sentence.' " (Emphasis added.) *State v. Wyant*, 68 Ohio St.3d 162, 168, 624 N.E.2d 722 (1994) (Wright, J., dissenting), quoting *Froelich v. Cleveland*, 99 Ohio St. 376, 124 N.E. 212 (1919), paragraph one of the syllabus.

{¶ 294} Finally, the legislative history of the joint resolution that proposed the current version of Article XI expressly shows that the phrase "except as provided in Section 9 of this article" was specifically added to what became Article XI, Section 8(C)(1)(b). *Compare* 2014 Sub.H.J.R. No. 12, 130th General Assembly (as passed by the House, Dec. 4, 2014), available at archives.legislature.state.oh.us/res.cfm?ID=130_HJR_12_AH (accessed Jan. 2, 2022) [https://perma.cc/VP3T-XVXU] (containing "except as provided" language only in reference to a ten-year plan) *with* 2014 Am.Sub.H.J.R. No. 12, 130th General Assembly (as passed by the Senate, Dec. 11, 2014), available at http://archives.legislature.state.oh.us/res.cfm?ID=130_HJR_12_AS (accessed Jan. 2, 2022) [https://perma.cc/M6CN-G6GR] (including "except as provided" language in reference to a six-year plan). Hence, the General Assembly gave some

thought to this issue in drafting the current language and expressly declined to add the same "except as provided in Section 9" language to Section 8(C)(1)(a) that it added to Sections 8(B) and 8(C)(1)(b). *See Wachendorf v. Shaver*, 149 Ohio St. 231, 236-237, 78 N.E.2d 370 (1948) ("the Legislature must be assumed or presumed to know the meaning of words, to have used the words of a statute advisedly and to have expressed legislative intent by the use of the words found in the statute").

A. *The clear text of Article XI, Section 8(C) prevents review of four-year plans under Article XI, Section 9*

{¶ 295} Under the text of the Constitution, and as acknowledged in the complaints, this is an Article XI, Section 8 case. The primary provisions that the parties in these cases rely on to support their arguments that the court has jurisdiction in these cases are the provisions granting qualified authority to this court in Sections 9(A) and 9(B) and the reference in Section 9(D)(3)(c) to reviewing plans adopted under Section 8(C).

{¶ 296} These arguments are unavailing because Article XI, Section 8 specifies when Section 9 applies to an impasse and when it does not apply. As noted above, Sections 8(B) and 8(C)(1)(b) expressly and clearly state when Section 9 allows this court to review a final General Assembly–district plan, i.e., only in relation to ten-year and six-year plans. Section 8(C)(1)(a), however, creates *no exception* allowing this court to exercise any authority set forth in Section 9 when the plan is a four-year plan.

{¶ 297} It is true that Article XI, Section 9(A) grants this court "exclusive, original jurisdiction in all cases arising under this article." Although this provision grants exclusive, original jurisdiction, it does not empower this court to exercise that jurisdiction in any manner it sees fit. Instead, our review is constrained by other provisions found in Article XI. Chief among those provisions, for purposes

of these three cases, is Section 8(C)(1)(a), which, by its plain text, does not contain the phrase "except as provided in Section 9 of this article."

{¶ 298} Indeed, by omitting the phrase "except as provided in Section 9 of this article," Article XI, Section 8(C)(1)(a) expressly takes four-year plans outside the purview of Section 9. This court cannot rewrite Section 8(C)(1)(a) to create an exception to the effectiveness of four-year plans. " ' "Generally speaking, in construing the Constitution, we apply the same rules of construction that we apply in construing statutes." ' " *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 13, quoting *Smith v. Leis*, 106 Ohio St.3d 309, 2005-Ohio-5125, 835 N.E.2d 5, ¶ 57, quoting *State v. Jackson*, 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, ¶ 14. Perhaps the most fundamental of these rules of construction is that we must not add or delete words from the constitutional or statutory text. *See State ex rel. Lorain v. Stewart*, 119 Ohio St.3d 222, 2008-Ohio-4062, 893 N.E.2d 184, ¶ 36.

{¶ 299} More specifically, when a provision contains no such exception, we cannot add one to its express language. *State ex rel. Stoll v. Logan Cty. Bd. of Elections*, 117 Ohio St.3d 76, 2008-Ohio-333, 881 N.E.2d 1214, ¶ 39. The majority opinion's exercise of jurisdiction under Article XI, Section 9, despite Section 8(C)(1)(a)'s mandatory language providing that a four-year plan shall remain effective until two general elections for the House of Representatives have occurred under the plan, is a quintessential example of improperly "amending" constitutional language from the bench. Nonetheless, when amending the Constitution by adopting the current Article XI, Ohio voters declined to subject four-year plans to the provisions of Section 9. It is this court's duty to honor the language of Section 8(C)(1)(a) and not to ignore the language that appears in that provision of the Constitution merely because it desires to reach a certain argument.

{¶ 300} Nor does Article XI, Section 9(B) override Section 8(C)(1)(a). Section 9(B) sets forth the procedure to be used once this court finds invalid "any

general assembly district plan made by the Ohio redistricting commission." For this court to find a plan invalid, it must do so within the authority granted to it. As explained above, Section 8(C)(1)(a) contains no provision making a four-year plan subject to Section 9. It logically follows that Section 9(B) cannot apply to allow invalidation of four-year plans. Indeed, rather than grant this court authority to find four-year plans invalid, Section 9(B) merely outlines the procedures to be followed once this court finds a plan invalid, i.e., when this court is properly exercising its authority.

{¶ 301} For similar reasons, Article XI, Section 9(D)(3)(c) does not grant this court authority to review four-year plans. That provision sets forth conditions that the court must find before ordering the commission to adopt a new plan when "considering a plan adopted under division (C) of Section 8 of" Article XI. Significantly, Section 9(D)(3)(c) does not say *when* this court may review a plan adopted under Section 8(C). Instead, it merely outlines *on what basis* this court can find a plan invalid. As explained above, to determine *when* this court may review a plan adopted under Section 8(C), we must turn to the text of that provision. Again, Section 8(C)(1)(b) expressly provides that six-year plans are subject to Section 9 (including Section 9(D)(3)(c)); however, Section 8(C)(1)(a) contains no provision making four-year plans subject to Section 9.

*B. Speculation regarding the intention of Ohio voters in approving the amendments to the Constitution cannot override the actual text of Article XI of the Constitution as passed by the citizens of Ohio*

{¶ 302} In arguing that the text of Article XI, Section 8(C) cannot preclude our review of four-year plans, many of the petitioners in these cases argue that a conclusion that four-year plans are not subject to review is contrary to the intention of Ohio voters and would create an absurd result allowing some district plans to be reviewed while others cannot. This argument can also be found in the majority opinion. *See* majority opinion at ¶ 74.

{¶ 303} "[O]ur primary concern in construing Article XI is to determine the intent of the electorate in adopting the article, *and to discern that intent, we must examine its text*." (Emphasis added.) *Wilson*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, at ¶ 13, addressing former Article XI, Ohio Constitution (effective Nov. 7, 1967, to Jan. 1, 2021). We look to the intent of the framers of the Constitution only if "the meaning of a provision cannot be ascertained by its plain language." *Jackson*, 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, at ¶ 14.

{¶ 304} In these cases, intent can easily be ascertained by the plain text of the relevant constitutional provision. As explained above, the meaning and significance of Article XI, Section 8(C)(1)(a) is clear: the provision could contain an exception making four-year plans subject to Section 9, but the provision contains no such exception. And for this court to create such an exception would be a violation of this court's duty as interpreters—not drafters—of the Ohio Constitution. Thus, while one may argue, based on mere speculation, that Ohio voters wanted this court to review four-year plans, the clear text of Section 8(C)(1)(a) prevents us from reaching that conclusion.

{¶ 305} Given this clear and express constitutional language, it is not for this court to call the language of Article XI absurd. Article XI makes six-year plans and ten-year plans adopted pursuant to Section 8 subject to the provisions of Section 9. Four-year plans adopted pursuant to Section 8(C)(1)(a), as well as plans adopted pursuant to Article XI, Section 1(C) without resort to the impasse procedures, are exempted from judicial review, because each of those sections omits the phrase "except as provided in Section 9 of this article."

{¶ 306} But it is *not* for this court to question the wisdom of either the framers of the current Article XI or the voters who approved it. Even if that were our role, there are viable rationales for drafting Article XI without including the Section 9 proviso. Prior to the adoption of the current Article XI, this court

concluded that its role in adjudicating challenges to apportionment was limited. *Wilson*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, at ¶ 48. The current Article XI expands this court's role in adjudicating those challenges. That purpose has been achieved, because six-year plans and ten-year plans adopted pursuant to Section 8 are subject to the review provisions set forth in Section 9.

{¶ 307} In not making four-year plans adopted pursuant to Article XI, Section 8 and ten-year plans adopted pursuant to Section I subject to the review provisions set forth in Section 9, the framers and voters may have been expressing the intention that this court should not intervene in regard to ten-year plans reached by bipartisan consensus or in regard to four-year plans that will inevitably be replaced (perhaps by a significantly different commission, if Ohio voters are unhappy with the four-year plan and vote the governor, secretary of state, and auditor out of office and if the legislative members of the commission are voted out of office or otherwise replaced). Moreover, Section 8(D) describes the process by which a four-year plan will be replaced: by reconstituting and reconvening the commission after the four-year plan ceases to be effective and creating a new six-year plan (which is subject to Section 9 under Article XI, Section 8(C)(1)(b)).

{¶ 308} By not including the phrase "except as provided in Section 9 of this article" in Article XI, Section 8(C)(1)(a), the citizens of Ohio prohibited both major political parties from asking this court to enter into purely partisan fights. The text of Section 8 indicates that Ohioans do not want this court to enter into the purely political processes of gerrymandering or redistricting unless absolutely necessary. And the existence of this shorter, four-year plan indicates that Ohioans did not see the involvement of this court as absolutely necessary; however, the citizens of Ohio have made sure that this court may intervene to determine whether all constitutional requirements are met when there is a longer six-year or ten-year plan adopted pursuant to the impasse procedures.

{¶ 309} Consistently with keeping this court out of the process, in regard to four-year plans, Article XI, Section 8 creates a "carrot" and "stick" approach to the impasse procedure. To encourage compromise and negotiation, the members of the commission are given a carrot, or benefit, of having an agreed-upon plan that lasts for ten years (subject to this court's potential review) under Section 8(B).

{¶ 310} But the parties are also presented with a corresponding stick, or cost, if they do not negotiate. If no bipartisan consensus is reached, a majority party faces the cost of having its approved plan last for only four years, under Section 8(C)(1)(a). Further, a majority party, in light of the interceding two general elections, could lose control of the commission before the time comes to create the six-year plan.

{¶ 311} Under that same scenario, a minority party also faces a cost for not reaching a bipartisan consensus, namely, it will have to live with a plan that it did not agree to for four years. By ignoring the absence of the phrase "except as provided in Section 9 of this article," the analysis of the majority opinion effectively eliminates that stick and thus significantly lessens the cost to a minority party for failing to reach a consensus. If members of a minority party do not like the way the process is unfolding, they can simply stop participating in the process and challenge the eventual four-year plan in court. By making four-year plans subject to Section 9, when the text of the Constitution does not, the majority opinion significantly undermines the structure of Article XI and its system of costs and benefits.

{¶ 312} Ultimately, we cannot know what the voters' individual or collective intent and aims were beyond the specific wording that they approved. If Ohio voters had, and have, a different intent, they may express that intent by amending Article XI. Indeed, we have recent precedent for the voters "amending an amendment." After Article XV, Section 6 of the Ohio Constitution was amended in November 2009 to allow casino gaming at four specified sites in Ohio, that

section was quickly amended in May 2010 to change the Columbus site to another site in Franklin County. Thus, the procedures are in place for Ohio voters, not this court, to amend the Constitution in the event that a recently adopted amendment does not have the precise impact that the voters had desired in approving the original amendment.

{¶ 313} Indeed, the second concurring opinion indicates that the majority opinion may be based on policy motivations: the opinion suggests that Ohio's first experience with redistricting under the current version of Article XI has been contrary to the voters' intentions. *See* concurring opinion of Brunner, J., at ¶ 179. This suggestion indicates that rather than follow the text of the Constitution, the approach of the majority opinion is to honor the speculated intentions of Ohio's voters. The second concurring opinion goes so far as to state that based on this first experience with the Ohio Redistricting Commission, a new constitutional amendment is needed to establish an independent redistricting commission, *id*. at ¶ 180, in place of the current Ohio Redistricting Commission, which more than 70 percent of those who voted on the issue in 2015 approved, *see* Ohio Secretary of State, Statewide Issue History, https://www.ohiosos.gov/elections/election-results-and-data/historical-election-comparisons/statewide-issue-history/ (accessed Jan. 2, 2022) [https://perma.cc/CK6W-2KUC]. The first concurring opinion also suggests that Ohioans may consider pursuing a constitutional amendment to create an independent redistricting commission. Concurring opinion of O'Connor, C.J., at ¶ 147. It should be noted that in 2012, Ohioans overwhelmingly rejected a previous proposal to amend the Constitution, with more than 63 percent of those who voted on the issue declining to create a state-funded so-called "independent commission" to draw legislative and congressional districts. *See* Ohio Secretary of State, Statewide Issue History, https://www.ohiosos.gov/elections/election-results-and-data/historical-election-comparisons/statewide-issue-history/ (accessed Jan. 2, 2022) [https://perma.cc/CK6W-2KUC]. Ultimately, the decision whether to adopt

such a measure rests with Ohioans. For purposes of our analysis in these cases, we must apply Article XI as it exists now.

{¶ 314} For these reasons, this court should not, and cannot as a matter of law, elevate any speculative intention of voters in approving a constitutional provision above the clear language that those same voters approved. I accordingly conclude that we must honor and follow Article XI, Section 8(C)(1)(a) as written. In doing so, we should conclude that Section 8(C)(1)(a) precludes this court from reviewing a four-year plan under Section 9.

## II. Even if this court had the authority to review the district plan in these cases, it would still be unable to review it for a violation of Article XI, Section 6

{¶ 315} Even if we assume for the sake of argument that this court had the authority to review a four-year plan pursuant to Article XI, Section 9, the text of that same section would preclude us from conducting a substantive review of the four-year plan in these cases. In each of these three cases, the petitioners challenging the four-year plan direct us to Article XI, Section 9(D)(3)(c), which they assert allows this court to review a four-year plan for an alleged violation of Article XI, Section 6. Again, while I conclude that Article XI, Section 9(D)(3)(c) does not give this court the authority to review a four-year plan, if we were to review the four-year plan in these cases pursuant to Section 9(D)(3)(c), our review would be bound by the terms of that provision. In other words, petitioners may not use Article XI, Section 9(D)(3)(c) as both a sword and a shield. If they wish to invoke that provision in claiming that this court has the authority to review four-year plans, they must abide by all the terms of that same provision.

{¶ 316} Critically, Article XI, Section 9(D)(3) sets forth the remedies that are available to this court after it first "determines that a general assembly district plan adopted by the commission does not comply with the requirements of Section 2, 3, 4, 5, or 7 of this article." Article XI, Section 9(D)(3)(c) provides that when

this court has found a violation of Section 2, 3, 4, 5, or 7 in considering a plan adopted pursuant to Article XI, Section 8(C), the court "shall order the commission to adopt a new general assembly district plan in accordance with this article" if two additional criteria requiring violations of Article XI, Section 6 are met.

{¶ 317} Pursuant to the plain language of Article XI, Section 9(D)(3), this court may consider whether a violation of Article XI, Section 6 has occurred only if it has first found a violation of Article XI, Section 2, 3, 4, 5, or 7. This requirement is fatal to the claims currently before us.

A. *In two of the cases before us, the petitioners have failed to allege a violation of Article XI, Section 2, 3, 4, 5, or 7*

{¶ 318} In *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Supreme Court case No. 2021-1193, and *Bennett v. Ohio Redistricting Comm.*, Supreme Court case No. 2021-1198, the petitioners' complaints challenging the four-year plan allege only violations of Article XI, Section 6. Because those petitioners did not allege any violation of Article XI, Section 2, 3, 4, 5, or 7, this court may not find a violation of Section 2, 3, 4, 5, or 7 in those cases. Accordingly, pursuant to Article XI, Section 9(D)(3), we may not even reach the question whether a violation of Article XI, Section 6 has occurred. Thus, based on the pleadings filed in *League of Women Voters of Ohio* and *Bennett*, we would be required to uphold the adopted plan in those cases due to the petitioners' failure to allege a violation of Article XI, Section 2, 3, 4, 5, or 7, even if we had the authority to review the four-year plan.

B. *In the third case before us, the petitioners have alleged a violation of Article XI, Section 3(B)(2), but that claim is unavailing, precluding this court from reaching the petitioners' Article XI, Section 6 claims*

{¶ 319} In *Ohio Organizing Collaborative v. Ohio Redistricting Comm.*, Supreme Court case No. 2021-1210, petitioners Ohio Organizing Collaborative et al. (collectively, "OOC") have alleged violations of Article XI, Section 3(B)(2) in

their first two causes of action. Even if we had the authority to consider the merits of such claims, we should still reject them in this case.

{¶ 320} In addressing the merits of the Section 3(B)(2) claims, the second concurring opinion addresses a matter of first impression. In raising equal-protection, freedom-of-assembly, and freedom-of-speech challenges, all of which invoke Article I, OOC has not cited any case in which this court has considered such challenges to a General Assembly–district plan. In *Wilson*, this court considered a challenge under former Article XI and held that "[t]he Ohio Constitution does not mandate political neutrality in the reapportionment of house and senate districts, but partisan considerations cannot prevail over the nonpartisan requirements set forth in Article XI." 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, at paragraph one of the syllabus. But the claims in *Wilson* arose under former Article XI, not Article I. *See id*. at ¶ 2. Therefore, despite its broad wording, the *Wilson* holding sheds little light on OOC's Article I claims here.

{¶ 321} In 2019, the United States Supreme Court considered claims alleging that the apportionment of congressional districts in North Carolina and Maryland violated the Equal Protection Clause of the Fourteenth Amendment and the First Amendment to the United States Constitution. *Rucho v. Common Cause*, __ U.S. __, ___, 139 S.Ct. 2484, 2491, 204 L.Ed.2d 931 (2019). The federal district courts in each of those states had ruled in favor of the plaintiffs.

{¶ 322} The question in *Rucho* was whether the claims were justiciable in federal court. *Id*. at ___, 139 S.Ct. at 2491, 2493-2494. The court began by noting that "[p]artisan gerrymandering is nothing new. Nor is frustration with it. The practice was known in the Colonies prior to Independence, and the Framers were familiar with it at the time of the drafting and ratification of the Constitution." *Id*. at ___, 139 S.Ct. at 2494. The court then clarified that partisan gerrymandering is not a per se violation of the United States Constitution: "while it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to engage in racial

discrimination in districting, 'a jurisdiction may engage in constitutional political gerrymandering.' " *Id.* at ___, 139 S.Ct. at 2497, quoting *Hunt v. Cromartie*, 526 U.S. 541, 551, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). The question presented in cases in which the practice of gerrymandering is challenged, then, is not whether partisan gerrymandering occurred but whether the apportioning body went *too far*. *Id.* at ___, 139 S.Ct. at 2498, 2501.

{¶ 323} That question, the court concluded, is not justiciable in federal court. *Id.* at ___, 139 S.Ct. at 2499-2500, 2506-2507. To adjudicate such claims, courts would need "a standard that can reliably differentiate" between constitutional and unconstitutional political gerrymandering. *Id.* at ___, 139 S.Ct. at 2499. The court determined that no such standard exists. *Id.*

{¶ 324} The court first rejected the idea that the right to equal protection demands proportional representation: " 'The Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization.' " *Rucho*, ___ U.S. at ___, 139 S.Ct. at 2499, 204 L.Ed.2d 931, quoting *Mobile v. Bolden*, 446 U.S. 55, 75-76, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality opinion). It then observed that plaintiffs in political-gerrymandering cases—being unable to insist on strict proportionality—essentially ask the courts to determine "how much representation particular political parties *deserve*—based on the votes of their supporters." (Emphasis sic.) *Id.* The court explained that "fairness" is not a manageable standard for a court to administer. *Id.* at ___, 139 S.Ct. at 2499-2500.

{¶ 325} To illustrate that point, the court set forth several examples of what might be deemed "fair": a greater number of competitive districts; or "yielding to the gravitational pull of proportionality and engaging in cracking and packing" to guarantee each party a fair share of seats; or focusing on "adherence to 'traditional' districting criteria, such as maintaining political subdivisions, keeping communities of interest together, and protecting incumbents." *Id.* at ___, 139 S.Ct. at 2500. The

court concluded that "[d]eciding among just these different visions of fairness (you can imagine many others) poses basic questions that are political, not legal." *Id*. The court similarly concluded that the First Amendment provides "no standard for determining when partisan activity goes too far." *Id*. at ___, 139 S.Ct. at 2504.

{¶ 326} Ultimately, the *Rucho* court held that "partisan gerrymandering claims present political questions beyond the reach of the federal courts. Federal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions." *Id*. at ___, 139 S.Ct. at 2506-2507. Yet the court noted that the states—by statute or in their own constitutions—could "provide standards and guidance for state courts to apply," for example by removing partisans from the redistricting process, by expressly prohibiting partisan favoritism in redistricting, or by imposing specific requirements for partisan fairness. *Id*. at ___, 139 S.Ct. at 2507-2508 (citing examples).

{¶ 327} *Rucho* was decided under the federal Constitution. The question in this case is whether the OOC may achieve a different result under provisions of the Ohio Constitution similar to those in the federal Constitution. The OOC argues that the adopted plan does not comply with Article XI, Section 3(B)(2), because it violates the Ohio Constitution's guarantees of equal protection, *see* Article I, Section 2, the right to assemble, *see id.* at Section 3, and freedom of speech, *see id*. at Section 11.

{¶ 328} Historically, this court has held that the Ohio and federal Equal Protection Clauses "are functionally equivalent and require the same analysis." *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 29; *see also Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 60, 717 N.E.2d 286 (1999) ("the federal and Ohio Equal Protection Clauses are to be construed and analyzed identically"). But "the Ohio Constitution is a document of independent force." *State v. Mole*, 149 Ohio St.3d 215, 2016-

Ohio-5124, 74 N.E.3d 368, ¶ 14 (plurality opinion); *see also State v. Noling*, 149 Ohio St.3d 327, 2016-Ohio-8252, 75 N.E.3d 141, ¶ 11 (the Ohio Constitution's Equal Protection Clause may be "stronger than" the federal Equal Protection Clause); *Arnold v. Cleveland*, 67 Ohio St.3d 35, 42, 616 N.E.2d 163 (1993) ("As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal Bill of Rights, [they] are unrestricted in according greater civil liberties and protections to individuals and groups" under their state constitutions).

{¶ 329} At least one state court interpreting a state constitution has reached a conclusion contrary to that in *Rucho*. A three-judge panel of a Superior Court of North Carolina held that claims of political gerrymandering are justiciable under the equal-protection, freedom-of-speech, and free-association guarantees of the North Carolina Constitution. *See Common Cause v. Lewis*, N.C.Super. No. 18 CVS 014001, 2019 WL 4569584, *3 (Sept. 3, 2019).

{¶ 330} The OOC also cites two other cases in which state courts held that partisan gerrymandered plans violated provisions of their state's constitutions. *See League of Women Voters v. Commonwealth*, 645 Pa. 1, 178 A.3d 737 (2018); *League of Women Voters of Florida v. Detzner*, 172 So.3d 363 (Fla.2015). These cases were *not* decided on state equal-protection, freedom-of-assembly, or freedom-of-speech grounds. The Pennsylvania case was decided under the Free and Equal Elections Clause of the Pennsylvania Constitution (a provision that the Ohio Constitution lacks). *See Commonwealth* at 97, fn. 63. And the Florida case was decided under that state's Fair Districts Amendment to the Florida Constitution, a provision that bears some similarities to Article XI, Section 6 of the Ohio Constitution. *See Detzner* at 369-370, 375; Florida Constitution, Article III, Section 20(a) ("No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent").

{¶ 331} The OOC asserts that the Ohio Constitution's Equal Protection Clause grants citizens the "right to vote on equal terms." Although those words are *not* in the Ohio Constitution, the OOC argues that the guarantee arises from the statement in Article I, Section 2, that Ohio voters "have the right to alter, reform, or abolish" their government. They reason that "the most common way in which the people alter or reform their government is by voting for representatives who will enact different policy preferences into statutory law."

{¶ 332} In support, the OOC cites *Hamilton v. Fairfield Twp.*, 112 Ohio App.3d 255, 266, 678 N.E.2d 599 (12th Dist.1996), a case in which the court of appeals struck down a statute allowing a township to unilaterally form a municipality without the consent of its voters. The court invalidated the statute because "the right to vote or otherwise choose whether to form a municipal corporation is a fundamental right guaranteed by Section 2, Article I of the Ohio Constitution." *Id*. at 275. The OOC also relies on *State ex rel. Skaggs v. Brunner*, 120 Ohio St.3d 506, 2008-Ohio-6333, 900 N.E.2d 982, in which this court held that the secretary of state could not order one county to apply a standard unique to the county for the rejection of provisional ballots. *Id.* at ¶ 63. In support of that conclusion, this court stated, " 'The right to vote includes the right to have one's vote counted on equal terms with others.' " *Id*. at ¶ 58, quoting *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir.2008).

{¶ 333} With such arguments, the OOC makes an absolutely unconvincing case that Ohio's Equal Protection Clause provides the manageable standards of review that its federal counterpart lacks. First, the OOC's argument that the right to "alter, reform, or abolish" the government translates to the "right to vote on equal terms" is attenuated; the OOC provides no support for its claim that voting for legislative representatives is the "most common" way that Ohioans reform their government. Indeed, the principal case that the OOC relies on, *Hamilton*, involved the right to vote on the *form* of government (whether to create a municipality), not

136

the right to vote for representatives within an existing form of government.  *See Hamilton* at 275.  And *Skaggs* dealt with inequality in the rules governing whether votes were to be *counted or not counted*.  *Skaggs* at ¶ 63.  Inequality in the relative weight of those votes was not at issue.  And finally, the right to "alter, reform, or abolish" the government is actuated by Ohio voters amending the Constitution, not by electing different representatives to the current government.  The OOC thus has not shown that it has a viable claim arising under Ohio's Equal Protection Clause.

{¶ 334} The OOC also has not shown that it has a viable claim under Ohio's Right to Assemble or Freedom of Speech Clauses.  It points out the linguistic differences between the First Amendment to the United States Constitution and Article I, Sections 3 and 11 of the Ohio Constitution.  That is, the federal Constitution contains prohibitory language—"Congress shall make no law * * * abridging the freedom of speech * * * or the right of the people peaceably to assemble," First Amendment to the United States Constitution—while the Ohio Constitution contains affirmatively phrased guarantees—"[t]he people have the right to assemble," Ohio Constitution, Article I, Section 3; "[e]very citizen may freely speak," *id.* at Section 11.  But the OOC concedes that in other contexts, this court has interpreted these Ohio provisions coextensively with federal law and has never considered these Ohio provisions in connection with redistricting.  The OOC makes no case for finding any more specific or manageable standards applicable to reviewing partisan-gerrymandering claims under Ohio's Right to Assemble and Freedom of Speech Clauses than their federal counterparts.

{¶ 335} The OOC has failed to identify support allowing this court to decide that the Ohio Constitution provides greater protection than the federal Constitution against partisan gerrymandering by way of Ohio's Equal Protection, Right to Assemble, or Freedom of Speech Clauses.  Because the OOC has not set forth a convincing argument for deciding this case under Article XI, Section 3(B)(2), this court is compelled to reject its Section 3(B)(2) claims.  We accordingly would be

required to uphold the four-year plan for failure to establish a violation of Article XI, Section 2, 3, 4, 5, or 7, even if we had the authority to review the four-year plan.

### III. Even if this court could review the district plan for a violation of Article XI, Section 6 in these cases, no violation of that section has been proved beyond a reasonable doubt

{¶ 336} Although I do not believe that this court should reach the merits of petitioners' arguments, given that we do not have the constitutional authority to do so, I note that in addition to the OOC's failure of to establish its claimed violation of Article XI, Section 3(B)(2), the petitioners in all three cases have generally failed to meet the applicable burden of proof. Because it is apparent that the petitioners in these cases have not met their burden of proving that the district plan is unconstitutional beyond a reasonable doubt, I must address the majority opinion's flawed analysis of the merits of the claims. To reach a desired conclusion, the majority opinion ignores this court's well-established precedent in reaching the desired result.

{¶ 337} This court interprets the language of a constitutional provision de novo. While we may be swayed by an interpretation presented by the parties, we give no deference to and are not bound by those interpretations; the proper interpretation of a constitutional provision is a duty that lies entirely with this court, as it is purely a question of law. *See State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 9 (questions of law are reviewed de novo); *Wilson*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, at ¶ 13 (the same rules for interpreting statutes apply to interpreting constitutional provisions). Nevertheless, while this court interprets a constitutional provision de novo, this does not diminish petitioners' burden of proof.

{¶ 338} Generally, the party who makes a facial constitutional challenge to a legislative act has the burden of proving that the legislative act is unconstitutional beyond a reasonable doubt, the highest standard of proof in our legal system. *See*

*State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 128 N.E.2d 59 (1955), paragraph one of the syllabus; *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 21. This important standard of proof is derived from the *Dickman* decision and has remained unchanged since that case was decided in 1955. This court has consistently and repeatedly cited *Dickman* for this standard. *See, e.g.*, *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16. Our recent caselaw concerning legislative redistricting employs that analysis. *See Wilson* at ¶ 23-24.

{¶ 339} The beyond-a-reasonable-doubt standard prevents this court from becoming a policymaking branch of this state's government and helps to maintain the separation of powers inherent in the Ohio Constitution. And the reasoning behind this standard is to avoid, whenever possible, a constitutional crisis in this state. *See State ex rel. Swetland v. Kinney*, 69 Ohio St.2d 567, 576, 433 N.E.2d 217 (1982) (the sanctity of legislative enactments is firmly entrenched in our judicial system); *see also Holeton v. Crouse Cartage Co.*, 92 Ohio St.3d 115, 135, 748 N.E.2d 1111 (2001) (Moyer, C.J., dissenting); The Federalist No. 78, at 468-469 (Alexander Hamilton) (Clinton Rossiter Ed.1961) ("The courts must declare the sense of the law; and if they should be disposed to exercise will instead of judgment, the consequence would equally be the substitution of their pleasure to that of the legislative body").

{¶ 340} This high standard applies in these cases because, under our precedent, a plan adopted by the redistricting commission must be considered a legislative act. *See Wilson*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, at ¶ 20. In *Wilson*, this court determined that the plans created by the Ohio Apportionment Board—the body then responsible for drawing Ohio's legislative-district maps—should be considered legislative acts because redistricting has been primarily and historically a legislative function. *Id.* We now have the same

situation that we faced in *Wilson*, and redistricting is still an historically legislative function. It would be unreasonable to apply a different standard. Therefore, the district plan must be treated as a legislative act. And because redistricting is a legislative act, the presumption of constitutional validity applies. *See id.* at ¶ 21. Thus, petitioners must prove that the plan is unconstitutional beyond a reasonable doubt. Although the majority opinion acknowledges this standard, *see* majority opinion at ¶ 77, the analysis set forth in the majority opinion falters in applying the standard.

{¶ 341} This court has determined that for a party to succeed on a facial constitutional challenge, the party must demonstrate beyond a reasonable doubt that there is no plausible interpretation of the challenged provision under which the provision would be valid. *See Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37. The court in *Collier*, relying on *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), stated, "The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid." *Collier* at ¶ 37. This court reaffirmed that principle in *Ohio Grocers Assn. v. Levin*, 123 Ohio St.3d 303, 2009-Ohio-4872, 916 N.E.2d 446, ¶ 24. In *Ohio Grocers Assn.*, the court determined that when there are two plausible interpretations of a statute, under one of which the statute is constitutional and under the other it is unconstitutional, the challenging party cannot as a matter of law demonstrate beyond a reasonable doubt that the statute is unconstitutional on its face. *See id.*; *see also State v. Aalim*, 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862, ¶ 36 (Kennedy, J., concurring in part and dissenting in part), *vacated on other grounds after reconsideration*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883.

{¶ 342} Important here, this court in *Ohio Grocers Assn.* specifically recognized that there were competing plausible readings of the legislative act at issue and that the act could thus not be found unconstitutional beyond a reasonable

doubt. *Id.* at ¶ 24. This principle directly informs our analysis in these cases. We have recognized that "it is not enough to show that one plausible reading requires [the legislative act] to be stricken as unconstitutional, when another plausible reading permits it to survive." *Id.*; *see also Collier* at ¶ 37.

{¶ 343} After reviewing the evidence in these cases, the majority opinion and the first dissenting opinion reach different conclusions. The majority opinion proposes a plausible reading of the district plan under which the plan is unconstitutional. Majority opinion at ¶ 131. However, the first dissenting opinion sets forth a competing plausible reading under which the plan is constitutional, determining that the evidence indicates that the redistricting commission made an effort to comply with Article XI, Section 6. Dissenting opinion of Kennedy, J., at ¶ 247-251. The plausibility of the majority opinion's interpretation finding the plan unconstitutional and the plausibility of the first dissenting opinion's interpretation finding the plan constitutional necessitates, under longstanding Ohio precedent, the conclusion that petitioners cannot, as a matter of law, show beyond a reasonable doubt that the plan is unconstitutional. Petitioners have not met their burden of proof, and thus their claims must fail. For the majority opinion to hold otherwise means that, in effect, nearly every case cited in this section of this opinion must be overruled or considered to be of no precedential value. The majority opinion's analysis ignores and undermines Ohio law as we know it.

{¶ 344} For the reasons stated above and given the evidence before us in these cases, I would conclude that if we could address the Article XI, Section 6 arguments on the merits, which we are not permitted to do but the majority opinion does anyway, petitioners have still failed to establish a constitutional violation beyond a reasonable doubt.

## IV. Conclusion

{¶ 345} Contrary to the assertion set forth in the majority opinion, my overriding concern in these cases is not the outcome of the majority's analysis.

Instead, the most troubling aspect of the majority opinion is that it engages in a merits analysis when Article XI contains no provision making four-year plans subject to Article XI, Section 9, which leaves this court with no authority to review four-year plans. Critically, the citizens of Ohio voted for the specific language and text of Article XI, and this court must enforce the Ohio Constitution as written. By ignoring the fact that there is no "except" language contained in Article XI, Section 8(C)(1)(a), the majority opinion undermines the independence, impartiality, and integrity of this court. It is fundamental that this court will not consider a constitutional challenge that is not properly before it and will consider a constitutional challenge only when it has no other choice. *See Greenhills Home Owners Corp. v. Greenhills*, 5 Ohio St.2d 207, 212, 215 N.E.2d 403 (1966) ("a court will not exercise its power to determine the constitutionality of a legislative enactment unless it is absolutely necessary to do so").

{¶ 346} Notably, neither the majority opinion nor either of the two concurring opinions attempts to answer the basic question raised in this opinion: If Article XI, Section 8(B) (ten-year plan adopted after an impasse), which is the paragraph immediately preceding Section 8(C)(1)(a) (four-year plan adopted after an impasse), and Section (8)(C)(1)(b) (six-year plan adopted after an impasse), which is the paragraph immediately following Section 8(C)(1)(a), both include the language "except as provided in Section 9 of this article," what does the omission of that same language from Section 8(C)(1)(a) mean? Moreover, if, as the majority opinion argues, Article XI, Sections 9(A) and 9(B) somehow override the conscious decision to omit that language from Section 8(C)(1)(a), why would Section 8(C)(1)(a) even need to exist in the Ohio Constitution? For that matter, why would Sections 8(B) and 8(C)(1)(b) need to exist in the Constitution if Sections 9(A) and 9(B) always apply?

{¶ 347} Most importantly, neither the majority opinion nor either of the concurrences accords appropriate significance to the fact that the complaints filed

in all three of these cases and petitioners' arguments during oral argument demonstrate that the bases for these cases are the impasse procedures under Article XI, Section 8. Why do the majority and concurring opinions ignore the specific allegations underlying the entirety of these cases? The reason is simple. The honest and reasonable answers to those questions would undermine the entirety of those opinions.

{¶ 348} There may be more than a little irony in the majority opinion—which shies away from the text and structure of Article XI that was added to the Constitution by a 2015 amendment that passed with 71 percent of the vote, *see* Ohio Secretary of State, Statewide Issue History—being supported by two concurring opinions suggesting that the state of Ohio should consider amending the Constitution to create a so-called "independent redistricting commission," concurring opinion of Brunner, J., at ¶ 180; *see* concurring opinion of O'Connor, C.J., which is a concept that Ohio voters soundly rejected in 2012 by 63 percent of the vote, *see* Ohio Secretary of State, Statewide Issue History. As required by my oath to this office, I will stick with both the enacted Article XI, which received bipartisan support, and with the voters of Ohio who overwhelmingly approved its text, and I will avoid entering the discussion of the "independent redistricting commission" concept, which was decidedly rejected by the citizens of Ohio after the 2011 redistricting process and which involves policy issues beyond the scope of the cases presently before us.

{¶ 349} By reaching the merits of these cases even though this court lacks the authority to do so—and our authority is established by the Ohio Constitution—the majority opinion makes this court less independent, as it now becomes a policymaking part of Ohio's government, a role belonging to the General Assembly. And it effectively becomes a third policymaking arm of Ohio's government, and thus less impartial, as policy must be debated under the Ohio Constitution by all Ohioans through their elected representatives, whether the

representatives are legislators or administrators in the executive branch of the government.

{¶ 350} The saddest and worst result for the citizens of Ohio due to the majority opinion's reaching the merits of these cases in order to formulate policy—a role that this court is not designed to do—is that the majority opinion undermines the integrity and good reputation of this court. The majority opinion undercuts the citizens' support of this institution as the ultimate and final arbiter of the law, particularly the Ohio Constitution, as written. By making a policy decision instead of looking only at the words of the Constitution, the majority opinion abdicates this court's responsibility to the citizens of Ohio and makes this court a "super legislative" branch of the government less worthy of Ohioans' trust.

{¶ 351} The majority opinion's constitutional analysis is not logical, is not reasoned, and does not properly construe the text of the Constitution, and thus it undermines confidence in this court. The resulting lack of the citizens' support will harm the judicial branch of Ohio's government for generations. Therefore, I respectfully, and sadly, must dissent.

————————————

ACLU of Ohio Foundation, Inc., Freda J. Levenson, and David J. Carey; American Civil Liberties Union, Alora Thomas, and Julie A. Ebenstein; and Covington & Burling, L.L.P., Robert D. Fram, Donald Brown, Joshua González, Juliana Goldrosen, David Denuyl, L. Brady Bender, Alexander Thomson, Anupam Sharma, James Hovard, and Yale Fu, for petitioners in case No. 2021-1193.

McTigue & Colombo, L.L.C., Donald J. McTigue, and Derek S. Clinger; and Elias Law Group, L.L.P., Abha Khanna, Ben Stafford, Aria C. Branch, Jyoti Jasrasaria, and Spencer W. Klein, for petitioners in case No. 2021-1198.

Reed Smith, L.L.P., Peter M. Ellis, M. Patrick Yingling, Brian A. Sutherland, Ben R. Fliegel, Brad A. Funari, and Danielle L. Stewart; and Brennan Center for Justice at New York University School of Law, Alicia L. Bannon, Yurij

Rudensky, Michael Li, Harry Black, and Ethan Herenstein, for petitioners in case No. 2021-1210.

Dave Yost, Attorney General, and Organ Law, L.L.P., Erik J. Clark, and Ashley Merino, special counsel to Attorney General Dave Yost, for respondent Ohio Redistricting Commission.

Dave Yost, Attorney General, and Bridget C. Coontz, Julie M. Pfeiffer, and Michael A. Walton, Assistant Attorneys General, and Michael J. Hendershot, Deputy Solicitor, for respondents Ohio Governor Mike DeWine, Ohio Secretary of State Frank LaRose, and Ohio Auditor Keith Faber.

Taft Stettinius & Hollister, L.L.P., W. Stuart Dornette, Beth A. Bryan, and Philip D. Williamson; and Nelson Mullins Riley & Scarborough, L.L.P., Phillip J. Strach, Thomas A. Farr, John E. Branch III, and Alyssa M. Riggins, for respondents Senate President Matt Huffman and Speaker of the House Robert Cupp.

Ice Miller, L.L.P., Diane Menashe, and John Gilligan, for respondents Senator Vernon Sykes and House Minority Leader Emilia Sykes.

Thompson Hine, L.L.P., Stephanie M. Chmiel, and Mary E. Csarny, urging granting of relief for amicus curiae David Niven, Ph.D.

Andrew W. Garth, City Solicitor, Emily Smart Woerner, Deputy City Solicitor, and Shannon Price, Assistant City Solicitor, urging granting of relief for amicus curiae city of Cincinnati.

Ulmer & Berne, Steven S. Kaufman, Dolores P. Garcia Prignitz, and Sara S. Dorland; and Rob Weiner, Chris Lamar, and Valencia Richardson, urging granting of relief for amicus curiae Campaign Legal Center, in case No. 2021-1193.

The Chandra Law Firm, L.L.C., Subodh Chandra, and Donald Screen; and NAACP Office of the General Counsel, Janette McCarthy Wallace, urging granting of relief for amicus curiae Ohio State Conference of the NAACP, in case Nos. 2021-1193 and 2021-1210.

John M. Haseley, urging granting of relief for amicus curiae We Are Ohio, in case No. 2021-1193.

Isaac, Wiles & Burkholder, L.L.C., Donald C. Brey, and Ryan C. Spitzer, urging denial of relief for amicus curiae Renew Ohio.

_____